UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

| | |
|---|---|
| ADETAYO ADEDIPE on behalf of herself individually, and on behalf of all others similarly situated, | Court File No. |
| **Plaintiff,** | |
| vs. | |
| U.S. BANK, NATIONAL ASSOCIATION, NUVEEN ASSET MANAGEMENT, LLC, as successor in interest to FAF ADVISORS, INC., RICHARD K. DAVIS, DOUGLAS M. BAKER, JR., Y. MARC BELTON, PETER H. COORS, JOEL W. JOHNSON, OLIVIA F. KIRTLEY, O'DELL M. OWENS, CRAIG D. SCHNUCK, ARTHUR D. COLLINS, JR., VICTORIA BUYNISKI GLUCKMAN, JERRY W. LEVIN, DAVID B. O'MALEY, PATRICK T. STOKES, RICHARD G. REITEN, WARREN R. STALEY, ANDREW J. CECERE, TERRANCE R. DOLAN, and JOHN and JANE DOE 1-20, | **CLASS ACTION COMPLAINT** |
| **Defendants.** | |

---

Plaintiff, Adetayo Adedipe, on behalf of herself and all others similarly situated, by and through her counsel, alleges as follows:

## I.     NATURE OF THE ACTION

1.     Plaintiff, a participant in the U.S. Bancorp ("U.S. Bancorp" or the "Company") Pension Plan (the "Plan"), brings this class action on behalf of the Plan pursuant to § 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), against Plan fiduciaries for violations of ERISA arising out of their policy and practices with respect to the investment of the Plan's assets.  From at least September 30, 2007 to December 31, 2010 (the "Class Period"), the Defendants

caused the Plan to invest approximately 100% of its assets in one asset class, equities (the "Investment Allocation Strategy").   This inappropriately risky and undiversified Investment Allocation Strategy, which served the interest of the Defendants rather than the Plan and its participants, exposed the assets of the Plan to risk of large loss and caused significant losses to the Plan.   By comparison, the average asset allocation for the top 100 defined benefit plan plans at year end 2007 was: 59% equities, 30% fixed income/debt securities, 1% cash, 3% real estate and 7% other asset classes.

2.      As a result of the several violations of ERISA committed by Defendants, the Plan lost $1.1 billion in 2008 and plummeted from being 144% funded at the end of 2007 to being 84% funded at the end of 2008.

3.      Beginning in April 2007, two new committees of Named Fiduciaries were named for the Plan: the U.S. Bancorp's Compensation Committee (the "Compensation Committee") and the U.S. Bancorp Investment Committee (the "Investment Committee").   These committees were charged with, among other things, (i) determining the type and allocation of the Plan's investments; (ii) selecting, monitoring, and terminating Plan investments; (iii) appointing, monitoring, and terminating Plan investment managers; and (iv) selecting, monitoring, and terminating Plan investment advisors.

4.      Following their appointment, the Compensation Committee Defendants and the Investment Committee Defendants failed to adequately monitor the Plan's investments and failed to take appropriate steps to remove the Plan's Investment Manager, FAF Advisors, which was a subsidiary of U.S. Bancorp.   Specifically, throughout the Class Period, the Committee Fiduciaries permitted and/or caused FAF Advisors to continue to invest the Plan's assets in an imprudent, disloyal, and undiversified Investment Allocation Strategy.   This strategy served the Company and FAF Advisors' own interest to the detriment of the Plan and its participants, because FAF

invested (i) over 40% of the Plan's assets, or $1.25 billion, in its own mutual funds, and (ii) the remainder of the portfolio in equity securities which supported FAF Advisors' own securities lending program (the "SLP").

5.     By permitting FAF Advisors to engage in these imprudent and self-interested investment practices during the Class Period, the Compensation and Investment Committee Defendants caused the Plan to be 100% invested in equities, either in direct stock holdings or through mutual funds managed by FAF Advisors, which served the Company's interest.   The Compensation and Investment Committee Defendants' failed to prudently and loyally balance the need to generate investment returns with the need to safeguard principal through proper risk management and diversification among different asset classes.   As a result, the Compensation and Investment Committee Defendants and FAF Advisors caused the Plan to be 100% invested in equities, which exposed the Plan to the risk of large losses and ultimately caused devastating losses of over $1.1 billion in 2008.

6.     The Plan also participated in FAF Advisors' securities lending program, whereby FAF Advisors also acted as a Plan fiduciary by directing the re-investment of the Plan's cash collateral received from third parties who borrowed the Plan's equity securities through the SLP.  As explained below, FAF Advisors had a duty to reinvest the Plan's cash collateral only in conservative, high quality, low risk investments (akin to money market funds) so as to fully protect the collateral from principal losses.  Despite these obligations, FAF Advisors invested the collateral the Plan received in two securities lending portfolios (the "Mount Vernon Portfolios"), which were also managed by FAF and invested in highly risky, low quality assets-backed commercial paper issued by three structured investment vehicles ("SIVs") that were backed by toxic subprime mortgage and Alt-A securities.  Prior to and throughout the Plan's investment in the Mount Vernon Portfolios, FAF Advisors did not conduct an adequate independent investigation into the

nature and quality of the assets backing the SIVs in which the Mount Vernon Portfolios were invested.  After the SIVs defaulted in 2007, FAF Advisors engaged in fraudulent transfers of losses from one Mount Vernon Portfolio in order to preserve its reputation.

7.     As a result of FAF Advisors' mismanagement and fraudulent acts, the Plan collateral held under securities lending arrangements declined in value by more than $14 million in 2008.

8.     By March 2008, the Compensation Committee possessed clear and convincing evidence that FAF Advisors had breached its fiduciary duties to the Plan by imprudently and disloyally investing Plan's securities lending collateral.  Based on an internal investigation of the SLP, the Compensation Committee also knew that, after the SIVs defaulted in 2007, FAF Advisors engaged in fraudulent transfers of losses from one of its funds to another in order to preserve its reputation.

9.     By March 2008, the Compensation Committee should have removed FAF Advisors to safeguard the Plan's principal and replaced FAF Advisors with a prudent and loyal fiduciary.  Nonetheless, the Compensation Committee continued to retain FAF Advisors to manage the Plan; this arrangement indirectly benefited the Company.  In so doing, the Compensation Committee continued to permit FAF Advisors to manage the Plan's assets in an overly aggressive and undiversified manner and to keep the Plan's assets 100% invested in equities, a significant portion of which were directly invested in FAF Advisor's own mutual funds.

10.     The Compensation and Investment Committee Defendants maintained the overly risky, imprudent, and disloyal Investment Allocation Strategy until the Company's self-interest in having its own subsidiary manage the multi-billion Plan was removed when the Company sold FAF Advisors in December 2010.  Thereafter, in 2011, the Committee Fiduciaries began to diversify the investment of the Plan's assets by devoting a portion of the Plan's assets to fixed income securities.  By 2012, the Committee

Fiduciaries had diversified the Plan's assets by reducing the allocation to equities to 75% and including a 20% allocation to fixed income securities and 5% allocation to real estate.

11.     During the Class Period, the Defendants breached their fiduciary and co-fiduciary duties in several ways.  Defendants failed to act solely in the interest of participants and beneficiaries of the Plan by pursuing and/or permitting the pursuit of an Investment Allocation Strategy which served the interest of the Company and FAF Advisors rather than the Plan and its participants.  Defendants also failed to act with care, skill, prudence, and diligence by diversifying the assets of the Plan so as to minimize the risk of large losses in violation of Section 404(a)(1)(A), (B), and (C) of ERISA, 29 U.S.C. § 1104(a)(1)(A),(B), and (C).  Defendants also engaged in prohibited transactions and dealt with the assets of the Plan in their own interest in violation of Sections 406(a) and (b) of ERISA, 29 U.S.C. § 1106(a) and (b).

12.     Further, the Compensation Committee, Investment Committee Defendants and the Board of Direct Defendants failed to periodically monitor the Plan's investments and to promptly remove FAF Advisors after it became known that FAF Advisors had engaged in fraudulent transfers of assets and imprudently and disloyally invested the Plan's assets.

13.     To remedy these breaches, Plaintiff brings this action pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109 and 1132(a), to recover losses to the Plan for which Defendants are personally liable, to disgorge any unjust profits received by certain Defendants, and for such other equitable relief against the Defendants as may be appropriate including, without limitation, injunctive relief, a court-appointed fiduciary, constructive trust, restitution, equitable tracing, and other monetary relief to make the Plan whole.

14.     Plaintiff's allegations in this Complaint are based upon her own personal information and the investigation of Plaintiff's counsel, which included a review of the available documents governing the operations of the Plan, U.S. Bancorp's filings with the U.S. Securities and Exchange Commission ("SEC"), and the Plan's Forms 5500s filed with the U.S. Department of Labor ("DOL") by U.S. Bancorp.  Because most of the information and documents on which Plaintiff's claims are based are in Defendants' possession, certain of Plaintiff's allegations are by necessity made upon information and belief.  At such time as Plaintiff has the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint.

## II.       JURISDICTION AND VENUE

15.     **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132 (e)(1).

16.     **Personal Jurisdiction**.  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132 (e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States, and this Court therefore has personal jurisdiction over them.

17.     **Venue**.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132 (e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and several Defendants, including U.S. Bank National Association, Douglas M. Baker, Y. Marc Belton, and Richard K. Davis, reside, regularly conduct business, or otherwise may be found here.

## III.   PARTIES

### A.   Plaintiffs

18.   **Plaintiff Adetayo Adedipe** is a participant of the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).   Plaintiff Adedipe was credited with five years of service under the Plan prior to terminating her employment with U.S. Bank/U.S. Bancorp on April 27, 2007, and was therefore a vested participant in the Plan who is now entitled to receive a Normal Retirement Benefit under the Plan starting in January 1, 2022. Plaintiff Adedipe is a resident of Lathrop, California.

### B.   Defendants

19.   **Defendant U.S. Bank, National Association** ("U.S. Bank, N.A."), located at 180 East Fifth Street St. Paul, MN 55164, is a national banking association organized under the laws of the United States and it is a wholly owned subsidiary of U.S. Bancorp. U.S. Bank, N.A., as the Plan Trustee, is a Named Fiduciary of the Plan within the meaning of ERISA Section 402(a), 29 U.S.C. §§ 1102(a), having been so designated in the U.S. Bancorp Pension Plan (2002 Restatement) adopted and approved   by U.S. Bancorp on December 27, 2002   (hereinafter the "Plan Document").

20.   **Defendant Nuveen Asset Management, LLC, successor in interest to FAF Advisors, Inc.**, is an asset management firm organized under the laws of the State of Delaware, with a principal place of business at 333 W. Wacker Drive, Chicago, IL, 60606.   Nuveen Asset Management, LLC acquired FAF Advisors, Inc. from U.S. Bancorp in or around July 2010.   During the Class Period, FAF Advisors acted as the Plan's Investment Manager and managed all of the Plan's investments.   FAF Advisors also managed the First American family of mutual funds in which up to $1.25 billion of the Plan's assets were invested during the Class Period.

*The U.S. Bancorp Board of Directors Defendants*

21.    The U.S. Bancorp Board of Directors has the power to appoint and remove members of the U.S. Bancorp Compensation Committee.  Upon information and belief, the U.S. Bancorp Board of Directors also has the power to appoint and remove members of the Investment Committee.

22.    **Defendant Richard K. Davis** is currently the Chief Executive Officer, Chairman of the Board of Directors, and President of U.S. Bancorp.  Mr. Davis has served as U.S. Bancorp's CEO since December 2006; as the Chairman of the Board of Directors since December 2007; and as President since October 2004.

23.    **Defendant Douglas M. Baker, Jr**. is currently a Director of U.S. Bancorp and has served in this position since January 2008.

24.    **Defendant Y. Marc Belton** is currently a Director of U.S. Bancorp and has served in this position since March 2009.

25.    **Defendant Richard G. Reiten** served as Director of U.S. Bancorp from approximately 1998 until 2012.  Mr. Reiten is the former Chief Executive Officer at Northwest Natural Gas Co.  Mr. Reiten was a Director throughout the Class Period.

26.    **Defendant Warren R. Staley** served as a Director of U.S. Bancorp in at least 2006 – 2007.  Mr. Staley is the former Chief Executive Officer of Cargill, Inc., of Minneapolis Minnesota.

27.    **Defendant Andrew J. Cecere** served as a Director of U.S. Bancorp from at least 2007 – 2010.  Mr. Cecere is currently the Vice Chair and Chief Financial Officer at U.S. Bancorp, and he has held numerous senior financial executive financial positions with U.S. Bancorp and its predecessor entities.

28.    **Defendant Terrance R. Dolan** served as a Director of U.S. Bancorp from at least 2007 – 2009.  Mr. Dolan currently is the Vice Chairman of Wealth Management

& Securities Services at U.S. Bancorp, where he has also served in other executive financial positions.

29.    **Defendant Craig E. Gifford** served as a Director of U.S. Bancorp in at least the year 2010.  He is currently the Executive Vice President, Controller and Chief Accounting Officer at U.S. Bancorp.

30.    **Defendant Joel W. Johnson** is currently a Director of U.S. Bancorp and has served in this position since 1999.  Mr. Johnson was a Director throughout the Class Period.

31.    **Defendant Olivia F. Kirtley** is currently a Director of U.S. Bancorp and has served in this position since October 2006.  Ms. Kirtley is a certified public accountant, and has previously served as a member of the Compensation and Audit Committees of the Papa John's International, Inc. Board of Directors.

32.    **Defendant O'Dell M. Owens, M.D., M.P.H.**, is currently a Director of U.S. Bancorp and has served in this position since 1991.  Mr. Owens was a Director throughout the Class Period.

33.    **Defendant Craig D. Schnuck** is currently a Director of U.S. Bancorp and has served in this position since 2002.  Mr. Schnuck was a Director throughout the Class Period.  From 1979 to 1991, Mr. Schnuck served as bank director for various predecessor banks of U.S. Bank.

34.    Defendants Davis, Baker, Belton, Reiten, Staley, Cecere, Dolan, Gifford , Johnson, Kirtley, Owens, Schnuck, and the Compensation Committee Defendants identified below, who, on information and belief, are all members of the U.S. Bancorp Board of Directors, are collectively referred to as the "Board of Director Defendants."

*The U.S. Bancorp Compensation Committee Defendants*

35.     At all times during the Class Period the Compensation Committee was a Named Fiduciary of the Plan, within the meaning of ERISA Section 402(a), 29 U.S.C. §§ 1102(a), having been so designated in the Fifth Amendment to the Plan Document.  In or around 2009, the Compensation Committee was re-named the "Compensation and Human Resources Committee."  Plaintiff will refer to this Committee throughout the Class Period as the "Compensation Committee."

36.     **Defendant Peter H. Coors** served as a Director of U.S. Bancorp in at least 2006 – 2007, and served as a member of the Compensation Committee in 2007.  Mr. Coors is Chairman of the Molson Coors Brewing Company and Chairman of MillerCoors.

37.     **Defendant Arthur D. Collins, Jr.** has been a member of the U.S. Bancorp Compensation Committee from at least 1996 to the present.  He has been a Senior Advisor at Oak Hill Capital Partners, which he joined in 2009.  Mr. Collins consults across Oak Hill Capital's private equity portfolio.

38.     **Defendant Victoria Buyniski Gluckman** has been a member of the U.S. Bancorp Compensation Committee from at least 1990 to the present.

39.     **Defendant Jerry W. Levin** has been a member of the U.S. Bancorp Compensation Committee from at least 1995 to the present.  Levin is currently the Chair of the Compensation Committee.  Levin serves as the Chairman of the Board and Chief Executive Officer at JW Levin Partners LLC and JWL Partners Acquisition Corp.

40.     **Defendant David B. O'Maley** has been a member of the U.S. Bancorp Compensation Committee from at least 1995 to the present.  Since 1994, Mr. O'Maley has served as an Executive Chairman of Ohio National Mutual Holdings Inc. and various

affiliates, including Ohio National Financial Services Inc. and Ohio National Life Insurance Co.

41.     **Defendant Patrick T. Stokes** has been a member of the U.S. Bancorp Compensation Committee from at least 1992 to the present.

42.     **John and Jane Doe 1-10.**  To the extent that persons other than the individual Compensation Committee Defendants served on the U.S. Bancorp Compensation Committee during the Class Period or had responsibilities with respect to the investment or management of Plan assets during the Class Period, they are named as Defendants John and Jane Doe 1-10.  Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

43.     Defendants Coors, Collins, Gluckman, Levin, O'Maley, Stokes, and John and Jane Does 1-10 all served as members of the Compensation Committee of the U.S. Bancorp Board of Directors during the Class Period and are collectively referred to as the "Compensation Committee Defendants."

### The U.S. Bancorp Investment Committee Defendants

44.     During the Class Period, the U.S. Bancorp Investment Committee was a Named Fiduciary of the Plan within the meaning of ERISA Section 402(a), 29 U.S.C. § 1102(a), having been so designated on or about April 20, 2007, in the Fifth Amendment to the Plan.

45.     **John and Jane Doe 11-20.**  Plaintiffs currently do not know the identities of the members of the Investment Committee during the Class Period.  As such, they are named as Defendants John and Jane Doe 11-20.   Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

## IV.    THE PLAN

46.    The Plan is an "employee pension benefit plan" as defined by ERISA § 3(2)(A) of 29 U.S.C. § 1002(2)(A).  The Plan is a noncontributory "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35), and a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  While the Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plan, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

47.    The purpose of the Plan is to provide a "monthly retirement income based on [a U.S. Bancorp employee's] pay and years of service."

48.    U.S. Bancorp and its subsidiaries make all contributions to the Plan.  For years ending December 31, 2006 – 2011, U.S. Bancorp was able to avoid making any minimum contributions to the Plan.

49.    During the Class Period, the Plan was maintained pursuant to the Plan Document effective as of January 1, 2002; this is one of the documents governing the Plan within the meaning of  ERISA Section 402(a)(1), 29 U.S.C. § 1102(a).

50.    *Trustee*. During the Class Period the assets of the Plan were maintained by the Trustee, U.S. Bank, N.A., in a Trust Fund governed by a "separate written instrument entitled 'U.S. Bank Pension Plan Trust Agreement' entered into by and between U.S. Bancorp and the Trustee as of January 1, 2002" (the "Pension Plan Trust Agreement"). Effective January 21, 2011, the assets of the Plan were merged with the assets of another pension plan and are currently held in trust under the Master Trust Agreement, U.S. Bank Pension Plan and U.S. Bank Union Pension Plan (the "Master Trust Agreement").

51.    According to the Plan Document as amended by the Fifth Amendment thereto, during the Class Period, U.S. Bank, N.A., as the Trustee, "had "the exclusive authority to manage and control the assets of the Plan held in trust and their custody and

shall not be subject to the direction of any person in the discharge of its duties…. except as provided in the Trust Agreement entered into between the Compensation Committee and the Trustee."

52.     As provided in the Plan Document, during the Class Period, the Plan's assets were held by the Trustee, U.S. Bank N. A., for the benefit of the participants and beneficiaries of the Plan in "a Fund for the purpose of receiving contributions made in support of the Plan, managing the assets of the Plan, paying the reasonable expenses of the Plan and disbursing benefits determined by the Benefits Administration Committee to be due under the Plan."

53.     ***Reversion of Fund Prohibited.***   The Plan Document expressly prohibits the reversion of Plan assets to the Company.  Specifically, the Plan Document states that the assets of the Plan "shall at all times be a trust fund separate and apart from the assets of the Company and no part thereof shall be or become available to the Company or to the creditors of the Company under any circumstances other those specified in this Plan Statement.  Prior to the termination of the Plan and except as permitted by ERISA and the Code …, it shall be impossible for any part of the corpus or income of the Fund to be used for, or diverted to, purposes other than for the exclusive benefit of Participants, joint annuitants and Beneficiaries[.]"

54.     ***Eligibility and Participation.***   Eligible employees automatically become participants in the Plan on the first January 1 or July 1 after they reach 21 years of age and have completed one year of service during which they worked 1,000 hours or more. Plan Sections 4.1, 3.1.3.

55.     Participants become 100% vested in the Plan after completing five years of vesting service; a year of vesting service is each calendar year in which a participant has 1,000 hours of service.

56.     According to the benefit statement provided to Plaintiff Adedipe by the Plan, Plaintiff has five years of service and based upon her average monthly income is entitled to receive "a monthly benefit of $159.93 under the Single Life Annuity form of payment at her normal Retirement Date of January 1, 2022 [or she] may elect to receive a reduced form of benefit beginning as early as December 1, 2012."

## V.     FIDUCIARY STATUS OF THE DEFENDANTS

57.     *Named Fiduciaries*.  ERISA requires every Plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a).

58.     Effective for plan years beginning on and after August 1, 2006, the Plan Document set forth the following "Named Fiduciaries":  The Trustee, the Benefits Administration Committee, the Compensation Committee, and the Investment Committee.

59.     *De Facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control with respect to management of such Plans or exercises any authority or control with respect to management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such Plans, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such Plans."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

60.     Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

**A.     The Fiduciary Status of the Compensation Committee Defendants**

61.     Pursuant to the operative Plan Document, during the Class Period the Compensation Committee Defendants were "responsible for (i) determining the types of investments in which the Fund is to be invested (i.e., equity versus bond), (ii) determining the allocation of the Fund to invest in each type of investment (i.e., 80% equity and 20% bond), (iii) selecting, monitoring and terminating the individual investments, (iv) selecting or establishing, monitoring, and terminating individual separate accounts for investment, (v) selecting, monitoring and terminating investment advisors, and (vi) selecting, monitoring and terminating the Trustee.  The Compensation Committee may hire an investment advisor or investment consultant to monitor the performance of investments and report to the Investment Committee and Compensation Committee."

62.     Throughout the Class Period, the Compensation Committee and the Compensation Committee Defendants were responsible for determining the Investment Allocation Strategy for the Plan, as well as evaluating Plan objectives, funding policies, and investment policies.

63.     At all relevant times, the Compensation Committee also had the power to select, monitor, and terminate the Plan Trustee, as well as the authority to select, monitor, and terminate investment advisors to the Plan.

64.     The Compensation Committee Defendants met multiple times a year throughout the Class Period to review and set the investment allocation for the Plan's assets.

65.     In light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), as well as de facto fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that each exercised discretionary

authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets.

**B.      The Fiduciary Status of Investment Committee Defendants**

66.      Pursuant to the operative Plan Document, during the Class Period the Investment Committee Defendants were responsible for (i) determining the amount of allocation of the Fund in an investment type (i.e., equity) to be invested in a targeted area within the investment type (i.e., large cap equity, small cap equity, international); (ii) allocating the amount of allocation in a targeted area to be invested in an individual investment or separate account (chosen from among the individual investments and separate accounts selected or established by the Compensation Committee for that type of investment), and (iii) monitoring the performance of investments.   The Investment Committee was responsible for approving and monitoring the performance of any investment managers or investment advisors of the Plan.

67.      In light of the foregoing duties, responsibilities, and actions, the Investment Committee Defendants (named as John and Jane Does 11-20) are named fiduciaries of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), as well as de facto fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that each exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets.

**C.      The Fiduciary Status of FAF Advisors**

68.      On information and belief, at all relevant times the Compensation Committee had the power to appoint one or more investment advisors/managers to manage all or a portion of the Trust Fund and to direct the Trustee with respect to the investment and reinvestment of assets.

69.     On information and belief, the Compensation Committee appointed FAF Advisors to serve as the investment advisor/manager to the Plan, or allowed FAF Advisors to so serve with respect to the Plan, throughout the Class Period.

70.     Beginning by at least January 1, 2007, FAF Advisors managed all of the Plan's investments including at least $1.25 billion of Plan assets which FAF Advisors invested in its own mutual funds.

71.     In addition, FAF Advisors acted as the Plan's securities lending agent pursuant to a contractual agreement, whereby the Plan loaned certain securities to qualified borrowers in exchange for collateral.  FAF Advisors was then responsible for re-investing this collateral on behalf of the Plan in order to generate investment fee income which FAF Advisors shared with the Plan.

72.     In light of the foregoing duties, responsibilities, and actions, FAF Advisors acted as a de facto fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plans' assets.

**D.     The Fiduciary Status of U.S. Bank, N.A.**

73.     Throughout the Class Period Defendant U.S. Bank, N.A. was the Trustee for the U.S. Bank Pension Plan.

74.     From at least 2007 to 2010, all of the assets of the U.S. Bank Pension Plan were held in trust by U.S. Bank, N.A., pursuant to the Pension Plan Trust Agreement entered into between U.S. Bancorp (the Company) and U.S. Bank, N.A.

75.     As Trustee of the Plan, U.S. Bank, N.A. had the authority to control, mange, invest, and reinvest the Trust Fund and possessed all powers, rights, and discretions generally possessed by trustees.

76.     As the Trustee, Defendant U.S. Bank N.A. is a named fiduciary of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), as well as de facto fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control with respect to management of the Plan and  exercised authority or control with respect to management or disposition of the Plan's assets held in the Trust Fund.

### E.     The Fiduciary Status of the Board of Director Defendants

77.     The U.S. Bancorp Board of Directors is empowered to select, appoint, and remove the members of the Compensation Committee, which held significant responsibilities with respect to the investment of the assets of the Plan:  Upon information and belief, during the Class Period, some or all of the Compensation Committee Defendants were selected, approved, appointed and/or subject to being monitored and replaced by the U.S. Bancorp Board of Directors.

78.      In light of the foregoing duties, responsibilities, and actions, the Board of Director Defendants are de facto fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plans' assets, through the Compensation Committee, and/or the Investment Committee.

## VI.     FACTUAL ALLEGATIONS

### A.     The Compensation Committee Defendants and the Investment Committee Defendants Maintained and/or Permitted the Plan to Maintain an Imprudent, Undiversified and Disloyal Investment Allocation Strategy

79.     By 2004, it was the investment strategy of the Plan to invest virtually all of the assets of the Plan in a portfolio consisting of 100% equities which was managed by FAF Advisors.

80.     After their appointment in about April 2007, the Compensation Committee Defendants and the Investment Committee Defendants, on information and belief, failed to conduct an adequate independent review of the prudence and diversification of the existing Investment Allocation Strategy, the individual investments of the Plan, or the adequacy of FAF Advisors' management of the Plan's assets.  Instead of exercising their own independent judgment regarding the prudence and diversification of the Plan's Investment Allocation Strategy and the adequacy of FAF Advisors' investment management decisions, the Compensation Committee and the Investment Committee Defendants continued to permit FAF Advisors to pursue the existing imprudent and non-diversified Investment Allocation Strategy whereby Plan assets were invested 100% in equities.

81.     By comparison, the average asset allocation for the top 100 defined benefit plan plans at year end 2007 was: 59% equities, 30% fixed income/debt securities, 1% cash, 3% real estate and 7% other asset classes.

82.     As U.S. Bancorp itself disclosed in its SEC filings, a typical investment allocation for a pension plan would devote approximately 62% to equities and include substantial investments in debt securities.  Despite this fact, year after year from 2007 to 2010, the Compensation Committee and the Investment Committee Defendants failed to adequately monitor the Plan's investments and failed to select a prudent and diversified investment strategy that protected the Plan's principal.   Year after year, the Compensation Committee Defendants and Investment Committee Defendants made the imprudent decision to continue the existing Plan Investment Allocation Strategy of investing nearly 100% of the Plan's assets in equities.

83.     The failure to include any other asset classes (such as bonds/fixed income or real estate) was contrary to the Compensation Committee Defendants' and Investment

Committee Defendants' obligation to prudently manage the assets Plan and to diversify the investment of the Plan to avoid the risk of large losses.

**B.     The Plan's Investment Allocation Strategy Benefitted the Plan Sponsor While Exposing the Plan to Excessive Risk of Loss**

84.     Additionally, by permitting the Plan to pursue an imprudent and non-diversified Investment Allocation Strategy, the Compensation Committee Defendants and the Investment Committee Defendants failed in their obligation to act solely in the interest of the Plan and for the exclusive purpose of providing benefits to the Plan and its participants and defraying reasonable Plan expenses by intentionally placing the interest of U.S. Bancorp, which benefitted from the "up-side potential" of equities, ahead of the participants' interest in minimizing the risk of losing their pension assets.

85.     As U.S. Bancorp recognized in its 2007 Annual Report:

> Generally, based on historical performance of the various investment asset classes, investments in equities have outperformed other investment classes but are subject to higher volatility. While an asset allocation including bonds and other assets generally has lower volatility and may provide protection in a declining interest rate environment, it limits the pension plan's long-term up-side potential. Given the pension plans' investment horizon and the financial viability of [U.S. Bancorp] to meet its funding objectives, the [Compensation ]Committee has determined that an asset allocation strategy investing in 100 percent equities diversified among various domestic equity categories and international equities is appropriate.

86.     The assumed rate of return for pension plan assets is a key driver of pension cost because a higher return on pension assets automatically lowers a company's pension costs, or can boost a company's pension income.  This in turn flows through to a company's bottom line, and to earnings per share, thereby increasing the per-share value of the company.

87.     Based on the investment allocation of 100% of Plan assets to equities, U.S. Bancorp assumed an expected return on Plan assets of 8.5 – 9.5%, which is 0.6 – 1.6% higher than the long-term rate of return expected from a "typical" diversified asset mix.

88.     U.S. Bancorp accordingly benefitted from the unreasonably risky asset allocation and its corresponding higher rate of return in that between 2004 and 2011, U.S. Bancorp was not required by ERISA to make, and did not make, any contributions to the Plan.  In contrast, the Plan had no reason to pursue higher returns by adopting a risky investment strategy which allocated 100% of its assets to equity investments.  By 2007, the Plan was significantly overfunded and did not need the additional income which such a risky strategy might produce in order to meet its pension obligations.

89.     Thus, the "up-side potential" of investing in "higher volatility" asset classes inured primarily to U.S. Bancorp, while the risk was borne chiefly by the Plan and its participants.

**C.     The Plan's Investment Allocation Strategy Also Benefitted the U.S. Bank's Subsidiary FAF Advisors**

90.     In addition, by continuing to pursue the existing Investment Allocation Strategy, the Compensation Committee and the Investment Committee also failed in their obligation to act solely in the interest of the Plan and for the exclusive purpose of providing benefits to the Plan and its participants and defraying reasonable Plan expenses.  The Compensation Committee and the Investment Committee intentionally placed the interest of FAF Advisors, the Plan's Investment Manager and a subsidiary of U.S. Bank, N.A., which significantly benefitted from the strategy, ahead of the participants' interest.

91.     Beginning at least as early as 2003, FAF Advisors invested a majority of the Plan's assets in its own mutual funds, First American Funds, Inc. (the "FAF Mutual

Funds"), whose underlying assets consisted of equities.  The Form 5500 for the Plan filed with the Department of Labor reported that in 2003, over 98% of the Plan's nearly $2.2 billion in assets were invested in FAF Mutual Funds, whose underlying investments consisted of equities.

92.    Because FAF Advisors was both a fiduciary of the Plan and the investment advisor/manager of the underlying First American mutual funds in which it invested the Plan's assets, FAF Advisors was acting on both sides of all transactions where the Plan invested or redeemed its interest the First American mutual funds.

93.    By 2007, the Plan's Form 5500 reported that FAF Advisors invested (i) over 40% of the Plan's assets, or $1.25 billion, in mutual funds managed by FAF Advisors, and (ii) the remainder of the portfolio in equity securities which supported FAF Advisors' securities lending program.

94.    As a result of the adoption of an investment strategy which allocated 100% of the Plan assets to equities, FAF Advisors was able to significantly increase the assets under management of its own mutual funds, thus making them more attractive to other investors, as well as create a pool of securities which it was able to use for its in-house SLP.

95.    Despite the fact that the Plan reported that it was over-funded by more $850 million at the end of 2007, the Compensation Committee Defendants and the Investment Committee Defendants, because of their many conflicts of interest, continued to and/or permitted FAF Advisors to continue to allocate nearly100% of the Plan's assets to equities.  Based on the Plan's 2007 Form 5500 dated December 2007, the Plan continued to invest more than $2.7 billion of its total $2.8 billion in assets in FAF Mutual Funds and corporate securities, some of which FAF Advisors lent to third parties through its SLP.

96.     Thus, following their appointment, the Compensation Committee Defendants and the Investment Committee Defendants kept the Plan assets, and the management thereof, completely within the control of FAF Advisors and other entities within the U.S. Bancorp corporate family, allowing each entity to earn significant management and administrative fees from the Plan.

97.     It was not until 2011, after U.S. Bancorp sold its subsidiary FAF Advisors to Defendant Nuveen Asset Management, LLC, that the Plan began to diversify meaningfully into asset classes other than equities.  By year end 2011, the Plan had a 10% allocation to debt/fixed income and 5% to real estate, which reduced the equity allocation to 85%.  By year end 2012, the Plan had a 20% allocation to debt/fixed income and 5% to real estate which further reduced the equity allocation to 75%.

**D.     The   Investment Allocation Strategy Maintained or Permitted to be Maintained by the Compensation Committee and the Investment Committee Resulted in Substantial Losses to the Plan and Resulted in the Plan Becoming Underfunded**

98.     The decision of the Compensation Committee Defendants and the Investment Committee Defendants to continue to pursue the Plan's existing imprudent and undiversified Investment Allocation Strategy caused the Plan to lose $1.1 billion in 2008.   The net assets available to pay benefits reported in the 2008 Form 5500 fell from $2.8 billion to less than $1.7 billion in 2008.

99.     As a result of the $1.1 billion loss, the funding status of the Plan fell sharply, going from being significantly overfunded (144%) in 2007, to significantly underfunded (84%) in 2008 based on the Adjusted Funding Target Attainment Percentage (AFTAP).  Currently, on an AFTAP basis, the Plan is underfunded by $516 million (80% funded) as of January 1, 2012, as reported in the Funding Notice provided to Plan participants in April of 2013.

100.    The Plan has been consistently underfunded on an AFTAP basis since the $1.1 billion loss suffered in 2008.   According to the Funding Notice U.S. Bancorp provided to Plan participants in April 2012, the Plan was underfunded by $248 million (84.44% funded) as of January 1, 2009, the Plan was underfunded by $366 million (81.91% funded) as of January 1, 2010, and the Plan was underfunded by $436 million (80% funded) as of January 1, 2011.

**E.    FAF Advisors' Management of the Plan's Securities Lending Portfolio was Imprudent and Fraudulent**

101.    Beginning in 2005 and continuing until 2011, the Plan also participated in Defendant FAF Advisors' SLP under which SLP acted as both the lending agent for the Plan as well as the administrator of the SLP.

102.    Pursuant to a contractual arrangement entered into between the Plan and FAF Advisors effective October 2005 (the "SLP Agreement"), FAF Advisors temporarily loaned securities owned by the Plan to borrowers on a short-term basis.   In exchange for the loans of the Plan's securities, the Plan received cash collateral which FAF Advisors was then obligated under the terms of the SLP Agreement to invest in conservative, safe and liquid investments.   The income derived from the investment of the cash collateral was shared between FAF Advisors and the Plan and purportedly provided a means by which the Plan could earn an incrementally higher return on the corporate securities in which FAF Advisors as the Plan's investment manager had invested the Plan's assets.

103.    FAF Advisors was bound both by a fiduciary duty and a contractual obligation to select sound investments for the Plan's assets.   On information and belief, the SLP Agreement required FAF Advisors to invest the cash collateral the Plan received from securities borrowers in the SLP in only conservative, high quality, and low risk investments that were highly liquid.   Additionally, FAF Advisors' role as an ERISA

fiduciary required it to strictly control the risks associated with the Plan's investments overall.

104.    On information and belief, despite the fact that the Compensation Committee and Investment Committee Defendants were expressly charged with the obligation to monitor the investment strategies, activity and performance of FAF Advisors, they never did so with respect to FAF Advisor's reinvestment of the Plan's cash collateral in the SLP.

105.    Emil C. Busse, Jr. was the head of securities lending for FAF Advisors at the start of the Class Period until June of 2008.  In that capacity Mr. Busse managed two portfolios, the Mount Vernon Securities Lending Short-Term Bond Portfolio  (the "Mount Vernon Bond Portfolio") and the Mount Vernon Securities Lending Prime Portfolio (the "Mount Vernon Prime Portfolio") (collectively the "Mount Vernon Portfolios").   The Mount Vernon Portfolios were available for the investment by FAF Advisors' SLP clients and contained funds received exclusively from collateral given in exchange for loans of securities made by SLP customers, including the Plan.

106.    By December 2007, FAF Advisors, in its capacity as the administrator of the SLP, had directed the Plan to invest $504 million of the Plan's collateral in the Mount Vernon Portfolios which was managed by Busse and FAF Advisors.

107.    The Mount Vernon Prime Portfolio operated as a money market fund within the meaning of Rule 2a-7 under the Investment Company Act. As such, FAF was required to manage the fund with a view toward maintaining a stable net asset value ("NAV") of $1 per share. A team of persons at FAF, including Mr. Busse, managed the Prime Portfolio.  The participants and beneficiaries never received information regarding the composition of the Mount Vernon Bond Portfolio.

108. The Mount Vernon Bond Portfolio was supposed to be managed to preserve capital and minimize fluctuations in the NAV. The Bond Portfolio was not managed as a money market fund. FAF, however, sought to keep the NAV at $1 per share. The participants and beneficiaries never received information regarding the composition of the Mount Vernon Bond Portfolio.

109. On information and belief, despite their obligation to invest the Mount Vernon Portfolios in high quality, and low risk investments, FAF Advisors invested the Mount Vernon Bond Portfolio in asset-backed commercial paper issued by three specific structured investment vehicles ("SIVs"). These SIVs – KKR Atlantic Funding Trust, KKR Pacific Funding Trust, and Ottimo Funding, Ltd. – were backed by toxic subprime mortgage and Alt-A securities.

110. On information and belief, Defendant FAF Advisors did not conduct an independent investigation of the nature and quality of the assets backing the SIVs' commercial paper, but instead simply bought commercial paper that rating agencies, such as Standard & Poor's, Moody's Investor Services, and Fitch Ratings, had rated highly. As such, FAF Advisors' decision to invest the Plan's assets in the Mount Vernon Portfolios was imprudent.

111. The values for SIV commercial paper began to fall sharply, so that as early as August 2007, investment rating agencies had started to downgrade the rating of the commercial paper issued by the SIVs. By November 2007, rating agencies rated all three SIVs as either "D," "Not Prime," or "junk."

112. As the SIVs held by the Mount Vernon Bond Portfolio became distressed, the value of the portfolio declined and the NAV of the Mount Vernon Bond Portfolio threatened to fall below $1. In an attempt to dilute the effect that the distressed SIVs had on the Mount Vernon Bond Portfolio and prevent the NAV from "breaking the buck,"

Mr. Busse engaged in an unlawful scheme to liquidate and restructure the Mount Vernon Bond Portfolio.

113.    Starting in February through at least March 2008, Mr. Busse directed the reallocation of numerous loans of securities from lenders in the Mount Vernon Prime Portfolio to lenders invested in the Mount Vernon Bond Portfolio, in an effort to increase the assets in the Mount Vernon Bond Portfolio and maintain a NAV of $1. The Plan, which was invested in the Prime Portfolio, suffered losses as a result of these fraudulent transfers.

114.    Despite Mr. Busse's fraudulent efforts to prop up the NAV of the Mount Vernon Bond Portfolio, the value of the portfolio – and therefore the value of the Plan's assets – dropped significantly on March 5, 2008.   The Plan, which was also invested in the Bond Portfolio, suffered losses as a result of the defaulted SIVs.

115.    According to the Plan's 2008 Form 5500, the collateral held by the Plan under the SLP which was invested in the Mount Vernon Portfolios lost over $14.2 million in 2008 and those losses were never recovered by the Plan before it ceased participating in the SLP.

116.    On or about this time, U.S. Bancorp through its wholly owned subsidiary, U.S. Bank, N.A., discovered the fraudulent reallocation of the SLP collateral investments by Mr. Busse and began an internal investigation of FAF Advisors and Mr. Busse's actions.

117.    The reallocation scheme later became the subject of an enforcement action by the SEC and, in November 2010, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings against Mr. Busse.

118.    The SEC found that Mr. Busse, in connection with FAF Advisor's management of the Mount Vernon Bond Portfolios, had committed several violations of

the antifraud provisions of the securities laws, including Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

119.    Defendant U.S. Bank, N.A., the parent of FAF Advisors and the Trustee of the Plan, paid to settle Mr. Busse's case, as well as other cases alleging breaches of fiduciary duty in the management of their securities lending programs.

120.    Sometime in 2010, Defendant U.S. Bancorp sold FAF Advisors to Defendant Nuveen Asset Management, LLC.

121.    After the sale of FAF Advisors, the Company ceased to use parties in interest to manage a significant portion of the Plan's assets, by reducing the parties in interest managed assets by 81% from $512 million to $95 million.

**F.    Failure to Monitor the Plan's Assets**

122.    At all times after the Compensation Committee became a named fiduciary of the Plan in 2007, the Compensation Committee Defendants had the obligation to (i) monitor the Plan's investments, its investment allocation strategy among investment classes, and the performance of the Plan's investment manager, FAF Advisors, (ii) to periodically review the reports of the Investment Committee reporting on the investments of the Plan, and (iii) to take appropriate action to terminate the Plan's investments and/or its investment advisors/managers if the circumstances so warranted.

123.    At all times after the Investment Committee Defendants became named fiduciaries of the Plan in 2007, they had the further obligation to:  (i) approve the appointment of investment advisors and/or managers; (ii) periodically review investment strategies, activity, and performance with the investment advisors/managers for such pension plans; and (iii) report periodically to the Compensation Committee on its actions.

124.    The material events set forth above regarding the fraudulent scheme engaged in by FAF Advisors and Busse should have caused the Compensation Committee Defendants and the Investment Committee to take steps to safeguard the assets of the Plan and remove FAF Advisors as a fiduciary and investment manager of the Plan.

125.    By no later than March 2008, after FAF Advisors' fraudulent scheme became known to U.S. Bank, N.A., the parent and Trustee of FAF Advisors, the Compensation Committee Defendants, and the Investment Committee Defendants should have conducted a thorough review of FAF Advisors' entire management of the Plans assets, including (i) the fraudulent manipulation of the Mount Vernon Portfolios, and (ii) FAF Advisors' self-interested, imprudent and disloyal Investment Allocation Strategy which resulted in the investment of the Plan's assets 100% in equities in order to further the interests of FAF Advisors' SLP and the FAF Mutual Funds.

126.    A prudent fiduciary, under the circumstances then prevailing, upon conducting such a review would have at a minimum safeguarded the Plan's assets by (i) removing FAF Advisors as the fiduciary investment manager, (ii) engaging a new unconflicted investment manager for the Plan, and (iii) modifying the Plan's investment allocation strategy of investing the Plan 100% in equities by diversifying the Plan's investments into additional asset classes including fixed income/debt securities.

127.    Had any of the Compensation Committee or the Investment Committee Defendants taken appropriate steps at the time to reform the Plan's investment allocation once the fraud was uncovered and thereafter properly diversified the Plan's investment, the Plan would have avoided the $1.1 billion losses caused by FAF Advisors' decision to invest 100% of the Plan's assets in equities.

## VII.        CLASS ALLEGATIONS

### A.        Class Definition

128.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 (b)(1)(A) and (2), on behalf herself and the following Class:

> All participants who are vested in accrued benefits in the Plan from September 30, 2007 to December 31, 2010 and their beneficiaries.

Excluded from the Class are Defendants and members of their immediate families, or any of their heirs, successors, or assigns.

### B.        Numerosity

129.    The members of the Class are so numerous that joinder of all members is impracticable.  According to the 2008 Form 5500, the Plan had 74,149 participants at the end of the 2008 Plan year.

### C.        Commonality

130.    The issues of liability in this case present numerous common questions of law and fact that are common to all member of the Class members, including:

a.        whether each or all Defendants were fiduciaries of the Plan under ERISA with respect to their roles regarding the creation, maintenance, and/or implementation of the Investment Allocation Strategy which invested approximately 100% of the Plan's assets in equities;

b.        whether each or all Defendants breached their fiduciary obligations under ERISA to prudently manage the Plan's assets by causing or allowing the Plan to invest approximately 100% of the Plan's assets in equities;

c.        whether each or all of the Defendants breached their fiduciary obligations under ERISA to act loyally and solely in the interest of Plan participants and

beneficiaries by causing or allowing the Plan to pursue an investment allocation strategy which exposed Plan assets to unnecessary risk in order to enhance U.S. Bancorp's bottom line and/or by using the assets of the Plan for their own benefit;

        d.     whether the Defendants breached obligations to diversify the investment of the Plan when they caused or permitted the Plan to be invested 100% in equities;

        e.     whether the Defendants engaged in self-dealing by pursuing an Investment Allocation Strategy which caused the Plan to invest 100% of its assets in equities which benefitted FAF Advisors  and provided a pool of securities for use in its SLP;

        f.     whether the Plan suffered losses as a result of the breaches of fiduciary duty committed by any or all of the Defendants, and if so the extent of those losses; and

        g.     whether U.S. Bancorp, Defendants U.S. Bank, N.A., and/or Nuveen Asset Management/FAF Advisors profit through the use of Plan assets.

131.    The issues regarding relief are also common to all members of the Class, as any relief will primarily consist of a determination of whether the Class is entitled to recover losses, on behalf of the Plan, from any of the Defendants as a result of their breach of fiduciary duty and/or recover any profits made through the use of Plan assets. Any monetary relief recovered pursuant to ERISA § 409(a) will be paid into the Plan itself.

**D.    Typicality**

132.    Plaintiff's claims are typical of those of the Class she seeks to represent, because they arise from the same events, practices, and/or course of conduct. Specifically, Plaintiff's claims on behalf of herself and all other members of the Class

challenge Defendants' Investment Allocation Strategy and management of the Plan's assets during the Class Period.

133.    Plaintiff's claims under ERISA § 502(a)(2), which allows for relief to be sought on behalf of the Plan and for any monetary relief to be paid into the Plan,  are typical because Plaintiff brings the same claim that each participant and beneficiary of the Plan is entitled to bring.

134.    Plaintiff's claims are also typical with respect to any equitable relief because that relief would affect all Class members equally.

**E.    Adequacy**

135.    Plaintiff will fully and adequately protect the interests of all members of the Class.

136.    Plaintiff has no interests that are antagonistic or in conflict with the interests of the Class.

137.    Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

138.    Plaintiff has retained competent counsel who are experienced in class action and ERISA litigation.

**F.    Rule 23(b)(1) Requirements**

139.    The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for one or more of the Defendants.

140.    The requirements of Rule 23(b)(1)(B) are satisfied because adjudications of these claims by individual members of the Class would, as a practical matter, be

dispositive of the interests of the other members who are not parties to the actions, or substantially impair or impede the ability of those other members of the Class to protect their interests.

**G.      Rule 23(b)(2) Requirements**

141.    The requirements of Rule 23(b)(2) are satisfied because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

**H.      Rule 23(b)(3) Requirements**

142.    The requirements of Fed. R. Civ. P. 23(b)(3) are met in this action because (a) the questions of law and/or fact – the Defendants violated ERISA by pursuing an investment allocation strategy that resulted in 100% of the Plan's assets being invested in equities -- are not only common, but will predominate over any individual questions, and (b) a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

143.    The following factors set forth in Rule 23(b)(3) favor certification of this case as a class action:

a.       The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.       This District is most desirable location for concentrating the litigation because among the following reasons: (i) the fiduciary breaches alleged in the herein occurred in this District, (ii) the Plan is administered in this District, and (iii) the majority of the company witnesses are located in this District.

144.    There are no anticipated difficulties in managing this case as a class action.

## VIII.    CAUSES OF ACTION

## COUNT I

**(BREACH OF FIDUCIARY DUTIES UNDER ERISA § 404 FOR INVESTMENT OF PLAN ASSETS AGAINST THE COMPENSATION COMMITTEE DEFENDANTS AND FAF ADVISORS)**

145.    Pursuant to Fed. R. Civ. P. Rule 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

146.    The Compensation Committee Defendants and FAF Advisors were fiduciaries of the Plan within the meaning of ERISA § 3(21), with respect to the management and disposition of the assets of the Plan.

147.    As fiduciaries of the Plan, the Compensation Committee Defendants and FAF Advisors were required pursuant to ERISA § 404(a)(1)(A) to act solely in the interest of the participants and beneficiaries of the plan they serve and "(A) for the exclusive purpose of : (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).

148.    As fiduciaries of the Plan, the Compensation Committee Defendants and FAF Advisors were required pursuant to ERISA § 404(a)(1)(B) to discharge of their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

149.    As fiduciaries of the Plan, the Compensation Committee Defendants and FAF Advisors were required pursuant to ERISA § 404(a)(1)(C) to diversify the investments of the Plan so as to minimize the risk of large losses.  29 U.S.C. § 1104(a)(1)(C).

150.    The Compensation Committee Defendants and FAF Advisors breached those duties by adopting and/or maintaining an Investment Allocation Strategy which permitted the imprudent over-concentration of 100% of the Plan's assets in equity investments rather than properly diversifying the investments of the Plan, thereby exposing the Plan to unnecessary risk of loss, even though they knew or should have known that such an investment allocation represented an imprudent investment allocation for pension assets.

151.    The Compensation Committee Defendants and FAF Advisors also breached those duties by adopting and maintaining a risky and imprudent Investment Allocation Strategy that permitted U.S. Bancorp to project higher rates of return on the assets of the Plan to increase the Company's net income and stock price.

152.    The Compensation Committee Defendants and FAF Advisors also breached those duties by maintaining an imprudent, disloyal, and undiversified Investment Allocation Strategy in order to maximize the assets available to FAF Advisors to invest in its own mutual funds and to create a pool of corporate securities to use in its SLP, thereby increasing the net income of FAF Advisors, to benefit FAF Advisors and its parent U.S. Bank, N.A.

153.    Further evidence that an investment allocation of 100% in equities is imprudent and undiversified is the fact that after US Bancorp sold FAF Advisors (and thus its self interest removed), the Plan was reformed to include a significant allocation to fixed income and real estate.

154.    As a result of the above-described conduct, the Compensation Committee Defendants and FAF Advisors have (a) failed to act solely in the interest of the participants and beneficiaries of the Plan for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);  (b) failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing

that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, in violation of ERISA § 404(a)(1)(C) , 29 U.S.C. § 1104(a)(1)(C).

155.   The Compensation Committee Defendants and FAF Advisors, through these multiple breaches of fiduciary duty caused the Plan to suffer $1.1 billion in losses.

156.   Had the Plan's investments been allocated to a more diverse asset mix during the Class Period, the Plan would not have suffered such significant losses. As such, the Compensation Committee Defendants and FAF Advisors are liable to restore to the Plan the losses suffered by the Plan as a result of their breaches, as well as disgorgement of any profits or fees FAF Advisors or the Compensation Committee Defendants received in connection with their several breaches of fiduciary duty.

## COUNT II

### (BREACH OF FIDUCIARY DUTIES UNDER ERISA § 404 FOR MANAGEMENT OF THE SLP COLLATERAL AGAINST FAF ADVISORS)

157.   Pursuant to Fed. R. Civ. P. Rule 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

158.   FAF Advisors was a fiduciary of the Plan within the meaning of ERISA § 3(21), with respect to the management and disposition of the assets of the Plan.

159.   As fiduciaries of the Plan, FAF Advisors was required pursuant to ERISA § 404(a)(1)(A) to act solely in the interest of the participants and beneficiaries of the plan they serve and "(A) for the exclusive purpose of : (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

160. As a fiduciary of the Plan, FAF Advisors was also required pursuant to ERISA § 404(a)(1)(B) to invest the Plan assets "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

161. The collateral which the Plan received from borrowers to secure the repayment of the equity securities loaned to third parties under the SLP constituted Plan assets which FAF Advisors was under an obligation to prudently invest in conservative, high quality, low risk investments so as to minimize the risk of loss to the Plan.

162. Despite these obligations, FAF Advisors invested the collateral the Plan received under the SLP in the Mount Vernon Bond Portfolio, which it knew or should have known included highly risky, low quality assets-backed commercial paper issued by three SIVs that were backed by toxic subprime mortgage and Alt-A securities.

163. After the SIVs defaulted, the value of the Bond Portfolio, which was supposed to always stay above an NAV of $1, lost significant value. As a result of FAF Advisors caused The Plan, as a result of the losses as a result of the defaulted SIVs.

164. According to the Plan's 2008 Form 5500, the collateral held by the Plan under the SLP which was invested in the Mount Vernon Portfolios lost over $14.2 million in 2008 and those losses were never recovered by the Plan before it ceased participating in the SLP.

165. FAF Advisors also invested the collateral the Plan received under the SLP in the Mount Vernon Prime Portfolio.

166. FAF Advisors, through Emil Busse, fraudulently transferred loans between the lenders in the Prime Portfolio (including the Plan) to lenders in the Bond Portfolio, to

preserve FAF's reputation as a money manager.  These acts causes losses to the Plan and benefited FAF Advisors rather than the Plan.

167.    As a result of the above-described conduct, FAF Advisors  (a) failed to act solely in the interest of the participants and beneficiaries of the Plan for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);   and (b) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

168.    Had FAF Advisors invested the collateral which the Plan received from borrowers to secure the repayment of the equity securities loaned to third parties under the SLP in conservative, high quality, low risk investments as it was obligated to do, the Plan would not have the losses which the Plan suffered as a result of the investment in the Mount Vernon Portfolios.

169.    As such, FAF Advisors is liable to restore to the Plan the losses suffered by the Plan as a result of their breaches and to disgorge all profits which it made from lending the Plan's securities under the SLP.

## COUNT III

**(BREACH OF FIDUCIARY DUTY UNDER ERISA § 404 FOR FAILURE TO MONITOR OTHER FIDUCIARIES AGAINST THE COMPENSATION COMMITTEE DEFENDANTS, THE INVESTMENT COMMITTEE DEFENDANTS, AND THE BOARD OF DIRECTOR DEFENDANTS)**

170.    Pursuant to Rule 10(c), Fed. R. Civ. P., Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

171.     This Count alleges fiduciary breaches against the Compensation Committee Defendants, the Investment Committee Defendants and the Board of Director Defendants (collectively the "Monitoring Defendants").

172.     As fiduciaries, these Defendants were required by ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) to manage and administer the Plan, and the Plan's investments "solely in the interest of the participants and beneficiaries" of the Plan and for the "exclusive purpose" of providing benefits to the participants and beneficiaries of the Plan and defraying reasonable expenses.

173.     As fiduciaries of the Plan, the Compensation Committee Defendants and FAF Advisors were required pursuant to ERISA § 404(a)(1)(B) to discharge of their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

174.     As fiduciaries of the Plan, the Compensation Committee Defendants and FAF Advisors were required pursuant to ERISA § 404(a)(1)(C) to diversify the investments of the Plan so as to minimize the risk of large losses.  29 U.S.C. § 1104(a)(1)(C).

175.     Under ERISA, a fiduciary charged in a plan document with the authority to select and remove other fiduciaries has an ongoing duty to monitor the performance of those persons whom the fiduciary may remove at reasonable intervals to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. As previously alleged, the U.S. Bancorp Board of Directors Defendants were responsible for the appointment and removal, and for periodically monitoring the performance, of the Compensation Committee and FAF

Advisors, through which the Compensation Committee controlled the investments and investment allocations of the Plan.

176.   As previously alleged, the Compensation Committee was responsible on an ongoing basis for the appointment of the investment advisor/manager of the Plan, FAF Advisors, which included the ongoing duty to monitor the investment performance of FAF Advisors.

177.   As previously alleged the Investment Committee Defendants were expressly charged with the responsibility for approving the appointment of investment advisors/managers like FAF Advisors, periodically monitoring FAF Advisors by reviewing the investment strategies, activity and performance of FAF Advisors with FAF Advisors, and reporting periodically to the Compensation Committee.

178.   The Monitoring Defendants who were responsible for the appointment and removal and for periodically monitoring the investment performance of FAF Advisors breached that duty by, inter alia:

a.   Failing to properly monitor the performance of FAF Advisors to determine whether it was prudently investing the assets of the Plan and adequately diversifying the Plan's investments to reduce the risk of large loss to the Plan;

b.   After learning that FAF Advisors had fraudulently manipulated the Mount Vernon Portfolios, failing to conduct a thorough review of FAF Advisors' management of the Plan's assets and the management of the SLP, and failing to promptly remove FAF Advisors as the Plan's investment manager;

c.   Failing to assure that the Investment Committee properly monitored the performance of FAF Advisors to determine whether it was prudently investing the assets of the Plan and adequately diversifying the Plan's investments to reduce the risk of large loss to the Plan and provided periodic reports regarding FAF Advisors' management of Plan assets;

d.      Permitting FAF Advisors to adopt and maintain an Investment Allocation Strategy which permitted the over-concentration of 100% of the Plan's assets in equity investments rather than properly diversifying the investments of the Plan, thereby exposing the Plan to unnecessary risk of loss, even though the Monitoring Defendants knew or should have known that such an investment allocation represented an inappropriate investment allocation for pension assets;

e.      Permitting FAF Advisors to adopt and maintain a risky and imprudent Investment Allocation Strategy that permitted U.S. Bancorp to project higher rates of return on the assets of the Plan to increase the Company's net income and stock price;

f.      Permitting FAF Advisors to adopt and maintain a risky, imprudent and disloyal Investment Allocation Strategy that permitted FAF Advisors to maximize the assets available to invest in FAF Advisors own mutual funds and to create a pool of funds to invest in its SLP, all to the benefit of FAF Advisors and its parent Defendant U.S. Bank, N.A., at a time when the Plan was substantially overfunded and the continued pursuit of such a risky investment allocation strategy to secure a high rate of return on the Plan's investments would not result in any greater pension benefits for the Plan participants and their beneficiaries; and

g.      Failing to ensure that FAF Advisors performed an adequate due diligence of the assets acquired by the Mount Vernon Bond Portfolio in which the collateral received by the Plan under the SLP was invested to assure that such investments were conservative, high quality, low risk and highly liquid so they would not present an undue risk of loss to the Plan.

179.   As a result of the above-described conduct, the Compensation Committee Defendants and FAF Advisors have (a) failed to act solely in the interest of the participants and beneficiaries of the Plan for the exclusive purpose of providing them

benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);  (b) failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, in violation of ERISA § 404(a)(1)(C) , 29 U.S.C. § 1104(a)(1)(C).

180.    As a result of the above-described conduct, the Monitoring Defendants have breached their fiduciary obligations to monitor FAF Advisors.  As such, the Monitoring Defendants are liable to restore to the Plan the losses suffered by the Plan as a result of their breaches.

## COUNT IV

### (VIOLATION OF ERISA § 406(a) AGAINST THE COMPENSATION COMMITTEE DEFENDANTS AND FAF ADVISORS)

181.    Pursuant to Rule 10(c), Fed. R. Civ. P., Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

182.    As an employer and the sponsor of the Plan, U.S. Bancorp was and continues to be a party-in-interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14).

183.    As fiduciaries of the Plan, the Compensation Committee Defendants and FAF Advisors were prohibited pursuant to ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) from causing the Plan to engage in any transaction when they individually or collectively knew that the transaction constituted a direct or indirect use by or for the benefit of a party-in-interest of any assets of the Plan.

184.    By virtue of their positions as fiduciaries of the Plan, the Compensation Committee Defendants and/or FAF Advisors caused or permitted the Plan to pursue an

Investment Allocation Strategy of 100% equity investments that was designed to and did allow U.S. Bancorp, the sponsor of the Plan, to claim artificially high pension returns as part of  U.S. Bancorp's operating income by investing 100% of Plan assets in equities. This direct or indirect use of plan assets benefited U.S. Bancorp in the following ways: (1) U.S. Bancorp's funding requirements for the Plan were decreased by getting higher returns through an imprudent and unduly risky Investment Allocation Strategy; and (2) the aggressive Investment Allocation Strategy allowed U. S. Bancorp to justify to shareholders a high assumed rate of return for pension assets, which improved the Company's financial reporting.

185.    As such, the Compensation Committee Defendants and FAF Advisors violated their fiduciary duties under ERISA by causing the Plan to engage in transactions using Plan assets when they knew or should have known that the transactions constituted a direct or indirect use by or for the benefit of, U.S. Bancorp, a party in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

## COUNT V

### (VIOLATION OF ERISA § 406(b) AGAINST FAF ADVISORS)

186.    Pursuant to Rule 10(c), Fed. R. Civ. P., Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

187.    As a fiduciary of the Plan, FAF Advisors was prohibited under ERISA § 406(b)(1), 29 U.S.C. § 1106(b), from dealing with the assets of the plan in their own interest or for their own accounts.

188.    By virtue of its position as a fiduciary of the Plan, FAF Advisors caused or permitted the Plan to pursue an Investment Allocation Strategy of 100% equity investments that was designed to and did allow FAF Advisors, the investment manager of

the Plan, to maximize the assets available to FAF Advisors to invest in its own mutual funds and to create a pool of funds to use in its SLP, thereby increasing the net income of FAF Advisors, to the  benefit of FAF Advisors and its parent Defendant U.S. Bank, N.A. Accordingly, FAF Advisors pursued an Investment Allocation Strategy that redounded to the benefit of FAF Advisors while risking the retirement security of the Plan's participants and beneficiaries by exposing the Plan assets to the higher risk of an undiversified portfolio.   By these actions they violated their fiduciary duties under ERISA by dealing with the assets of the Plan in their own interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

189.   As a fiduciary of the Plan, FAF Advisors was prohibited under ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2) from acting in transactions involving the Plan on behalf of a party whose interests are adverse to the interests of the Plan or the interests of its participants or beneficiaries, which has been interpreted to prohibit FAF Advisors as a fiduciary of the Plan from acting on both sides of a transaction that involves Plan assets. *See e.g.*, *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir. 1979).

190.   Because FAF Advisors was the investment advisor/manager of the underlying First American mutual funds in which it invested the Plan's assets, FAF Advisors was acting on both sides of all transactions where the Plan invested or redeemed its interest the First American mutual funds.  By these actions FAF Advisors violated its fiduciary duties under ERISA numerous times by acting in transactions involving the Plan on behalf of a party whose interests are adverse to the interests of the Plan or the interests of its participants or beneficiaries in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

## COUNT VI

### (CO-FIDUCIARY LIABILITY UNDER ERISA § 405 AGAINST THE BOARD OF DIRECTOR DEFENDANTS, U.S. BANK, N.A., THE INVESTMENT COMMITTEE DEFENDANTS, AND THE COMPENSATION COMMITTEE DEFENDANTS)

191.   Pursuant to Rule 10(c), Fed. R. Civ. P., Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

192.   This Count alleges fiduciary breaches against the Board of Director Defendants, U.S. Bank, N.A., the Investment Committee Defendants, and the Compensation Committee Defendants.

193.   As alleged above, during the Class Period these Defendants were named as fiduciaries in the Plan Document pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

194.   Section 405(a)(1) of ERISA, 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if he knowingly participates in a breach of fiduciary duty of another fiduciary. Section 405(a)(2) of ERISA, 29 U.S.C. § 1105(a)(2), imposes liability if a fiduciary in the administration of his fiduciary responsibilities enables another fiduciary to commit a breach. Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if he knows of a breach by another fiduciary and fails to remedy it.

195.   The Board of Director Defendants, U.S. Bank, N.A., and the Investment Committee Defendants, each of whom were fiduciaries within the meaning of ERISA, by the nature of their fiduciary responsibilities with respect to the Plan knew of each breach of fiduciary duty alleged herein arising out the investment allocation strategy pursued by the Compensation Committee and FAF Advisors, which resulted in the Plan's assets

45

being invested 100% in equities and took no steps to remedy those breaches.  As such, each is liable for such breaches by the Compensation Committee and FAF Advisors pursuant to Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3).

196.   The Compensation Committee Defendants established and maintained the unduly risky and inappropriate investment allocation strategy thereby enabling the breaches of FAF Advisors for adhering to the Investment Allocation Strategy which resulted in the Plan's assets being invested 100% in equities.  As such the Compensation Committee Defendants are liable for the breaches of FAF Advisors pursuant to Section 405(a)(2) of ERISA, 29 U.S.C. § 1105(a)(2).

197.   The Compensation Committee Defendants established and maintained the unduly risky and inappropriate investment allocation strategy thereby knowingly participating in the breaches of FAF Advisors for adhering to the Investment Allocation Strategy which resulted in the Plan's assets being invested 100% in equities.  As such the Compensation Committee Defendants are liable for such breaches of FAF Advisors pursuant to Section 405(a)(1) of ERISA, 29 U.S.C. § 1105(a)(1)

198.   The Investment Committee Defendants, whose fiduciary responsibilities included monitoring the performance of the Plan's  investment strategies, performance and investments and reporting on the performance of the Plan's investments to the Compensation Committee, knowingly participated in and/or by their actions enabled the breaches of fiduciary duty alleged herein against the Compensation Committee and FAF Advisors arising out the Investment Allocation Strategy which resulted in the Plan's assets being invested 100% in equities.   As such the Investment Committee Defendants are liable for such breaches of the Compensation Committee Defendants and/or FAF Advisors pursuant to Section 405(a)(1) and (2) of ERISA, 29 U.S.C. § 1105(a)(1) and (2).

## IX.      ENTITLEMENT TO RELIEF

199.    By virtue of the violations of ERISA described in the preceding paragraphs, Plaintiff and the Class, as participants and beneficiaries of the Plan, have standing to sue the fiduciaries who committed these breaches of fiduciary duty and/or violations of ERISA pursuant to ERISA § 502(a)(2) and § 502(a)(3).

200.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiff is entitled to obtain for any relief under § 409(a), 29 U.S.C. § 1109(a), including to recover any losses on behalf of the Plan from any breaching fiduciaries, to recover profits or disgorgement of profits resulting from any such breach and other equitable or remedial relief as the Court deems appropriate, including permanent injunctive relief, including but not limited to the removal of the current fiduciaries and appointment of an independent fiduciary to manage the investments of the Plan.

201.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which permits a plan participant, beneficiary, or fiduciary to bring an action to redress violations and/or enforce provisions of Title I of ERISA including for any injunctive relief that the Court deems appropriate, Plaintiff is entitled to sue Defendants for equitable relief.

## X.      PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants in the following manner:

A.      A declaration that the Defendants have breached their fiduciary duties to the Class in the manner described herein;

B.      An order requiring each fiduciary found to have breached his/her/its fiduciary duty the Plan to jointly and severally pay such amount to the Plan as is necessary to make the Plan whole for any losses which resulted from said breaches or by virtue of liability pursuant to ERISA § 405.

C.      An order requiring each fiduciary found to disgorge any profits made through the use of the assets of the Plan;

D.      An injunction preventing the fiduciaries of the Plan from engaging in this investment allocation strategy in the future;

E.      An order removing these fiduciaries from their role as fiduciaries for the Plan and an order appointing an independent fiduciary to manage the assets of the Plan;

F.      Except insofar as the any of the following functions are assigned to a court-appointed fiduciary, an injunction requiring: (1) Defendants to prudently diversify the investments of the Plan among appropriate asset classes, (2) the Compensation Committee Defendants to review and revise the Investment Allocation Strategy of the Plan, (3) the investment manager to properly implement the revised Investment Policy, and (4) the Board of Director Defendants and the Compensation Committee Defendants to monitor the performance of all investment managers to that an appropriate  investment allocation strategy is adhered to which prudently diversifies the Plan's investments; and

G.      The costs and expenses of this suit, including expenses for expert witnesses and reasonable attorneys' fees pursuant to ERISA § 502(g)(1) and the Court's inherent equitable authority and powers;

H.      Such other and further relief as the Court deems just and necessary.

Dated:  September 30, 2013                    ZIMMERMAN REED, PLLP


                                              By: *s/Carolyn G. Anderson*
                                              Carolyn G. Anderson, No. 275712
                                              June P. Hoidal, No. 033330X
                                              1100 IDS Center, 80 South 8th Street
                                              Minneapolis, Minnesota 55402
                                              Telephone: (612) 341-0400
                                              Facsimile: (612) 341-0844
                                              Carolyn.Anderson@zimmreed.com
                                              June.Hoidal@zimmreed.com

                                              COHEN MILSTEIN SELLERS & TOLL, PLLC
                                              Michelle C. Yau
                                              Bruce F. Rinaldi
                                              Mary J. Bortscheller
                                              1100 New York Avenue, N.W.
                                              Suite 500, West Tower
                                              Washington, D.C.  20005
                                              Telephone: (202) 408-4600
                                              Facsimile: (202) 408-4699
                                              myau@cohenmilstein.com
                                              brinaldi@cohenmilstein.com
                                              mbortscheller@cohenmilstein.com

                                              *Attorneys for Plaintiff*