# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| ADETAYO ADEDIPE, JAMES J. THOLE, MARLENE JACKSON, and SHERRY SMITH on behalf of themselves individually, and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>U.S. BANK, NATIONAL ASSOCIATION, individually and as successor in interest to FAF ADVISORS, INC.,  U.S. BANCORP, NUVEEN ASSET MANAGEMENT, LLC, as successor in interest to FAF ADVISORS, INC., RICHARD K. DAVIS, DOUGLAS M. BAKER, JR., Y. MARC BELTON, PETER H. COORS, JOEL W. JOHNSON, OLIVIA F. KIRTLEY, O'DELL M. OWENS, CRAIG D. SCHNUCK, ARTHUR D. COLLINS, JR., VICTORIA BUYNISKI GLUCKMAN, JERRY W. LEVIN, DAVID B. O'MALEY, PATRICK T. STOKES, RICHARD G. REITEN, WARREN R. STALEY, and JOHN and JANE DOE 1-20,<br><br>       Defendants. | Court File No. 13-cv-02687 (JNE/JJK)<br><br>CLASS ACTION<br><br><br><br><br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs, Adetayo Adedipe, James J. Thole, Marlene Jackson and Sherry Smith ("Plaintiffs") on behalf of themselves and all others similarly situated, by and through their counsel, allege as follows:

## I.    NATURE OF THE ACTION

1.    Plaintiffs, who are participants in the U.S. Bancorp ("U.S. Bancorp" or the "Company") Pension Plan (the "Plan"), bring this class action on behalf of the Plan pursuant to § 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), against Plan fiduciaries for violations of ERISA arising out of their policies and practices with respect to the investment of the Plan's assets.

2.    From at least September 30, 2007 to December 31, 2010 (the "Class Period"), the Defendants caused the Plan to invest approximately 100% of its assets in one asset class, equities (the "100% Equities Strategy").  Defendants maintained the 100% Equities Strategy throughout the Class Period despite persistent indications of market instability including a sharp increase in the volatility of the equities market and increased correlation among all stocks, which ultimately became a "full blown crisis" in 2008.

3.    The 100% Equities Strategy was inappropriately risky, imprudent, disloyal and undiversified; it served the interests of the Defendants rather than the Plan and its participants; it exposed the assets of the Plan to substantial risk; and it caused significant losses to the Plan.  By comparison, the average asset allocation for the top 100 defined benefit plans at year-end 2007 was: 59% equities, 30% fixed income/debt securities, 1% cash, 3% real estate, and 7% other asset classes.

4.    As a result of the several violations of ERISA committed by Defendants, the Plan lost $1.1 billion in 2008 and has plummeted from being significantly overfunded at the end of 2007 to being significantly underfunded.

2

5.      Effective in 2007, two new committees of Named Fiduciaries were named for the Plan: the U.S. Bancorp Compensation Committee (the "Compensation Committee") and the U.S. Bancorp Investment Committee (the "Investment Committee") (collectively, the "Committee Defendants").   On information and belief, these committees were appointed by the U.S. Bancorp Board of Directors, and they were charged with, among other things, (i) determining the type and allocation of the Plan's investments; (ii) selecting, monitoring, and terminating Plan investments; (iii) appointing, monitoring, and terminating the Plan Trustee; and (iv) selecting, monitoring, and terminating Plan investment advisors.

6.      After their appointment, and throughout the Class Period, the Compensation Committee Defendants and the Investment Committee Defendants, on information and belief, did not review the existing allocation of the Plan's assets. Defendants failed to review the investment allocation despite multiple indicators of a deepening financial and economic crisis including a sharp increase in the volatility of the equities market and increased correlation among all stocks which exposed the Plan to an unnecessary risk of loss, and which should have caused the Committee Defendants to reevaluate the 100% Equities Strategy.  Defendants therefore failed to maintain a prudent, loyal, and diversified allocation for the Plan's assets.  The Committee Defendants also failed to adequately monitor the Plan's investments and failed to monitor and take appropriate steps to remove the Plan's Investment Manager[1], FAF Advisors, a wholly-owned subsidiary of U.S. Bank, N.A.  Specifically, throughout the Class Period, the Committee Defendants permitted and/or caused FAF Advisors to continue to invest the

---

[1] The relevant Plan documents allow for the appointment of "investment managers" and "investment advisors."   The Consolidated Amended Complaint uses the term "Investment Manager" to mean FAF Advisors, Inc. specifically.  The term "investment advisor," as used herein, means all entities providing advisory services to the Plan Trustee and the Compensation and Investment Committees related to the investment of Plan assets and includes the Investment Manager, FAF Advisors, Inc.

3

Plan's assets in an imprudent, disloyal, and undiversified 100% Equities Strategy.  This strategy served the Company's interest and the interest of its subsidiary, FAF Advisors, to the detriment of the Plan and its participants, because (i) FAF invested over 40% of the Plan's assets, or $1.25 billion, in its own mutual funds, (ii) FAF invested the remainder of the portfolio in equity securities which supported FAF Advisors' own securities lending program (the "SLP"), and (iii) the excessively risky 100% Equities Strategy allowed the Company to project extremely high returns for the pension portfolio which improved the Company's bottom line.  In addition, several individual Defendants benefitted personally from the increased profits reported by the Company through the exercise and sale of stock options.

7.     By failing to review the 100% Equities Strategy even as volatility in the equities market doubled, signaling a four-fold increase in the uncertainty of the equities market, and by permitting FAF Advisors to engage in imprudent and self-interested investment practices during the Class Period, the Compensation and Investment Committee Defendants caused the Plan to continue to be 100% invested in equities, either in direct stock holdings or through mutual funds managed by FAF Advisors, which served the Company's interest while exposing the Plan to unnecessary risk of loss.  The Committee Defendants failed to prudently and loyally balance the need to generate investment returns with the need to safeguard principal through proper risk management and diversification among different asset classes.  As instability in the equities market worsened at the end of 2007 and the beginning of 2008, the 100% Equities Strategy exposed the Plan to increasing risk of large losses and ultimately caused devastating losses of over $1.1 billion by the end of 2008.

8.     As further explained below, volatility in the equities market doubled during the first half of 2008 after having remained constant since 2004 and the correlation among all stocks significantly increased, further compounding the lack of diversification of the Plan's assets.

4

9.      During the Class Period, the Plan also participated in FAF Advisors' SLP, whereby FAF Advisors also acted as a Plan fiduciary by directing the re-investment of the Plan's cash collateral received from third parties who borrowed the Plan's equity securities through the SLP.  As explained below, FAF Advisors had a duty to reinvest the Plan's cash collateral only in high quality, low risk investments (akin to money market funds) so as to fully protect the collateral from principal losses.   Despite these obligations, FAF Advisors invested the collateral the Plan received in two of its proprietary securities lending portfolios (the "Mount Vernon Portfolios").   FAF then invested the Mount Vernon Portfolios in high risk, low quality assets-backed commercial paper issued by three structured investment vehicles ("SIVs") backed by toxic subprime mortgage and Alt-A securities.  Prior to and throughout the Plan's investment in the Mount Vernon Portfolios, FAF Advisors did not conduct an adequate independent investigation into the nature and quality of the assets backing these SIVs.  After the SIVs defaulted in 2007, FAF Advisors engaged in fraudulent transfers of losses from one Mount Vernon Portfolio to another in order to preserve its reputation.

10.     In 2008, as a result of FAF Advisors' mismanagement and fraudulent acts, the Plan collateral held under securities lending arrangements with FAF declined in value by more than $14 million.

11.     On information and belief, by March 2008, U.S. Bancorp, the U.S. Bancorp Board of Directors, U.S. Bank, N.A., and the Committee Defendants possessed clear and convincing evidence that FAF Advisors had breached its fiduciary duties to the Plan by imprudently and disloyally investing the Plan's securities lending collateral.

12.     By April 2008, the Committee Defendants should have acted to safeguard the Plan's principal by removing FAF Advisors and appointing a prudent and loyal fiduciary as Investment Manager.   Additionally, the Defendants should have made reasonable efforts thereafter to remedy FAF Advisors' fiduciary breaches by, among other things, bringing an action against FAF Advisors to recover the Plan's losses.

5

13.     Multiple significant changes in circumstance should have caused the Committee Defendants, U.S. Bancorp, and U.S. Bank, N.A. to reevaluate the selection of FAF Advisors as the Plan's Investment Manager; the investments of the Plan; and the 100% Equities Strategy.  For example, the SEC investigation of FAF Advisors and FAF's own internal investigation indicated that FAF Advisors was not a loyal and prudent fiduciary.  In addition, the increased volatility in the equities market and the significant increase in correlation among all stocks exposed the Plan, which was exclusively invested in equities, to an even greater risk of loss and further exacerbated the lack of diversification of the Plan's assets.

14.     Nonetheless, the Committee Defendants, the Board of Director Defendants, and U.S. Bank, N.A. failed to fulfill their fiduciary duties.  The Compensation Committee continued to retain FAF Advisors as the Plan's Investment Manager; this arrangement indirectly benefited the Company.  The Committee Defendants, the Board of Director Defendants, and U.S. Bank, N.A. also continued to pursue the 100% Equities Strategy by directing or permitting FAF Advisors to manage the Plan's assets in an overly aggressive and undiversified manner and to keep the Plan's assets invested exclusively in equities, a significant portion of which were directly invested in FAF Advisors' own mutual funds.

15.     The Compensation and Investment Committee Defendants and the Board of Director Defendants maintained the overly risky, imprudent, and disloyal 100% Equities Strategy until the Company's self-interest in having its own subsidiary manage the multi-billion Plan was removed when the Company sold FAF Advisors in December 2010.  Thereafter, in 2011, the Committee Defendants began to diversify the investment of the Plan's assets by devoting a portion of the Plan's assets to fixed income securities.  By 2012, the Committee Defendants had diversified the Plan's assets by reducing the allocation to equities to 75% and including a 20% allocation to fixed income securities and a 5% allocation to real estate.

6

16.     During the Class Period, the Committee Defendants, the Board of Director Defendants, U.S. Bank, N.A. and FAF Advisors breached their fiduciary and co-fiduciary duties in several ways.   These Defendants failed to act solely in the interest of participants and beneficiaries of the Plan by pursuing and/or permitting the pursuit of a 100% Equities Strategy which served the interest of the Company, its Directors, and FAF Advisors rather than the Plan and its participants.   These Defendants also failed to act with care, skill, prudence, and diligence by failing to diversify the assets of the Plan between asset classes so as to minimize the risk of large losses in violation of Sections 404(a)(1)(A), (B), and (C) of ERISA, 29 U.S.C. §§ 1104(a)(1)(A),(B), and (C). Defendants also engaged in prohibited transactions and dealt with the assets of the Plan in their own interest in violation of Sections 406(a) and (b) of ERISA, 29 U.S.C. §§ 1106(a) and (b).

17.     In addition, the Committee Defendants and the Board of Director Defendants failed to periodically monitor the Plan's investments, and the Compensation Committee Defendants failed to promptly remove FAF Advisors after it became known that FAF Advisors had engaged in fraudulent transfers of assets and imprudently and disloyally invested the Plan's assets.

18.     The Compensation Committee Defendants and Board of Director Defendants also failed to make reasonable efforts to remedy FAF Advisors' breaches by bringing an action against FAF Advisors to recover the losses to the Plan resulting from FAF Advisors' imprudent and disloyal investment of the Plan's securities lending collateral.

19.     Plaintiffs bring this action pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109 and 1132(a), to remedy these breaches and to recover losses to the Plan for which Defendants are personally liable, and to disgorge any unjust profits received by certain Defendants.   Plaintiffs also bring this action for equitable relief, including but not limited to disgorgement of profits improperly obtained by several members of the Board

7

of Directors in violation § 406 of ERISA, 29 U.S.C. § 1106.  Further, under §§ 409, 502(a)(2) and 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs also seek other equitable relief from Defendants, including, without limitation, injunctive relief, a court-appointed fiduciary, and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

20.     Plaintiffs' allegations in this Amended Complaint are based upon their own personal information and the investigation of Plaintiffs' counsel, which included a review of the available documents governing the operations of the Plan, U.S. Bancorp's filings with the U.S. Securities and Exchange Commission ("SEC"), and the Plan's Forms 5500 filed with the U.S. Department of Labor ("DOL") by U.S. Bancorp.  Because most of the information and documents on which Plaintiffs' claims are based are in Defendants' possession, certain of Plaintiffs' allegations are by necessity made upon information and belief.  At such time as Plaintiffs have the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint.

## II.     JURISDICTION AND VENUE

21.     **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132 (e)(1).

22.     **Personal Jurisdiction**.  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132 (e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States, and this Court therefore has personal jurisdiction over them.

23.     **Venue**.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132 (e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and several Defendants, including U.S. Bank, N.A., U.S. Bancorp, Douglas M. Baker, Y. Marc

8

Belton, and Richard K. Davis, reside, regularly conduct business, or otherwise may be found here.

## III.     PARTIES

### A.     Plaintiffs

24.     **Plaintiff Adetayo Adedipe** is a participant of the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Plaintiff Adedipe was employed by U.S. Bank from 2001 to 2007 and was credited with five years of service under the Plan prior to terminating her employment with U.S. Bank/U.S. Bancorp on April 27, 2007.  Plaintiff Adedipe is therefore a vested participant in the Plan who is now entitled to receive a Normal Retirement Benefit under the Plan starting in January 1, 2022.  Plaintiff Adedipe is a resident of Lathrop, California.

25.     **Plaintiff James J. Thole** is a participant of the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).   Plaintiff Thole, who is a Certified Public Accountant, was the Controller/Financial Manager of U.S. Bank's Metropolitan Retail Banking Division for the St. Louis, Missouri Region from 1983 to 2011.  Mr. Thole is therefore a vested participant in the Plan who is currently receiving a pension benefit from the Plan.  Plaintiff Thole is a resident of Manchester, Missouri.

26.     **Plaintiff Marlene Jackson** is a participant of the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Plaintiff Jackson was employed by U.S. Bank and/or the Mercantile Bancorporation, Inc. ("Mercantile Bank"), which was merged into U.S. Bank, as a check processing clerk from 1990 until August 2009.  Plaintiff Jackson is therefore a vested participant in the Plan who is now entitled to receive a Normal Retirement Benefit under the Plan starting in 2018.  Plaintiff Jackson is a resident of Alton, Illinois.

27.     **Plaintiff Sherry Smith** is a participant of the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Plaintiff Smith was employed by U.S. Bank and/or

9

the Mercantile Bank as an overnight check processing clerk from 1990 until August 2009.  Plaintiff Smith is therefore a vested participant in the Plan who is currently receiving a pension benefit from the Plan.  Plaintiff Smith is a resident of Alton, Illinois.

**B.    Defendants**

28.    **Defendant U.S. Bank, National Association ("U.S. Bank, N.A." or "U.S. Bank"), individually and as successor in interest to FAF Advisors, Inc.**, located at 180 East Fifth Street, St. Paul, MN 55164, is a national banking association organized under the laws of the United States and it is a wholly owned subsidiary of U.S. Bancorp. U.S. Bank, N.A., as the Plan Trustee, is a named fiduciary of the Plan within the meaning of ERISA Section 402(a), 29 U.S.C. § 1102(a), having been so designated in the U.S. Bancorp Pension Plan (2002 Restatement) adopted and approved  by U.S. Bancorp on December 27, 2002  (hereinafter the "Plan Document").  During the Class Period, U.S. Bank, N.A. was the parent of FAF Advisors, Inc., which managed all of the Plan's investments as the Plan's appointed Investment Manager.  FAF Advisors also managed the First American Family of mutual funds, in which up to $1.25 billion of the Plan's assets were invested during the Class Period.  In or around December 2010, U.S. Bank, N.A. sold FAF Advisors' business of providing investment management services to Defendant Nuveen Asset Management, and as part of the sale, U.S. Bank, N.A. retained certain assets and liabilities of FAF Advisors, Inc.

29.    **Defendant U.S. Bancorp** is a diversified financial services company organized under the laws of the State of Delaware that provides, among other things, lending and depository services, cash management, credit card, mortgage banking and investment management services.  U.S. Bancorp, with its headquarters at 800 Nicollet Mall, Minneapolis, MN 55402, is the parent company of U.S. Bank, N.A.

30.    **Defendant Nuveen Asset Management, LLC, as successor in interest to FAF Advisors, Inc.**, is an asset management firm organized under the laws of the State

10

of Delaware, with a principal place of business at 333 W. Wacker Drive, Chicago, IL, 60606.  Nuveen Asset Management, LLC acquired certain assets and liabilities of FAF Advisors, Inc. from U.S. Bancorp in or around December 2010.

***The U.S. Bancorp Board of Directors Defendants***

31.     The U.S. Bancorp Board of Directors has the power to appoint and remove members of the U.S. Bancorp Compensation Committee.  Upon information and belief, the U.S. Bancorp Board of Directors also has the power to appoint and remove members of the Investment Committee.

32.     **Defendant Richard K. Davis** is currently the Chief Executive Officer, Chairman of the Board of Directors, and President of U.S. Bancorp.  Mr. Davis has served as U.S. Bancorp's CEO since December 2006; as the Chairman of the Board of Directors since December 2007; and as President since October 2004.

33.     **Defendant Douglas M. Baker, Jr**. is currently a Director of U.S. Bancorp and has served in this position since January 2008.

34.     **Defendant Y. Marc Belton** is currently a Director of U.S. Bancorp and has served in this position since March 2009.

35.     **Defendant Richard G. Reiten** served as Director of U.S. Bancorp from approximately 1998 until 2012.  Mr. Reiten is the former Chief Executive Officer at Northwest Natural Gas Co.  Mr. Reiten was a Director throughout the Class Period.

36.     **Defendant Warren R. Staley** served as a Director of U.S. Bancorp from at least 2006 – 2007.  Mr. Staley is the former Chief Executive Officer of Cargill, Inc.

37.     **Defendant Joel W. Johnson** is currently a Director of U.S. Bancorp and has served in this position since 1999.  Mr. Johnson was a Director throughout the Class Period.

38.     **Defendant Olivia F. Kirtley** is currently a Director of U.S. Bancorp and has served in this position since October 2006.  Ms. Kirtley is a certified public

accountant, and has previously served as a member of the Compensation and Audit Committees of the Papa John's International, Inc. Board of Directors.

39.     **Defendant O'Dell M. Owens, M.D., M.P.H.**, is currently a Director of U.S. Bancorp and has served in this position since 1991.  Mr. Owens was a Director throughout the Class Period.

40.     **Defendant Craig D. Schnuck** is currently a Director of U.S. Bancorp and has served in this position since 2002.  Mr. Schnuck was a Director throughout the Class Period.  From 1979 to 1991, Mr. Schnuck served as bank director for various predecessor banks of U.S. Bank.

41.     Defendants Davis, Baker, Belton, Reiten, Staley, Johnson, Kirtley, Owens, Schnuck, and the Compensation Committee Defendants identified below, who, on information and belief, are all members of the U.S. Bancorp Board of Directors, are collectively referred to as the "Board of Director Defendants."

***The U.S. Bancorp Compensation Committee Defendants***

42.     At all times during the Class Period the Compensation Committee was a Named Fiduciary of the Plan, within the meaning of ERISA Section 402(a), 29 U.S.C. § 1102(a), having been so designated  on or about August 1, 2006 in the Fifth Amendment to the Plan Document.[2]

43.     **Defendant Peter H. Coors** served as a Director of U.S. Bancorp from at least 2006 – 2007, and served as a member of the Compensation Committee in 2007.  Mr. Coors is Chairman of the Molson Coors Brewing Company and Chairman of MillerCoors.

44.     **Defendant Arthur D. Collins, Jr.** is currently a Director of U.S. Bancorp, and has served in this position since 1996.  On information and belief, Mr. Collins has

---

[2] In or around 2009, the Compensation Committee was re-named the "Compensation and Human Resources Committee."  Plaintiffs will refer to this Committee throughout the Class Period as the "Compensation Committee."

been a member of the U.S. Bancorp Compensation Committee from at least 1996 to the present.  He is currently a Senior Advisor at Oak Hill Capital Partners, which he joined in 2009.  Mr. Collins consults across Oak Hill Capital's private equity portfolio.

45.     **Defendant Victoria Buyniski Gluckman** is currently a Director of U.S. Bancorp, and has served in this position since 1990.  On information and belief, Ms. Gluckman has been a member of the U.S. Bancorp Compensation Committee from at least 1990 to the present.

46.     **Defendant Jerry W. Levin** is currently a Director of U.S. Bancorp, and has served in this position since 1995.  On information and belief, Mr. Levin has been a member of the U.S. Bancorp Compensation Committee from at least 1995 to the present. Mr. Levin is currently the Chair of the Compensation Committee.  Mr. Levin serves as the Chairman of the Board and Chief Executive Officer at JW Levin Partners LLC and JWL Partners Acquisition Corp.

47.     **Defendant David B. O'Maley** is currently a Director of U.S. Bancorp, and has served in this position since 1995.  On information and belief, Mr. O'Maley has been a member of the U.S. Bancorp Compensation Committee from at least 1995 to the present.   Since 1994, Mr. O'Maley has served as an Executive Chairman of Ohio National Mutual Holdings Inc. and various affiliates, including Ohio National Financial Services Inc. and Ohio National Life Insurance Co.

48.     **Defendant Patrick T. Stokes** is currently a Director of U.S. Bancorp, and has served in this position since 1990.  On information and belief, Mr. Stokes has been a member of the U.S. Bancorp Compensation Committee from at least 1992 to the present.

49.     **John and Jane Doe 1-10.**   To the extent that persons other than the individual Compensation Committee Defendants served on the U.S. Bancorp Compensation Committee during the Class Period or had responsibilities with respect to the investment or management of Plan assets during the Class Period, they are named as

13

Defendants John and Jane Doe 1-10.  Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

50.     Defendants Coors, Collins, Gluckman, Levin, O'Maley, Stokes, and John and Jane Doe 1-10 all served as members of the Compensation Committee of the U.S. Bancorp Board of Directors during the Class Period and are collectively referred to as the "Compensation Committee Defendants."

### *The U.S. Bancorp Investment Committee Defendants*

51.     During the Class Period, the U.S. Bancorp Investment Committee was a Named Fiduciary of the Plan within the meaning of ERISA Section 402(a), 29 U.S.C. § 1102(a), having been so designated in the Fifth Amendment to the Plan.

52.     **John and Jane Doe 11-20.**  Plaintiffs currently do not know the identities of the members of the Investment Committee during the Class Period.  As such, they are named as Defendants John and Jane Doe 11-20.   Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.


### IV.     THE PLAN

53.     The Plan is an "employee pension benefit plan" as defined by ERISA § 3(2)(A) of 29 U.S.C. § 1002(2)(A).  The Plan is a noncontributory "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35), and a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  While the Plan is not a party to this action, the relief requested in this action is for the benefit of the Plan, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

54.     The Plan was established effective January 1, 2002, by the merger of several predecessor plans sponsored by U.S. Bancorp and other corporations which merged into U.S. Bancorp.

55.     The purpose of the Plan is to provide a monthly retirement income based on a U.S. Bancorp employee's pay and years of service.

14

56.     U.S. Bancorp and its subsidiaries make all contributions to the Plan.  For years ending December 31, 2006 – 2011, U.S. Bancorp was able to avoid making any minimum contributions to the Plan.  For the year ending December 31, 2012, U.S. Bancorp made contributions to the Plan of $258,579,921.

57.     During the Class Period, the Plan was maintained pursuant to the Plan Document effective as of January 1, 2002; this is one of the documents governing the Plan within the meaning of  ERISA Section 402(a)(1), 29 U.S.C. § 1102(a).

58.     ***Trustee***.  During the Class Period, the assets of the Plan were maintained by the Trustee, U.S. Bank, N.A., in a trust fund (the "Trust Fund") governed by a "separate written instrument entitled 'U.S. Bank Pension Plan Trust Agreement' entered into by and between U.S. Bancorp and the Trustee as of January 1, 2002" (the "Pension Plan Trust Agreement").  Effective January 21, 2011, the assets of the Plan were merged with the assets of another pension plan and are currently held in trust under the Master Trust Agreement.

59.     According to the Plan Document as amended by the Fifth Amendment thereto, during the Class Period, U.S. Bank, N.A., as the Trustee, had "the exclusive authority to manage and control the assets of the Plan held in trust and their custody and shall not be subject to the direction of any person in the discharge of its duties…. except as provided in the Trust Agreement entered into between the Compensation Committee and the Trustee."

60.     As provided in the Plan Document, during the Class Period, the Plan's assets were held by the Trustee, U.S. Bank N. A., for the benefit of the participants and beneficiaries of the Plan in "a Fund for the purpose of receiving contributions made in support of the Plan, managing the assets of the Plan, paying the reasonable expenses of the Plan and disbursing benefits determined … to be due under the Plan."

61.     ***Reversion of Fund Prohibited.***  The Plan Document expressly prohibits the reversion of Plan assets to the Company.  Specifically, the Plan Document states that the

assets of the Plan "shall at all times be a trust fund separate and apart from the assets of the [Company], and no part thereof shall be or become available to the Company or to creditors of the Company under any circumstances other those specified in this Plan Statement.  Prior to the termination of the Plan and except as permitted by ERISA and the Code …, it shall be impossible for any part of the corpus or income of the Fund to be used for, or diverted to, purposes other than for the exclusive benefit of Participants, joint annuitants and Beneficiaries[.]"

62.     ***Eligibility and Participation.***   Eligible employees automatically become participants in the Plan on the first January 1 or July 1 after they reach 21 years of age and have completed one year of service during which they worked 1,000 hours or more.

63.     Participants become 100% vested in the Plan after completing five years of vesting service; a year of vesting service is each calendar year in which a participant has 1,000 hours of service.

64.      Each of the Plaintiffs is vested in the Plan and is either eligible to receive a retirement benefit or is currently receiving a retirement benefit under the Plan.

## V.        FIDUCIARY STATUS OF THE DEFENDANTS

65.     ***Named Fiduciaries***.   Every Plan must specify one or more named fiduciaries of the Plan, pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a).

66.     During the Class Period, the Plan Document set forth the following "Named Fiduciaries":   The Trustee, the Benefits Administration Committee, the Compensation Committee, and the Investment Committee.

67.     ***De Facto Fiduciaries***.   ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent:  "(i) he exercises any discretionary authority or discretionary control respecting management of such Plan or exercises any authority or control respecting management or disposition of its assets,

16

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such Plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such Plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

68.    Each of the Defendants, with the sole exception of Defendant U.S. Bancorp, was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants in the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

**A.      The Fiduciary Status of the Compensation Committee Defendants**

69.    Pursuant to the operative Plan Document, during the Class Period, the Compensation Committee Defendants were responsible for (i) determining the types of investments in which the Fund is to be invested (i.e., equity versus bond), (ii) determining the allocation of the Fund to invest in each type of investment (i.e., 80% equity and 20% bond), (iii) selecting, monitoring and terminating the individual investments, (iv) selecting or establishing, monitoring, and terminating individual separate accounts for investment, (v) selecting, monitoring and terminating investment advisors, and (vi) selecting, monitoring and terminating the Trustee. The Compensation Committee may hire an investment advisor … to monitor the performance of investments and report to the Investment Committee and Compensation Committee.

70.    Throughout the Class Period, the Compensation Committee and the Compensation Committee Defendants were responsible on an ongoing basis for evaluating the suitability of the 100% Equities Strategy for the Plan, as well as evaluating Plan objectives, funding policies, and investment policies.

1862296.2

71.     At all relevant times, the Compensation Committee also had the power to select, monitor, and terminate the Plan Trustee, as well as the authority to select, monitor, and terminate investment advisors to the Plan, including FAF Advisors.

72.     The Compensation Committee Defendants met multiple times a year throughout the Class Period to review and set the investment allocation for the Plan's assets.

73.     In light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were named fiduciaries of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), as well as de facto fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that each exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets.

**B.      The Fiduciary Status of the Investment Committee Defendants**

74.     Pursuant to the operative Plan Document, during the Class Period, the Investment Committee Defendants were responsible for (i) determining the amount of allocation of the Fund in an investment type (i.e., equity) to be invested in a targeted area within the investment type (i.e., large cap equity, small cap equity, international); (ii) determining the allocation in a targeted area to be invested in an individual investment or separate account (chosen from the individual investments and separate accounts selected or established by the Compensation Committee for that type of investment); and (iii) monitoring the performance of investments.   On information and belief, the Investment Committee was responsible for approving and monitoring the performance of any investment advisors of the Plan.

75.     In light of the foregoing duties, responsibilities, and actions, the Investment Committee Defendants (named as John and Jane Doe 11-20) are named fiduciaries of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), as well as de facto fiduciaries

18

within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that each exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets.

## C.   The Fiduciary Status of FAF Advisors

76.   On information and belief, at all relevant times, the Compensation Committee had the power to appoint one or more investment advisors to manage all or a portion of the Trust Fund and to direct the Trustee with respect to the investment and reinvestment of assets.

77.   The Compensation Committee appointed FAF Advisors to serve as the Investment Manager to the Plan throughout the Class Period.  Pursuant to an Investment Management Agreement ("IMA") executed in 2007 and an attached Investment Policy Statement, FAF Advisors had "full discretionary authority" to supervise and direct the investment and reinvestment of the assets of the Plan in compliance with the limitations and requirements of ERISA.

78.   In the IMA, FAF Advisors represents and warrants that it is registered as an Investment Adviser under the Investment Advisers Act of 1940; that it is a "fiduciary" of the Trust (which holds the assets of the Plan) as defined in Section 3(21) of ERISA and therefore is an "investment manager" of the Trust as defined in Section 3(38) of ERISA and; and that FAF advisors currently maintains fidelity bond coverage.

79.   In the IMA, the Compensation Committee represents and warrants that it is a "named fiduciary" with respect to the control or management of the assets in the Trust with authority to appoint other fiduciaries to exercise investment discretion with respect to the Plan's assets in the Trust but that the Compensation Committee has appointed no other investment manager other than FAF Advisors.

80.     Beginning sometime in 2007, FAF Advisors managed all of the Plan's investments including the approximately $1.25 billion of Plan assets which FAF Advisors invested in its own proprietary mutual funds.

81.     In addition, FAF Advisors acted as the Plan's securities lending agent pursuant to a contractual agreement whereby the Plan loaned certain securities to qualified borrowers in exchange for collateral.  FAF Advisors was then responsible for re-investing this collateral on behalf of the Plan in order to generate investment fee income which FAF Advisors then shared with the Plan.

82.     In light of the foregoing duties, responsibilities, and actions, FAF Advisors acted as a de facto fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets.

83.     In or around December 2010, Defendant U.S. Bank, N.A. sold FAF Advisors to Defendant Nuveen Asset Management, LLC.

**D.     The Fiduciary Status of U.S. Bank, N.A.**

84.     Throughout the Class Period, Defendant U.S. Bank, N.A. was the Trustee for the Plan.

85.     From at least 2007 to 2010, all of the assets of the Plan were held in trust in the Trust Fund by U.S. Bank, N.A., pursuant to the Pension Plan Trust Agreement entered into between U.S. Bancorp and U.S. Bank, N.A.

86.     As Trustee of the Plan, U.S. Bank, N.A. had the authority to control, mange, invest, and reinvest the Trust Fund and possessed all powers, rights, and discretions generally possessed by trustees, including the power to institute legal proceedings on behalf of the Plan or the Trust Fund.

20

87.     As the Trustee, Defendant U.S. Bank, N.A. is a named fiduciary of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), as well as de facto fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets held in the Trust Fund.

**E.     The Fiduciary Status of the Board of Director Defendants**

88.     According to the U.S. Bancorp Corporate Governance Guidelines, the U.S. Bancorp Board of Directors is empowered to select, appoint, and remove the members of the Compensation Committee, which held significant responsibilities with respect to the investment of the assets of the Plan.   Upon information and belief, during the Class Period, some or all of the Compensation Committee Defendants were selected, approved, appointed and/or subject to being monitored and replaced by the U.S. Bancorp Board of Directors.

89.     Upon information and belief, the U.S. Bancorp Board of Directors is also empowered to select, appoint, and remove the members of the Investment Committee, which held significant responsibilities with respect to the investment of the assets of the Plan.  Upon information and belief, during the Class Period, some or all of the Investment Committee Defendants were selected, approved, appointed and/or subject to being monitored and replaced by the U.S. Bancorp Board of Directors

90.      In light of the foregoing duties, responsibilities, and actions, the Board of Director Defendants are de facto fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control with respect to management of the Plan and exercised authority or control with respect to management or disposition of the Plan's assets, through the Compensation Committee, and/or the Investment Committee.

## VI.      FACTUAL ALLEGATIONS

A.      **The Compensation Committee Defendants and the Investment Committee Defendants Maintained and/or Permitted the Plan to Maintain an Imprudent, Undiversified and Disloyal 100% Equities Strategy**

91.     By 2004, effectively 100% of the Plan's assets were invested in equities.

92.     During the Class Period, the Compensation Committee became responsible for determining the allocation among asset classes of the Plan portfolio (e.g. equities versus bonds); for monitoring the individual investments of the Plan; and for monitoring the Investment Committee, the investment advisors for the Plan, and the Plan's Investment Manager, FAF Advisors.

93.     Sometime in 2007, the Compensation Committee entered into an IMA whereby it appointed FAF Advisors to serve as the Investment Manager for the Plan, and therein delegated to FAF Advisors discretionary investment authority with respect to the Plan's assets.

94.     The IMA is undated, though it appears to indicate that it was intended to be executed sometime in 2007.

95.     By sometime in 2007, the Plan's entire portfolio was managed by FAF Advisors, the appointed Investment Manager.

96.     Throughout the Class Period, and despite the severe increase in volatility in the equities market and the significant increase in correlation among all stocks during the first half of 2008 (as discussed below), the Compensation Committee Defendants and the Investment Committee Defendants, on information and belief, failed to conduct an adequate independent review of the prudence and diversification of the existing 100% Equities Strategy, the individual investments of the Plan, or the adequacy of FAF Advisors' management of the Plan's assets.  Instead of exercising their own independent judgment regarding the prudence and diversification of the Plan's 100% Equities Strategy and the adequacy of FAF Advisors' investment management decisions, the

Compensation Committee and the Investment Committee Defendants ignored the significant increase in volatility in the equities market and the increased correlation among all stocks, which exposed the Plan to unnecessary risk, and continued to permit or direct FAF Advisors to pursue the existing imprudent and non-diversified 100% Equities Strategy.

97.     By comparison, the average asset allocation for the top 100 defined benefit plans at year-end 2007 was: 59% equities, 30% fixed income/debt securities, 1% cash, 3% real estate and 7% other asset classes.  In fact, as U.S. Bancorp itself disclosed in its 2007 Annual Report, a typical investment allocation for a pension plan would devote approximately 62% to equities and include substantial investments (32%) in debt securities.  Such diversification across asset classes reduces risk and uncertainty because, historically, different asset classes have not moved up or down at the same time.

98.     Proper diversification among asset classes is paramount within the prudent management of portfolios as required by ERISA § 404(a)(1)(B) and is also specifically mandated by ERISA § 404(a)(1)(C).

99.     Generally, there are several levels of diversification necessary to fulfill the requirements of ERISA §§ 404(a)(1)(B) and (C).  The most important and meaningful type of diversification is among different asset classes (e.g. equities, fixed income or bonds, cash, real estate and other types of investments).

100.    Despite these facts, year after year from 2007 to 2010, the Compensation Committee and the Investment Committee Defendants failed to adequately monitor the Plan's investments and failed to select a prudent and diversified investment allocation that included investments that protected the Plan's principal.  Year after year, the Committee Defendants made the imprudent decision to continue to invest virtually 100% of the Plan's assets in equities.

101.     The failure to reevaluate the 100% equities allocation despite the severe change in the equities market (discussed below) and the failure to include any other asset

23

classes (such as bonds/fixed income or real estate) was contrary to the Committee Defendants' obligation to prudently and loyally manage the assets of the Plan and to diversify the investments of the Plan to avoid the risk of large losses.

**B.     Defendants' Profits from the Excessively Risky 100% Equities Strategy**

102.    The excessively risky 100% Equities Strategy was not solely in the best interests of the participants and beneficiaries of the Plan, but primarily, if not exclusively, used to generate excess pension income which benefitted U.S. Bancorp (and its Board members) by allowing the Company to increase its operating income with the excess income generated by the Plan and by avoiding minimum employer contributions.

103.    As U.S. Bancorp recognized in its 2004 Annual Report:

> Based on an analysis of historical performance by asset class, over any 20-year period since the mid-1940s, investments in equities have outperformed other investment classes but are subject to higher volatility. While an asset allocation including bonds and other assets generally has lower volatility and may provide protection in a declining interest rate environment, it limits the pension plan's long-term up-side potential. Given the pension plans' investment horizon and the financial viability of [U.S. Bancorp] to meet its funding objectives, the [Compensation] Committee has determined that an asset allocation strategy investing in 100 percent equities diversified among various domestic equity categories and international equities is appropriate.

104.    The Committee Defendants maintained the excessively risky 100% Equities Strategy, despite their ongoing duty to monitor the Plan's investments and their duty to diversify the Plan's portfolio, in order to justify U.S. Bancorp's inordinately high assumed rate of return on Plan assets of 8.5 – 9.5%, which is 0.6 – 1.6% higher than the long-term rate of return expected from a "typical" diversified asset mix.

105.    Justifying a very high assumed rate of return for its pension plan assets directly benefited U.S. Bancorp because a higher assumed rate of return for its pension assets automatically lowers the Company's pension costs and boosts the company's

reported income.   The creation of significant amounts of pension income through the aggressive 100% Equities Strategy improves the Company's bottom line because accounting rules permit companies to include the assumed returns from pension fund investments in their income statements.   This gives companies a great deal of control over the amount of assumed pension income – and thus control over the corporate bottom line.

106.   An empirical study by Daniel Bergstresser, Mihir Desai, and Joshua Rauh, "Earnings Manipulation, Pension Assumptions And Managerial Investment Decisions" (2005), demonstrates that companies will opportunistically boost their pension plans' estimated returns prior to certain events, including critical earnings thresholds, acquiring other firms, issuing equity, and exercising stock options.

107.   Another study, by Coronado and Sharpe (2003), illustrates how senior managers can use pension accounting to boost reported corporate profits, which can influence stock prices.   The study finds that the valuation that the market places on pension assumptions are at least as high as, if not higher than, the value it places on core earnings, in spite of the often arbitrary nature of these pension assumptions and the transitory nature of their impact on reported income.   One implication of this phenomenon "is that the stocks of a number of S&P 500 companies that sponsor [defined benefit] pension plans were substantially overvalued in recent years."   Julia Lynn Coronado & Steven A. Sharpe, Did Pension Plan Accounting Contribute to a Stock Market Bubble?  (Federal Reserve Board of Governors, FEDS Working Paper No. 2003-38, 2003).

108.   On information and belief, U.S. Bancorp used the excessively risky 100% Equities Strategy to boost the Company's income through high assumed pension returns. Thus, the "up-side potential" of investing in "higher volatility" asset classes primarily inured to the benefit of U.S. Bancorp's Directors and senior executives while the risk was borne chiefly by the Plan and its participants.

25

109.   U.S. Bancorp also benefitted from the unreasonably risky asset allocation and its corresponding higher rate of return in that the Company was not required by ERISA to make, and did not make, any contributions to the Plan between 2004 and 2011. Yet the Plan had no reason, aside from chasing corporate profits, to pursue higher returns by adopting the risky investment strategy of allocating 100% of its assets to equity investments.   By 2007, the Plan was significantly overfunded and did not need the additional income that the risky 100% Equities Strategy was intended to produce.

110.   In addition, the Company received management fees from the Plan's investments in FAF Advisors' mutual funds and from payments by the Plan to FAF Advisors in connection with the Securities Lending Program.

111.   Because the Company benefitted from the 100% Equities Strategy, the fiduciaries of the Plan failed to re-evaluate such strategy and diversify the Plan, even after correlation among all stocks increased and the volatility in the equities market doubled—meaning that uncertainty in the equities market had increased four-fold— during the first half of 2008 (as described below).

1.   **The Compensation Committee and Board of Director Defendants Received Ill-Gotten Profits through the Sale of Stock Options**

112.   The compensation of members of the Board of Directors (including Compensation Committee Defendants) and senior executives of U.S. Bancorp is determined by and based, in part, on the profitability of the Company.  In addition, many Directors and senior executives have stock options and several Defendants exercised and sold their stock options at a hefty profit during the Class Period.

113.   The risky 100% Equities Strategy allowed the Company to use an accounting mechanism to create excess pension income for the Company, which improved its reported earnings per share.  The Company's financial statements to investors are based on the ***assumed*** rate of return on the Plan's assets, not the actual

investment performance of the Plan in a particular year. Thus, the Company can report pension income in its financial statements based on its unnecessarily high assumed rate of return in a year when the Plan lost hundreds of millions of dollars. The fiduciaries of the Plan are thereby able to use the high assumed rate of return to improve the financial outlook of the Company at particular points in time that benefit them and the Company.

114.   On information and belief, several members of the Compensation Committee and the Board of Directors did execute and sell Company stock options at higher prices because U.S. Bancorp's reported income (and thus its stock price) was increased by the excess pension income.

115.   The Compensation Committee Defendants who personally benefited from the excess pension income generated by the excessively risky 100% Equities Strategy include:

116.   Defendant Coors, who exercised and sold approximately $123,967 worth of U.S. Bancorp stock options since October 1, 2007.

117.   Defendant Collins, who exercised and sold approximately $2.5 million worth of U.S. Bancorp stock options since October 1, 2007.

118.   Defendant Gluckman, who exercised and sold approximately $6 million worth of U.S. Bancorp stock options since October 1, 2007.

119.   Defendant Levin, who exercised and sold approximately $6 million worth of U.S. Bancorp stock options since October 1, 2007.

120.   Defendant Stokes, who exercised and sold approximately $1.75 million worth of U.S. Bancorp stock options since October 1, 2007.

121.   Defendants Coors, Collins, Gluckman, Levin, and Stokes, all of whom are on the Compensation Committee, made the decision to allow and/or maintain a risky and undiversified Investment Policy that chased excess pension income rather than one that minimized the risk of loss to the Plan's assets.

122.    The Board of Director Defendants who personally benefited from the excess pension income generated by the excessively risky 100% Equities Strategy include:

123.    Defendant Davis, who exercised and sold approximately $67.4 million worth of U.S. Bancorp stock options since October 1, 2007.

124.    Defendant Reiten, who exercised and sold approximately $821,479 worth of U.S. Bancorp stock options since October 1, 2007.

125.    Defendant Johnson, who exercised and sold approximately $1.6 million worth of U.S. Bancorp stock options since October 1, 2007.

126.    Defendant Schnuck, who exercised and sold approximately $1.7 million worth of U.S. Bancorp stock options since October 1, 2007.

127.    Defendant Owens, who exercised and sold approximately $1.5 million worth of U.S. Bancorp stock options since October 1, 2007.

128.    Defendants Davis, Reiten, Johnson, Schnuck, and Owens, all of whom are members of the Board of Directors, caused the Plan to allow and/or maintain a risky and undiversified Investment Policy that chased excess pension income rather than one that minimized the risk of loss to the Plan's assets.

129.    The several breaches of fiduciary duty and self-dealing committed by the Compensation Committee Defendants and Board of Director Defendants allowed several individual Defendants to profit from the sale of their stock options at higher prices due, at least in part, to the boost in stock price from excess pension income.

130.    Moreover, because the above fiduciaries directly benefitted from the 100% Equities Strategy, they failed to re-evaluate such strategy and diversify the Plan, even after correlation among all stocks was increasing and the volatility in the equities market doubled—meaning that uncertainty in the equities market had increased four-fold— during the first half of 2008, as discussed further below.

### 2. The 100% Equities Strategy Benefitted U.S. Bank Subsidiary FAF Advisors

131.   In addition, by continuing to pursue the existing 100% Equities Strategy, the Compensation Committee and the Investment Committee failed in their obligations to act solely in the interest of the Plan and for the exclusive purpose of providing benefits to the Plan and its participants and defraying reasonable Plan expenses.  Because of the Company's interest in propping up the business of its subsidiary, FAF Advisors, the Compensation Committee and the Investment Committee placed the interest of FAF Advisors, which significantly benefitted from the 100% Equities Strategy, ahead of the Plan participants' interest.

132.   By 2007, FAF Advisors invested over 40% of the Plan's assets in its own mutual funds, First American Funds, Inc. (the "FAF Mutual Funds").  The Plan's Form 5500 filed with the Department of Labor reported that, in 2007, over $1.2 billion of the Plan's nearly $2.8 billion in assets were invested in FAF Mutual Funds, whose underlying investments consisted of equities.  Virtually all of the remaining assets of the Plan were invested in equities, as nearly 55% of the portfolio consisted of corporate stock holdings according to the Plan's 2007 Form 5500.

133.   During 2007, FAF Advisors purchased over 4 million shares of its own FAF Mutual Funds, worth approximately $67.3 million.

134.   During 2008, FAF Advisors purchased approximately 630,000 shares of its own FAF Mutual Funds, worth approximately $8.5 million.

135.   Because FAF Advisors was both a fiduciary of the Plan in its capacity as Investment Manager and the investment advisor of the underlying FAF Mutual Funds in which it invested the Plan's assets, FAF Advisors was acting on both sides of all transactions where the Plan invested or redeemed its interest in the FAF Mutual Funds.

136.   In addition to the inherent conflicts in FAF's management of Plan assets generally, the specific investment of the Plan's assets in non-money market mutual funds

29

managed by FAF Advisors also violated the Investment Guidelines contained within the Plan's Investment Policy and the IMA.

137.    The Investment Guidelines at page 7 of the Investment Policy specifically list "Securities of the investment manager, their parent or subsidiary companies (excluding money market funds) or any other security that could be considered a self-dealing transaction" as "Excluded Investments."  Accordingly, the FAF non-money market mutual funds were not allowed investments for the Plan.

138.    In addition, FAF Advisors' IMA only authorizes the investment of the Plan's assets in affiliated funds "to the extent such investment is consistent with the Investment Policy."  However, because the FAF non-money market mutual funds are not allowed by the Investment Policy, they are not permitted by an instrument under which the Plan is maintained.

139.    Exhibit B to the IMA states "[FAF Advisors] and the Compensation Committee agree that [FAF] has up to 30 days from the effective date of this Agreement to fully invest the [Plan's assets] according to the Investment Policy."  Thus, 30 days after the execution of the IMA in 2007, the following investments violated the IMA and the Investment Policy: First American International Growth, First American Mid-Cap Growth Oppys Fund, First American Mid Cap Index Fund, First American Mid Cap Value Fund, First American Real Estate Securities Fund, First American Small Cap Growth Oppy Securities Fund, First American Small Cap Select Fund, and First American Small Cap Value.

140.    As a result of the above investments, FAF Advisors was able to significantly increase the assets under the management of its own mutual funds, thus making them more attractive to other investors.  Thus, FAF Advisors benefitted not only from the mutual fund fees paid by the Plan, but from the fees paid by other investors who would not have invested in the FAF mutual funds had the Plan not devoted $1.2 billion of its assets to FAF's mutual funds.

141.   All asset transfers from the Plan to FAF Advisors in the form of fees constituted prohibited transactions under ERISA §§ 406(a) and 406(b).  FAF Advisors also benefited from the 100% Equities Strategy because it created a large pool of securities which it was able to use for its in-house SLP.

142.   Despite the fact that the Plan reported that it was overfunded by more than $850 million at the end of 2007, the Committee Defendants, the Board of Directors Defendants, and U.S. Bank, N.A., because of their many conflicts of interest, failed to conduct an independent review of the Plan's allocation even in the face of dramatically changing stock market conditions; failed to maintain a prudent, loyal, and diversified investment allocation; and failed to monitor FAF Advisors' management of the Plan.

143.   By continuing to pursue the 100% Equities Strategy even as the sharp increase in volatility of the equities market and the significant increase in correlation among all stocks exposed the Plan to even greater unnecessary risk of loss, the Committee Defendants, the Board of Directors Defendants, and U.S. Bank, N.A. permitted, and FAF Advisors caused, the Plan to engage in multiple transactions between 2007 and 2011 involving the purchase, sale and exchange of hundreds of millions of dollars in equity securities and/or FAF Mutual Funds backed by equities.

144.   Thus, following their appointment, the Committee Defendants kept the Plan assets and the management thereof within the control of FAF Advisors and other persons or entities within U.S. Bancorp, thereby allowing each person and entity to earn significant management and administrative fees from the Plan or to benefit in other ways from the imprudent and non-diversified 100% Equities Strategy.

145.   Not until 2011, after U.S. Bank, N.A. sold its subsidiary, FAF Advisors, to Defendant Nuveen Asset Management, LLC, did the Plan meaningfully begin to diversify into asset classes other than equities.  By year end 2011, the Plan had a 10% allocation to debt/fixed income and a 5% allocation to real estate, which reduced the equity allocation to 85%.  By year end 2012, the Plan had a 20% allocation to debt/fixed

31

income and a 5% allocation to real estate, which further reduced the equity allocation to 75%.

146.   At the end of 2009, the Plan continued to have nearly $1 billion of its assets invested in FAF Mutual Funds, whose underlying investments consisted of equities. After FAF Advisors was sold to Defendant Nuveen Asset Management, LLC in December 2010, the Plan disposed of all of its investments in FAF Mutual Funds that were backed by equities and invested those assets in a more diversified portfolio of stocks and bonds.

## C.   Dramatic Changes in the Equities Markets Occur From Late 2007 to Mid-2008

147.   The Financial Crisis Inquiry Commission ("FCIC") was created to examine the causes of the financial and economic crisis in the United States and the FCIC issued a comprehensive report on the crisis in January 2011 (the "Financial Crisis Report").

148.   The Financial Crisis Report summarized the crisis as follows:

> Panic fanned by a lack of transparency of the balance sheets of major financial institutions, coupled with a tangle of interconnections among institutions perceived to be "too big to fail," caused the credit markets to seize up. Trading ground to a halt. The stock market plummeted. The economy plunged into a deep recession.

Financial Crisis Report at *xvi*.

149.   "At the beginning of 2008, the stock market had fallen almost 15% from its peak in the fall of 2007." Financial Crisis Report at 292.  In addition, the equities market were becoming much more volatile and stocks more correlated than they had been in 2004 when the Plan embarked upon its 100% Equities Strategy.

## Volatility in the Equities market Increased Dramatically Starting in Late 2007

150.   From 2004, when the 100% Equities Strategy was adopted, through June 2007, the volatility in the equities market was relatively constant.  The graph below

depicts two measures of volatility: "Historical Volatility" and "VIX." The first metric, Historical Volatility, which is shown by the solid line, is a measure of volatility in the market based on actual returns of the S&P 500. The second metric, shown by the dotted line, is the VIX, an index which measures the implied volatility in the options market and, as such, is a forecast of the volatility in the market. Volatility is an industry-standard statistical metric that measures the expected amount of uncertainty in the market in the following 12 months. As an example, if the volatility is 15%, then stock returns, over the next 12 months, are expected to be within the range of -15% to +15% with a statistical likelihood of approximately 66%.

151. The Historical Volatility metric (solid line) shows that the level of volatility in the equities market remained relatively constant from January of 2004 until June of 2007, in the 10%-15% range. However, by early 2008, as the financial crisis deepened, volatility in the equities market had risen to nearly 30%. This increase in volatility in the equities market was particularly significant because volatility, like the Richter Scale, is a non-linear statistical measure, meaning that doubling of the metric from 15% to 30% actually represented a four-fold increase in the uncertainty of the market. Such a drastic increase signaled greater investor and market uncertainty and was indicative of extreme volatility in the equities market. Similarly, another measure of volatility, the VIX (dotted line) remained in the 10-22% range from the beginning of 2004 until June 2007. From June of 2007 until the spring of 2008, the VIX also climbed dramatically, to over 30%.

33



     152.   Another way to measure increased volatility in the equities market is to examine the frequency of occurrences of extreme market movements.  The chart below depicts, on a lagging basis, the percentage of days between 2004 and 2008 that the market experienced a movement of more than 2% up or down in a given day.  As illustrated, on both a trailing 3-month and 6-month basis, the likelihood of a 2% movement in a given day was virtually non-existent until mid-2007, at which time the likelihood of a 2% movement began to increase steadily.



153.    The increase in the frequency of extreme movements in the equities market from mid-2007 to mid-2008 signaled greater volatility in the equities market and indicated that the Plan's continued pursuit of its investment strategy exposed the Plan's investments to an even greater risk of loss than in 2004, when the 100% Equities Strategy was initiated.

154.    Throughout late 2007 and early 2008, major U.S. business news outlets were reporting on the increased volatility in the equities market and noting that market volatility was "near its highest level in five years" (from a New York Times article).

155.    In fact, a senior index analyst at the S&P 500, commenting on the unusual volatility in the market, compared the equities market to a person with "multiple-personality disorder" in a March 2008 New York Times article.

35

156.    The dramatic increase in volatility was the result of heightened market uncertainty along with an increase in the average correlation among all stocks, as discussed below.

## Correlation Among All stocks Also Increased in the Equities market Starting in Late 2007

157.    The Plan's portfolio became significantly more correlated (and thus non-diversified) beginning in late 2007.  Average correlation is a relevant metric that measures movements between pairs of individual stocks in the equities market.  Generally, not all stocks will move in the same direction at any given time; some will appreciate while others depreciate.  The tendency of stocks to move pair-wise in less than perfect step with each other is measured by a statistic called correlation.  Correlation is a value between –1.0 and 1.0.  A value of 1.0 indicates perfect co-movement, while –1.0 indicates one stock moves down while the other moves up.  When the average correlation between all pairs of stocks increases, the volatility in the stock market as a whole increases.

158.    Academic journals have long recognized "that international correlation [among equities] is much higher in periods of volatile markets[]."  François Longin and Bruno Solnik, "Extreme Correlation of International Equities market," *The Journal of Finance*, Vol. 56, No. 2, 649–76 (April 2001).  Indeed while it is considered "accepted wisdom among practitioners and the financial press" that correlation among equities is much higher during volatile equities market, several researchers in finance have further concluded that "correlation is not related to market volatility per se but to the market trend. Correlation increases in bear markets, but not in bull markets."  *Id.*

159.    Prior to every market crash, average correlation increased significantly, which, in turn, resulted in greater volatility in the equities market.  Indeed, researchers have concluded, "Using data on international stock market index returns, we found evidence of increasing correlation in the tails, indicating contagion between financial

36

markets for more extreme market movements. . . . The implications for portfolio allocation and risk management are serious because the benefits of diversification [within the equities asset class] are partly eroded when they are needed most."  Rachel Campbell, Kees Koedijk, and Paul Kofman, "Increased Correlation in Bear Markets" *Financial Analysts Journal*, Vol. 58, No. 1 93 (Jan.- Feb. 2002); *see also* Andrew Ang and Geert Bekaert, "How Do Regimes Affect Asset Allocation?" NBER Working Paper No. 10080 (November 2003) ("International equity returns are more highly correlated with each other in bear markets than in normal times. . . . Importantly, in the bear market regime, the correlations between various returns are higher than in the normal regime.").

160.    Thus, it is not surprising that the correlation among stocks in the S&P 500 increased significantly between the end of 2007 and mid-2008.  *See* data for CBOE S&P 500® Implied Correlation Index between October 2007 and June 2008.

161.    Similarly, the correlation among stocks around the world increased by the end of 2007, as reported by large newspapers such as the New York Times.

162.    Because of the significant increase in correlation among domestic and international stocks within the Plan's portfolio, the Plan became even less diversified between the end of 2007 and mid-2008 than 2004, when the 100% Equities Strategy was first implemented.

163.    In sum, between the last quarter of 2007 and mid-2008, the financial crisis deepened and various financial indicators signaled weakness and increasing risk in the equities market, including, but not limited to, the increase in volatility and average correlation in the global equities market.

164.    In the face of the significant increase in correlation among stocks in the domestic and international equities market, the fiduciaries of the Plan should have moved a significant portion of the Plan's assets into cash, treasury bills and/or bonds in order to meet their obligations under ERISA §§ 404(a)(1)(A), (B) and (C).

165.    In light of the changing circumstances alleged above, a prudent fiduciary would have, at a minimum, reevaluated the 100% Equities Strategy between late 2007 and mid-2008.  Yet as the financial crisis unfolded, on information and belief, the Compensation Committee and the Investment Committee Defendants failed to adequately monitor and reevaluate the 100% Equities Strategy to determine whether, under the circumstances then prevailing, this strategy continued to be in the best interest of the Plan and its participants and beneficiaries.  The Committee Defendants also failed to maintain a prudent, loyal, and diversified allocation for the Plan's assets.

166.    Alternatively, if the Committee Defendants did reevaluate the 100% Equities Strategy and/or the investments of the Plan as a whole after October 2007, they re-adopted the 100% Equities Strategy was imprudent, disloyal, and non-diversified for the reasons set forth above.

**D.    The 100% Equities Strategy Resulted in Substantial Losses to the Plan and Resulted in the Plan Becoming Underfunded**

167.    The decision of the Compensation Committee Defendants and the Investment Committee Defendants to maintain the Plan's imprudent and undiversified 100% Equities Strategy caused the Plan to lose $1.1 billion in 2008.  The net assets available to pay benefits, reported in the 2008 Form 5500, fell from $2.8 billion to less than $1.7 billion in 2008, thereby significantly increasing the risk of default of the Plan.

168.    Had the Committee Defendants not maintained the Plan's imprudent and undiversified 100% Equities Strategy, particularly in the face of a growing financial and economic turmoil and the sharp increase in volatility and risk in the equities market, but instead moved a significant portion of the Plan's assets into other, less risky asset classes, such as cash, treasury bills and/or bonds, they could have properly diversified the Plan's assets and protected against the growing volatility and uncertainty in the equities market. For example, had the Committee Defendants changed the Plan's asset allocation to the typical allocation mix adhered to by other pension plans, as described in U.S. Bancorp's

38

2007 Annual Report (which limits equities to 62% and includes 32% debt securities), the Plan would have avoided at least $748 million of the losses the Plan suffered in 2008.

169.   As a result of that $1.1 billion loss, the funding status of the Plan fell sharply, from being significantly overfunded in 2007 to significantly underfunded thereafter.

170.   In 2009, the Company admitted that the Plan was underfunded as a result of the significant losses it incurred in 2008.  On September 4, 2009, Plaintiff Thole received a copy of a "Feedback Notification" responding to a request by an employee that U.S. Bank comment on the health of the Plan.  The Human Resources Division of U.S. Bank advised the employee in the Feedback Notification as follows:

> The U.S. Bank pension plan is well funded and plan assets have exceeded the actuarial value of the plan liabilities in the past several years.  However, *with the significant declines in the equities market, during 2008 the value of the plan assets dropped below the plan liabilities.* (emphasis added)

171.   According to the Funding Notice U.S. Bancorp provided to Plan participants in April 2012, the Plan was underfunded by $248 million (84.44% funded) as of January 1, 2009; the Plan was underfunded by $366 million (81.91% funded) as of January 1, 2010; and the Plan was underfunded by $436 million (80% funded) as of January 1, 2011.

172.   According to the Funding Notices, the fair market value of the Plan's assets and liabilities at year-end 2011 and year-end 2012 were as follows:

|  | December 31, 2011 | December 31, 2012 |
|---|---|---|
| **Plan Assets:** | $2,062,581,669 | $2,332,436,540 |
| **Plan Liabilities:** | $2,816,228,598 | $3,360,188,897 |

1862296.2

173.    Even on an Adjusted Funding Target Attainment Percentage (AFTAP) basis, the Plan was only 80% funded by the end of 2010 and has remained at 80% funded status until the time this lawsuit was filed.

**E.     FAF Advisors' Management of the Plan's Securities Lending Portfolio was Imprudent and Fraudulent**

174.    Beginning in 2005 and continuing until 2010, the Plan also participated in FAF Advisors' SLP, under which FAF Advisors acted as both the lending agent for the Plan as well as the administrator of the SLP.

175.    Pursuant to a contractual arrangement entered into between the Plan and FAF Advisors effective October 2005 (the "SLP Agreement"), FAF Advisors temporarily loaned securities owned by the Plan to borrowers on a short-term basis.  In exchange for the loans of the Plan's securities, the Plan received cash collateral which FAF Advisors was then obligated to invest prudently.  The income derived from the investment of the cash collateral was shared between FAF Advisors and the Plan, and purportedly provided a means by which the Plan could earn an incrementally higher return on the corporate securities in which FAF Advisors, as the Plan's Investment Manager, had invested the Plan's assets.

176.    FAF Advisors was bound both by a fiduciary duty and a contractual obligation to select sound investments for the Plan's assets.  On information and belief, the SLP Agreement required FAF Advisors to invest the cash collateral the Plan received from securities borrowers in the SLP in only conservative, high quality, and low risk investments that were highly liquid.  Additionally, FAF Advisors' role as an ERISA fiduciary required it to strictly control the risks associated with the Plan's overall investments.

177.    On information and belief, despite the fact that the Compensation Committee Defendants were expressly charged with the obligation to monitor the

investment strategies, activity, and performance of FAF Advisors, they never did so with respect to FAF Advisors' reinvestment of the Plan's cash collateral in the SLP.

178.   Emil C. Busse, Jr. was the head of securities lending for FAF Advisors from the start of the Class Period until June of 2008.   In that capacity, Mr. Busse managed two portfolios, the Mount Vernon Securities Lending Short-Term Bond Portfolio (the "Mount Vernon Bond Portfolio") and the Mount Vernon Securities Lending Prime Portfolio (the "Mount Vernon Prime Portfolio") (collectively the "Mount Vernon Portfolios").   The Mount Vernon Portfolios were available for investment by FAF Advisors' SLP clients and contained funds received exclusively from collateral given in exchange for loans of securities made by SLP customers, including the Plan.

179.   By December 2007, FAF Advisors, in its capacity as the administrator of the SLP, had directed the Plan to invest $504 million of the Plan's collateral in the Mount Vernon Portfolios managed by Mr. Busse and FAF Advisors.

180.   The Mount Vernon Prime Portfolio operated as a money market fund within the meaning of Rule 2a-7 under the Investment Company Act.   As such, FAF was required to manage the fund in order to maintain a stable net asset value ("NAV") of $1 per share.   A team of persons at FAF, including Mr. Busse, managed the Prime Portfolio. The Plan's participants and beneficiaries never received information regarding the composition of the Mount Vernon Prime Portfolio.

181.   Similarly, the Mount Vernon Bond Portfolio was supposed to be managed to preserve capital and minimize fluctuations in the NAV.   The Bond Portfolio was not managed as a money market fund.   FAF, however, sought to keep the NAV at $1 per share.   The participants and beneficiaries of the Plan never received information regarding the composition of the Mount Vernon Bond Portfolio.

182.   On information and belief, despite their obligation to invest the Mount Vernon Portfolios in high quality and low risk investments, FAF Advisors invested the Mount Vernon Bond Portfolio in asset-backed commercial paper issued by three specific

41

structured investment vehicles ("SIVs"). These SIVs – KKR Atlantic Funding Trust, KKR Pacific Funding Trust, and Ottimo Funding, Ltd. – were backed by toxic subprime mortgages and Alt-A securities.

183.    FAF thus knew that the investment of Plan assets into the Mount Vernon Portfolios was imprudent.  On information and belief, Defendant FAF Advisors did not conduct an independent investigation of the nature and quality of the assets backing the SIVs' commercial paper, but instead simply bought commercial paper that rating agencies, such as Standard & Poor's, Moody's Investor Services, and Fitch Ratings, had rated highly.  As such, FAF Advisors' decision to invest and maintain the Plan's assets in the Mount Vernon Portfolios was imprudent.

184.    During the second half of 2007, the values for SIV commercial paper began to fall sharply.  As early as August 2007, investment rating agencies started to downgrade the rating of the commercial paper issued by the SIVs.  By November 2007, rating agencies rated all three SIVs as either "D," "Not Prime," or "junk."

185.    As the SIVs held by the Mount Vernon Bond Portfolio became distressed, the value of the portfolio declined and the NAV of the Mount Vernon Bond Portfolio threatened to fall below $1.

186.    The cutting of the SIV's bond rating to junk should have caused FAF Advisors to divest the Plan's interest in the Mount Vernon Portfolios.

187.    But instead, in an attempt to dilute the effect that the distressed SIVs had on the Mount Vernon Bond Portfolio and prevent the NAV from "breaking the buck," Mr. Busse engaged in an unlawful scheme to liquidate and restructure the Mount Vernon Bond Portfolio.

188.    Starting in February and through at least March 2008, Mr. Busse directed the reallocation of numerous loans of securities from lenders in the Mount Vernon Prime Portfolio to lenders invested in the Mount Vernon Bond Portfolio, in an effort to increase the assets in the Mount Vernon Bond Portfolio and maintain a NAV of $1.  The Plan,

42

which was invested in the Prime Portfolio, suffered losses as a result of these fraudulent transfers.

189.   Despite Mr. Busse's fraudulent efforts to prop up the NAV of the Mount Vernon Bond Portfolio, the value of the portfolio – and therefore the value of the Plan's assets – dropped significantly on March 5, 2008.  The Plan, which was also invested in the Mount Vernon Bond Portfolio, suffered losses as a result of the defaulted SIVs.

190.   According to the Plan's 2008 Form 5500, the collateral held by the Plan under the SLP, which was invested in the Mount Vernon Portfolios, lost over $14.2 million in 2008.   Those losses were never recovered by the Plan before it ceased participating in the SLP.

191.   Had the Mount Vernon Bond Portfolio been prudently managed by FAF Advisors to preserve capital and minimize fluctuation in the NAV and not invested in high risk, low quality assets-backed commercial paper issued by SIVs, the Plan would not have suffered the $14 million loss to the collateral held by the Plan under the SLP.

192.   On information and belief, in or about March 2008, U.S. Bancorp, U.S. Bank, N.A., and the Committee Defendants discovered the fraudulent reallocation of the SLP collateral investments by Mr. Busse and began an internal investigation of FAF Advisors and Mr. Busse's actions.

193.   The reallocation scheme later became the subject of an enforcement action by the SEC and, in November 2010, the SEC issued an Order Instituting Administrative and Cease-and-Desist Proceedings against Mr. Busse.

194.   The SEC found that Mr. Busse, in connection with FAF Advisors' management of the Mount Vernon Portfolios, had committed several violations of the antifraud provisions of the securities laws, including Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

1862296.2

195.    Defendant U.S. Bank, N.A., the parent of FAF Advisors and the Trustee of the Plan, paid to settle Mr. Busse's case, as well as other cases alleging breaches of fiduciary duty in the management of their securities lending programs.

196.    In or around December 2010, Defendant U.S. Bank, N.A. sold FAF Advisors to Defendant Nuveen Asset Management, LLC.  As part of the deal, Nuveen Asset Management acquired FAF Advisors' business of providing investment advisory services, research, sales and distribution in connection with equity, non-money market fixed income, real estate, or asset allocation investment products or accounts.  Nuveen Asset Management also acquired all liabilities of FAF Advisors relating to that business, as well as all liabilities arising under a list of assumed contracts, which includes FAF Advisors' 2007 contract to provide services to the Plan.

197.    Thus, Nuveen acquired liability for the fiduciary breaches and self dealing committed by FAF Advisor in its capacity as an investment manager for the Plan pursuant to the Investment Management Agreement, which was assumed by Nuveen.

198.    After the sale of FAF Advisors, U.S. Bancorp and U.S. Bank, N.A. ceased to use parties in interest to manage a significant portion of the Plan's assets by reducing the parties in interest-managed assets by 81%, from $512 million to $95 million.

**F.      Failure to Monitor the Plan's Assets**

199.    At all times after the Compensation Committee became a named fiduciary of the Plan, the Compensation Committee Defendants had the obligation: (i) to monitor the Plan's investments, its investment allocation strategy among investment classes, and the performance of the Plan's investment advisors, including the Investment Manager, FAF Advisors; (ii) to periodically review the reports of the Investment Committee reporting on the investments of the Plan; and (iii) to take appropriate action to terminate the Plan's investments and/or its investment advisors if the circumstances so warranted.

These obligations were particularly critical when there were significant changes in the equities market, which increased the risks of continuing the 100% Equities Strategy.

200.   On information and belief, at all times after the Investment Committee Defendants became named fiduciaries of the Plan, they had the obligation: (i) to periodically review investment strategies and activity and to monitor the performance of the Plan's investments and investment advisors; (ii) to report periodically to the Compensation Committee on its actions; and (iii) to take appropriate action to terminate the Plan's investments and/or its investment advisors if the circumstances so warranted. These obligations were particularly critical when there were significant changes in the equities market, which increased the risks of continuing the 100% Equities Strategy.

201.   On information and belief, at all times after the Compensation Committee became a named fiduciary of the Plan, the U.S. Bancorp Board of Directors Defendants were responsible for the appointment and removal, and for periodically monitoring the performance of the members of the Compensation Committee and the Investment Committee.

202.   The material changes in market conditions, including the increase in volatility and risk of the equities market should have caused the Committee Defendants to reevaluate the 100% Equities Strategy to determine whether, under the circumstances then prevailing, the strategy was prudent, diversified, and in the best interest of the Plan and its participants and beneficiaries.

203.   By no later than mid-2008, by which time increased volatility and correlation among all stocks in the equities market signaled an increase in the risk associated with equity investments generally, the Committee Defendants should have reevaluated the investments of the Plan, including a reevaluation of the 100% Equities Strategy and should have moved a significant portion of the Plan's assets into cash, treasury bills, and/or bonds.

45

204.   Had the Defendants made a reasonable effort sometime between the end of 2007 and the first half of 2008 to monitor and reevaluate the 100% Equities Strategy in light of the dramatic changes in market conditions and the sharp increase in the volatility of and the correlation within the equities market, and had the Defendants properly diversified the Plan's investments into other asset classes, such as cash, treasury bills, and/or bonds, the Plan would have avoided at least $748 million of the $1.1 billion losses it suffered in 2008.

205.   In addition, the fraudulent scheme engaged in by FAF Advisors and Mr. Busse should also have caused the Committee Defendants to take steps to safeguard the assets of the Plan and to remove FAF Advisors as a fiduciary and Investment Manager of the Plan.

206.   By no later than March 2008, after FAF Advisors' fraudulent scheme became known to U.S. Bancorp, the Board of Directors Defendants, U.S. Bank, N.A., and the Committee Defendants, the Defendants should have conducted a thorough review of all the investments of the Plan and of FAF Advisors' management of the Plan's assets, including (i) the management of the Mount Vernon Portfolios to assure the cash collateral the Plan received under the SLP was being invested in high quality, low-risk investments, (ii) the fraudulent manipulation of the Mount Vernon Portfolios, and (iii)  FAF Advisors' self-interested, imprudent, and disloyal investment of the Plan's assets into 100% equities in order to further the interests of FAF Advisors' SLP and the FAF Mutual Funds.

207.   A prudent fiduciary, upon conducting such a review, would have, at a minimum, safeguarded the Plan's assets by (i) removing FAF Advisors as the fiduciary and Investment Manager, (ii) engaging a new, unconflicted investment manager for the Plan, (iii) modifying the Plan's investment allocation strategy of investing the Plan 100% in equities by diversifying the Plan's investments into additional asset classes, including, cash, treasury bills, and/or bonds, and (iv) making reasonable efforts under the circumstances to remedy the fiduciary breaches of FAF Advisors.

208.   Once the fraud was uncovered, had the Defendants taken appropriate steps to reform the Plan's investment allocation and thereafter properly diversified the Plan's investments, the Plan would have avoided at least $748 million of the $1.1 billion losses it suffered in 2008.

209.   At no time after learning of the Plan's losses resulting from the investment of the Plan's collateral in the Mount Vernon Portfolios did any of the Defendants make a reasonable effort to remedy the breaches of FAF Advisors resulting from the imprudent investment of the Plan's assets in the Mount Vernon Portfolios.

210.   Had the Defendants made a reasonable effort to remedy the breaches of FAF Advisors, the Plan would have recovered the $14.2 million in losses suffered by the Plan resulting from the imprudent investment of the cash collateral received by the Plan under the SLP in the Mount Vernon Portfolios.

## VII.   CLASS ALLEGATIONS

### A.   Class Definition

211.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 (b)(1)(A) and (2), on behalf of themselves and the following Class:

> All participants who are vested in accrued benefits in the Plan from September 30, 2007 to December 31, 2010 and their beneficiaries. Excluded from the Class are Defendants and members of their immediate families, or any of their heirs, successors or assigns.

### B.   Numerosity

212.   The members of the Class are so numerous that joinder of all members is impracticable.  According to the 2008 Form 5500, the Plan had 74,149 participants at the end of the 2008 Plan year.

47

## C.     Commonality

213.    The issues of liability in this case present numerous questions of law and fact that are common to all members of the Class, including:

a.     whether each or all of the Defendants were fiduciaries of the Plan under ERISA with respect to their roles regarding the creation, maintenance, and/or implementation of the 100% Equities Strategy, which invested approximately 100% of the Plan's assets in equities;

b.     whether each or all of the Defendants breached their fiduciary obligations under ERISA to prudently manage the Plan's assets by causing or allowing the Plan to invest approximately 100% of the Plan's assets in equities;

c.     whether each or all of the Defendants breached their fiduciary obligations under ERISA to act loyally and solely in the interest of Plan participants and beneficiaries by causing or allowing the Plan to pursue an investment allocation strategy which exposed Plan assets to unnecessary risk in order to enhance U.S. Bancorp's bottom line and/or by using the assets of the Plan for their own benefit;

d.     whether the Defendants breached their obligations to diversify the investments of the Plan when they caused or permitted the Plan to be invested 100% in equities;

e.     whether each of the Defendants breached their obligations to monitor and reevaluate the 100% Equity Strategy in light of the dramatic changes in market conditions and the sharp increase in the volatility of and correlation within the equities market, thereby exposing the Plan to unnecessary risk of loss;

f.     whether the Defendants engaged in self-dealing by pursuing a 100% Equities Strategy which benefitted FAF Advisors and several members of the Compensation Committee and Board of Directors;

48

g.      whether the Plan suffered losses as a result of the breaches of fiduciary duty and co-fiduciary obligations committed by any or all of the Defendants and, if so, the extent of those losses; and

h.      whether Defendants profited through the use of Plan assets.

214.    The issues regarding relief are also common to all members of the Class, as any relief will consist primarily of a determination of whether the Class is entitled to recover losses on behalf of the Plan from any of the Defendants as a result of their breaches of fiduciary duty and/or to recover any profits made through the use of Plan assets.  Any monetary relief recovered pursuant to ERISA § 409(a) will be paid into the Plan itself.

**D.      Typicality**

215.    Plaintiffs' claims are typical of those of the Class they seek to represent because the claims arise from the same events, practices, and/or course of conduct. Specifically, Plaintiffs' claims on behalf of themselves and all other members of the Class challenge Defendants' 100% Equities Strategy and management of the Plan's assets during the Class Period.

216.    Plaintiffs' claims under ERISA § 502(a)(2), which allows for relief to be sought on behalf of the Plan and for any monetary relief to be paid into the Plan, are typical because Plaintiffs bring the same claim that each participant and beneficiary of the Plan is entitled to bring.

217.    Plaintiffs' claims are also typical with respect to any equitable relief because that relief would affect all Class members equally.

**E.      Adequacy**

218.    Plaintiffs will fully and adequately protect the interests of all members of the Class.

49

219.   Plaintiffs have no interests that are antagonistic or in conflict with the interests of the Class.

220.   Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

221.   Plaintiffs have retained competent counsel who are experienced in class action and ERISA litigation.

**F.   Rule 23(b)(1) Requirements**

222.   The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for one or more of the Defendants.

223.   The requirements of Rule 23(b)(1)(B) are satisfied because adjudication of these claims by individual members of the Class would, as a practical matter, be dispositive of the interests of the other members who are not parties to the actions, or substantially impair or impede the ability of those other members of the Class to protect their interests.

**G.   Rule 23(b)(2) Requirements**

224.   The requirements of Rule 23(b)(2) are satisfied because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

**H.   Rule 23(b)(3) Requirements**

225.   The requirements of Rule 23(b)(3) are met in this action because (a) the questions of law and/or fact – whether the Defendants violated ERISA by pursuing an investment allocation strategy that resulted in 100% of the Plan's assets being invested in

equities – are not only common, but will predominate over any individual questions, and (b) a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

226.    The following factors set forth in Rule 23(b)(3) favor certification of this case as a class action:

        a.    The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the same reasons that this case should be certified under Rule 23(b)(1).

        b.    This District is the most desirable location for concentrating the litigation for several reasons, including: (i) the fiduciary breaches alleged herein occurred in this District; (ii) the Plan is administered in this District; and (iii) the majority of the company witnesses are located in this District.

227.    There are no anticipated difficulties in managing this case as a class action.

## VIII.    CAUSES OF ACTION

### COUNT I

**BREACH OF FIDUCIARY DUTIES UNDER ERISA § 404 FOR MAINTAINING OR RE-ADOPTING THE 100% EQUITIES STRATEGY, AND FOR FAILING TO MONITOR AND TERMINATE THE 100% EQUITIES STRATEGY (AGAINST THE COMPENSATION COMMITTEE DEFENDANTS, THE INVESTMENT COMMITTEE DEFENDANTS, AND FAF ADVISORS)**

228.    Pursuant to Fed. R. Civ. P. Rule 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

229.    The Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors were fiduciaries of the Plan within the meaning of ERISA § 3(21) with respect to the management and disposition of the assets of the Plan.

230.    As fiduciaries of the Plan, the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors were required, pursuant to ERISA § 404(a)(1)(A), to act solely in the interest of the participants and beneficiaries of the plan

1862296.2

they served and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

231.   As fiduciaries of the Plan, the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors were required, pursuant to ERISA § 404(a)(1)(B), to discharge of their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

232.   As fiduciaries of the Plan, the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors were required, pursuant to ERISA § 404(a)(1)(C), to diversify the investments of the Plan so as to minimize the risk of large losses.  29 U.S.C. § 1104(a)(1)(C).  This obligation includes a duty to diversify the Plan's investments both between asset classes as well as within asset classes.

233.   As fiduciaries of the Plan, the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors were required, pursuant to ERISA § 404(a)(1)(D), to act in accordance with the documents and instruments governing the Plan, including the Investment Policy and the Investment Guidelines.   29 U.S.C. § 1104(a)(1)(D).

234.   As previously alleged, the Compensation Committee was expressly responsible, on an ongoing basis, for "determining the types of investments in which the Fund is to be invested (i.e., equity versus bond)," for "selecting, monitoring and terminating the individual investments," and for selecting or establishing, monitoring, and terminating individual separate accounts for investments.

235.   Because the Compensation Committee Defendants were charged with the responsibility to select, monitor, and terminate the types of investments of the Plan, the individual investments of a Plan, and the individual separate accounts for investments,

they each had an ongoing duty to monitor the prudence and loyalty of the investment strategy, as well as each investment (or each separate account), to ensure that any individual investment did not cause the Plan as a whole to be undiversified, that no investments constituted prohibited transactions, and that no investments violated the applicable Plan documents, including the Investment Policy and Investment Guidelines.

236. Specifically, the Compensation Committee was responsible for reviewing the existing 100% Equities Strategy and deciding to diversify the Plan's portfolio to include other asset classes, especially during times when the equities market environment changed dramatically. The Investment Policy states, "From time to time the Committee may make additional diversifying investments in other asset classes [other than equities]."

237. As previously alleged, the Investment Committee Defendants were expressly responsible for "monitoring the performance of the investments." As such, they had an ongoing duty to monitor the prudence and loyalty of each investment, to ensure that any individual investment did not cause the Plan as a whole to be undiversified, that no investments constituted prohibited transactions, and that no investments violated the applicable Plan documents, including the Investment Policy and Investment Guidelines.

238. As previously alleged, FAF Advisors had "full discretionary authority" to supervise and direct the investment and reinvestment of the assets of the Plan in compliance with the limitations and requirements of ERISA. As such, FAF Advisor had an ongoing duty to monitor the prudence and loyalty of the types of investments of the Plan as well as each investment of the Plan, to ensure that any individual investment did not cause the Plan as a whole to be undiversified, that no investments constituted prohibited transactions, and that no investments violated ERISA or the Plan documents, including the Investment Policy and Investment Guidelines.

239.    The Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors breached these duties to select, monitor, and terminate investments by, inter alia:

a.    Causing the Plan to continue to be invested in the 100% Equities Strategy, which was imprudent, disloyal, and failed to properly diversify the investments of the Plan, thereby exposing the Plan to unnecessary risk of loss, even though they knew or should have known that such an investment allocation represented an imprudent allocation for pension assets;

b.    Failing to adequately monitor the 100% Equities Strategy by reevaluating the strategy periodically to determine whether it continued to be prudent in light of the dramatic changes in market conditions in late 2007 and the first half of 2008, including the sharp increase in the volatility of the equities market and the increased correlation among all stocks, thereby exposing the Plan to unnecessary risk of loss;

c.    Allowing the purchase of new equity investments during the class period, which maintained the undiversified and excessively risky allocation to 100% equities;

d.    Failing to terminate existing equity investments and purchase other asset classes to ensure that the Plan's portfolio was diversified, invested prudently and loyally, and in compliance with the terms of the Plan and ERISA; and

e.    Failing to terminate existing investments that did not comply with the Investment Policy, Investment Guidelines, or Investment Management Agreements of the Plan.

240.    On information and belief, no other ERISA-governed defined benefit plan is invested 100% in equities.

241.   The Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors also breached those duties by causing the Plan to continue to be invested in an excessively risky strategy, which permitted U.S. Bancorp to project higher rates of return on the assets of the Plan to increase the Company's net income and stock price.   These Defendants maintained or re-adopted the 100% Equities Strategy despite the sharp increase in the volatility of the equities market and the increased correlation among all stocks that occurred from late 2007 to mid-2008.

242.   The Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors also breached those duties by continuing to maintain an imprudent, disloyal, and undiversified 100% Equities Strategy in order to maximize the assets available to FAF Advisors to invest in its own mutual funds and to create a pool of corporate securities to use in its SLP, thereby increasing the net income of FAF Advisors to the benefit of FAF Advisors and its parent, U.S. Bank, N.A.   These Defendants maintained or re-adopted the 100% Equities Strategy despite the sharp increase in the volatility of the equities market and the increased correlation among all stocks that occurred from late 2007 to mid-2008.

243.   The fact that after U.S. Bancorp sold FAF Advisors (and thus removed its self-interest), the Plan was reformed to include a significant allocation to fixed income and real estate is further evidence that an investment allocation of 100% in equities is imprudent and undiversified.

244.   As a result of the above-described conduct, the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors have (a) failed to act solely in the interest of the participants and beneficiaries of the Plan for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);   (b) failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with

55

CASE 0:13-cv-02687-JNE-JJK   Document 92   Filed 03/20/14   Page 56 of 78

like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, in violation of ERISA § 404(a)(1)(C) , 29 U.S.C. § 1104(a)(1)(C); and (d) failed to act in accordance with the documents and instruments governing the Plan, including the Investment Policy and the Investment Guidelines, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

245.    The Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors, through these multiple breaches of fiduciary duty, caused the Plan to suffer at least $748 million in losses that would not have occurred had the Plan been prudently diversified.

246.    As such, the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors are liable to restore to the Plan the losses suffered by the Plan as a result of their breaches, as well as to disgorge any profits or fees the Compensation Committee Defendants, the Investment Committee Defendants, or FAF Advisors received in connection with their several breaches of fiduciary duty.

## COUNT II

### BREACH OF FIDUCIARY DUTIES UNDER ERISA § 404 and § 406
### FOR MANAGEMENT OF THE SLP COLLATERAL
### (AGAINST FAF ADVISORS)

247.    Pursuant to Fed. R. Civ. P. Rule 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

248.    FAF Advisors was a fiduciary of the Plan within the meaning of ERISA § 3(21), with respect to the management and disposition of the assets of the Plan.

249.    As a fiduciary of the Plan, FAF Advisors was required, pursuant to ERISA § 404(a)(1)(A), to act solely in the interest of the participants and beneficiaries of the plan they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and

56

1862296.2

their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

250.    As a fiduciary of the Plan, FAF Advisors was also required, pursuant to ERISA § 404(a)(1)(B), to invest the Plan assets "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

251.    As a fiduciary of the Plan, FAF Advisors was required, pursuant to ERISA § 404(a)(1)(D), to act in accordance with the documents and instruments governing the Plan, including the Investment Policy and the Investment Guidelines. 29 U.S.C. § 1104(a)(1)(D).

252.    As a fiduciary of the Plan, FAF Advisors was prohibited under ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), from dealing with the assets of the Plan in its own interest or for its own accounts.

253.    The collateral which the Plan received from borrowers to secure the repayment of the equity securities loaned to third parties under the SLP constituted Plan assets which FAF Advisors was under an obligation to prudently invest in conservative, high quality, low risk investments so as to minimize the risk of loss to the Plan.

254.    Despite these obligations, FAF Advisors invested the collateral the Plan received under the SLP in the Mount Vernon Bond Portfolio, which it knew or should have known included high risk, low quality assets-backed commercial paper issued by three SIVs that were backed by toxic subprime mortgages and Alt-A securities.

255.    During the second half of 2007, the values for SIV commercial paper began to fall sharply. As early as August 2007, investment rating agencies started to downgrade the rating of the commercial paper issued by the SIVs. By November 2007, rating agencies rated all three SIVs as either "D," "Not Prime," or "junk."

256.   The cutting of the SIV's bond rating to junk should have caused FAF Advisors to divest the Plan's interest in the Mount Vernon Portfolios.

257.   After the SIVs defaulted, the value of the Bond Portfolio, which was always supposed to stay above a NAV of $1, lost significant value.  According to the Plan's 2008 Form 5500, the collateral held by the Plan under the SLP, which was invested in the Mount Vernon Portfolios, lost over $14.2 million in 2008 and those losses were never recovered by the Plan before it ceased participating in the SLP.

258.   Had the Bond Portfolio been prudently managed by FAF Advisors to preserve capital and minimize fluctuations in the NAV and not invested in risky, low quality commercial paper issued by SIVs, the Plan would not have suffered the $14 million loss to the Plan's reinvested collateral.

259.   Given that FAF Advisors knew that the Bond Portfolio was invested in risky low quality commercial paper issued by SIVs, it should have sold any investment the Plan had in the Bond Portfolio.

260.   FAF Advisors also invested the collateral the Plan received under the SLP in the Mount Vernon Prime Portfolio.

261.   FAF Advisors, through Emil Busse, fraudulently transferred loans between the lenders in the Prime Portfolio (including the Plan) to lenders in the Bond Portfolio, to preserve FAF's reputation as a money manager.  These acts caused losses to the Plan and benefited FAF Advisors rather than the Plan.

262.   As a result of the above-described conduct, FAF Advisors failed to act solely in the interest of the participants and beneficiaries of the Plan for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and failed to

act in accordance with the documents and instruments governing the Plan, including the Investment Policy and the Investment Guidelines in violation of ERISA § 404(a)(1)(D). 29 U.S.C. § 1104(a)(1)(D).

263.    The FAF Advisors conduct also violated ERISA § 406(b) in that FAF Advisors engaged in the fraudulent transfers for its own reputational benefit – to avoid "breaking the buck" and therefore dealt with plan assets for its own interest.

264.    Had FAF Advisors invested the collateral which the Plan received from borrowers to secure the repayment of the equity securities loaned to third parties under the SLP in conservative, high-quality, low-risk investments, as it was obligated to do, the Plan would not have suffered the same losses as a result of the investment in the Mount Vernon Portfolios.

265.    As such, FAF Advisors is liable to restore to the Plan the losses suffered by the Plan as a result of their breaches and to disgorge all profits and fees which it made from lending the Plan's securities under the SLP.

## COUNT III

**BREACH OF FIDUCIARY DUTY UNDER ERISA § 404 FOR FAILURE TO MONITOR OTHER FIDUCIARIES OF THE PLAN (AGAINST THE COMPENSATION COMMITTEE DEFENDANTS, THE INVESTMENT COMMITTEE DEFENDANTS, AND THE BOARD OF DIRECTOR DEFENDANTS)**

266.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

267.    This Count alleges fiduciary breaches against the Compensation Committee Defendants, the Investment Committee Defendants, and the Board of Director Defendants (collectively the "Monitoring Defendants").

268.    Under ERISA, a fiduciary charged with the authority to select and remove other fiduciaries or who, as a practical matter, actually appoints other fiduciaries, has an ongoing duty to monitor the performance of those persons whom the fiduciary may

59

remove at reasonable intervals to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.

269.   As fiduciaries, the Monitoring Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan and the Plan's investments "solely in the interest of the participants and beneficiaries" of the Plan and for the "exclusive purpose" of providing benefits to the participants and beneficiaries of the Plan and defraying reasonable expenses.

270.   As fiduciaries of the Plan, the Monitoring Defendants were required pursuant to ERISA § 404(a)(1)(B) to discharge of their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

271.   As fiduciaries of the Plan, the Monitoring Defendants were required pursuant to ERISA § 404(a)(1)(C) to diversify the investments of the Plan so as to minimize the risk of large losses.  29 U.S.C. § 1104(a)(1)(C).

272.   As fiduciaries of the Plan, the Monitoring Defendants were required pursuant to ERISA § 404(a)(1)(D) to act in accordance with the documents and instruments governing the Plan, including the Investment Policy and the Investment Guidelines.  29 U.S.C. § 1104(a)(1)(D).

273.   As previously alleged, the Board of Directors Defendants were responsible for the appointment and removal, and for periodically monitoring the performance, of the Compensation Committee, the Investment Committee, and FAF Advisors, through which the Compensation Committee controlled the investments and investment allocations of the Plan.

274.   As previously alleged, the Compensation Committee was responsible on an ongoing basis for the appointment of the Investment Manager of the Plan, FAF Advisors, which included the ongoing duty to monitor the performance of FAF Advisors.

275.    As previously alleged, the Investment Committee Defendants were charged with the responsibility for monitoring the performance of the investments of the Plan and for monitoring any investment advisors hired by the Investment Committee.  As part of its responsibility to monitor the investments of the Plan, the Investment Committee Defendants had a duty to monitor the investment decision making of the other fiduciaries who controlled the investment allocation of the Plan, including the Compensation Committee Defendants and FAF Advisors.

276.    The Monitoring Defendants, who were individually and collectively responsible for the appointment, removal, and periodic monitoring of the performance of FAF Advisors, breached that duty by, inter alia:

a.      Failing to properly monitor the performance of FAF Advisors to determine whether it was prudently investing the assets of the Plan and adequately diversifying the Plan's investments to reduce the risk of large loss to the Plan;

b.      Failing to conduct a thorough review of FAF Advisors' management of the Plan's assets and the management of the SLP, and failing to promptly remove FAF Advisors as the Plan's Investment Manager after learning that FAF Advisors had fraudulently manipulated the Mount Vernon Portfolios;

c.      Permitting FAF Advisors to maintain a 100% Equities Strategy despite the dramatic changes in market conditions, including the sharp increase in the volatility of the equities market and the increased correlation among all stocks from late 2007 to mid-2008, and thereby exposing the Plan to unnecessary risk of loss, even though the Monitoring Defendants knew or should have known that the Plan's undiversified investment allocation, under the circumstances then prevailing, represented an inappropriate allocation for pension assets;

   d. Permitting FAF Advisors to maintain a risky and imprudent 100% Equities Strategy that allowed U.S. Bancorp to project higher rates of return on the assets of the Plan to increase the Company's net income and stock price;

   e. Permitting FAF Advisors to maintain a risky, imprudent and disloyal 100% Equities Strategy that allowed FAF Advisors to maximize the assets available to invest in FAF Advisors' own mutual funds and to create a pool of funds to invest in its SLP, all to the benefit of FAF Advisors and its parent, U.S. Bank, N.A., at a time when the Plan was substantially overfunded and the continued pursuit of such a risky investment allocation strategy to secure a high rate of return on the Plan's investments would not result in any greater pension benefits for the Plan participants and their beneficiaries;

   f. Failing to ensure that FAF Advisors performed an adequate due diligence review of the assets acquired by the Mount Vernon Portfolios in which the collateral received by the Plan under the SLP was invested to assure that such investments were conservative, high-quality, low-risk, and highly liquid so they would not present an undue risk of loss to the Plan; and

   g. Failing to take actions to remedy the breaches of FAF Advisors and to recover the losses suffered by the Plan resulting from FAF Advisors' failure to prudently manage the Mount Vernon Portfolios to assure the cash collateral the Plan received under the SLP was being invested in high-quality, low-risk investments.

  277. The Monitoring Defendants, through these multiple breaches of fiduciary duty, caused the Plan to suffer at least $748 million in losses to the Plan's investment portfolio and an additional $14 million in losses to its securities lending portfolio that would not have occurred had the Plan been prudently diversified.

  278. Had the Monitoring Defendants properly monitored the other fiduciaries of the Plan, the Plan would not have suffered such significant losses.

279.   As a result of the above-described conduct, the Monitoring Defendants have failed to act solely in the interest of the participants and beneficiaries of the Plan for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); failed to diversify the investments of the Plan so as to minimize the risk of large losses, in violation of ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C); and failed to act in accordance with the documents and instruments governing the Plan, including the Investment Policy and the Investment Guidelines, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

280.   As a result of the above-described conduct, the Monitoring Defendants have breached their fiduciary obligations to monitor FAF Advisors.   As such, the Monitoring Defendants are liable to restore to the Plan the losses suffered by the Plan as a result of their breaches and disgorge any profits received as a result of the breaches.

281.   As a result of the above-described conduct, the Board of Director Defendants have breached their fiduciary obligations to monitor the Compensation Committee Defendants and are thus liable to restore to the Plan the losses suffered by the Plan as a result of their breaches and to disgorge any profits received as a result of the breaches.

## COUNT IV

### (VIOLATION OF ERISA § 406(a) AGAINST THE COMPENSATION COMMITTEE DEFENDANTS, THE INVESTMENT COMMITTEE DEFENDANTS, AND FAF ADVISORS)

282.   Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

283.   As an employer and the sponsor of the Plan, U.S. Bancorp was and continues to be a party-in-interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14).

284.   As fiduciaries of the Plan, the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors were prohibited, pursuant to ERISA § 406(a)(1)(D),  29 U.S.C. § 1106(a)(1)(D), from causing the Plan to engage in any transaction when they individually or collectively knew that the transaction constituted a direct or indirect use by or for the benefit of a party-in-interest of any assets of the Plan.

285.   By virtue of their positions as fiduciaries of the Plan, the Compensation Committee Defendants, Investment Committee Defendants, and/or FAF Advisors caused or permitted the Plan to pursue a 100% Equities Strategy that was designed to and did allow U.S. Bancorp, the sponsor of the Plan, to claim artificially high pension returns as part of U.S. Bancorp's consolidated income by investing 100% of Plan assets in equities. This direct or indirect use of plan assets benefited U.S. Bancorp in the following ways: (1) U.S. Bancorp's minimum contributions were decreased; and (2) the aggressive 100% Equities Strategy allowed U. S. Bancorp to justify to shareholders a high assumed rate of return for pension assets, which improved the Company's financial reporting.

286.   Between 2007 and 2010, the Compensation Committee Defendants, Investment Committee Defendants, and/or FAF Advisors caused the Plan to engage in multiple transactions involving purchases, sales, and exchanges of hundreds of millions in equity securities which were part of the 100% Equities Strategy designed to benefit U.S. Bancorp rather than Plan participants.

287.   As such, the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors violated their fiduciary duties under ERISA by causing the Plan to engage in transactions using Plan assets when they knew or should have known that the transactions constituted a direct or indirect use by or for the benefit of

64

U.S. Bancorp, a party in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

288.    The Compensation Committee Defendants, Investment Committee Defendants, and/or FAF Advisors are therefore liable to disgorge any profits or fees any of them received in connection with such prohibited transactions and to restore to the Plan the losses suffered by the Plan as a result of the prohibited transactions.

## COUNT V

### (VIOLATION OF ERISA § 406(b) AGAINST FAF ADVISORS)

289.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

290.    As a fiduciary of the Plan, FAF Advisors was prohibited under ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), from dealing with the assets of the Plan in its own interest or for its own accounts.

291.    By virtue of its position as a fiduciary of the Plan, FAF Advisors caused or permitted the Plan to pursue the 100% Equities Strategy that was designed to and did allow FAF Advisors, the Investment Manager of the Plan, to maximize the assets available to FAF Advisors to invest in its own mutual funds and to create a pool of funds to use in its SLP, thereby increasing the net income of FAF Advisors to the benefit of FAF Advisors and its parent, U.S. Bank, N.A.  Accordingly, FAF Advisors pursued a 100% Equities Strategy that redounded to the benefit of FAF Advisors while risking the retirement security of the Plan's participants and beneficiaries by exposing the Plan assets to the higher risk of an undiversified portfolio.  Moreover, FAF continued to pursue the 100% Equities Strategy, despite dramatic changes in market conditions, including the sharp increase in the volatility of the equities market and increased correlation among all stocks within the equities market, which occurred from late 2007 to mid-2008, thereby

exposing the Plan to an unnecessary risk of loss. By these actions, FAF Advisors violated its fiduciary duties under ERISA by dealing with the assets of the Plan in its own interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

292.    In addition, FAF Advisors had complete discretion to pick the individual equity investments for the Plan.  Rather than choose the lowest cost equity investments, FAF Advisors chose to invest a significant part of the Plan's assets its own mutual funds in order to generate management fees for FAF Advisors, which violates ERISA's prohibition against dealing with the assets of the Plan in its own interest. ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

293.    As a fiduciary of the Plan, FAF Advisors was prohibited under ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), from acting in transactions involving the Plan on behalf of a party whose interests are adverse to the interests of the Plan or the interests of its participants or beneficiaries, which has been interpreted to prohibit FAF Advisors as a fiduciary of the Plan from acting on both sides of a transaction that involves Plan assets.

294.    Because FAF Advisors was the investment advisor of the underlying FAF Mutual Funds in which it invested the Plan's assets, FAF Advisors was acting on both sides of all transactions where the Plan invested or redeemed its interest in the FAF Mutual Funds.  By these actions, FAF Advisors violated its fiduciary duties under ERISA numerous times by acting in transactions involving the Plan on behalf of a party whose interests are adverse to the interests of the Plan or the interests of its participants or beneficiaries in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

295.    FAF Advisors is therefore liable to disgorge of any profits or fees it received in connection with its management of Plan assets and to restore to the Plan the losses suffered by the Plan as a result of its violations of ERISA § 406(b).

## COUNT VI

## (VIOLATION OF ERISA § 406(b) AGAINST FIDUCIARIES WHO EXERCISED AND SOLD STOCK OPTIONS)

296.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

297.    The following Defendants exercised stock options and sold Company stock during the Class Period: Coors, Collins, Gluckman, Levin, Stokes, Davis, Reiten, Johnson, Schnuck, and Owens.

298.    As fiduciaries of the Plan, Defendants Coors, Collins, Gluckman, Levin, Stokes, Davis, Reiten, Johnson, Schnuck, and Owens are and were prohibited by ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), from dealing with the assets of the Plan in their own interest or for their own accounts.

299.    By virtue of their positions as fiduciaries of the Plan, Defendants Coors, Collins, Gluckman, Levin, Stokes, Davis, Reiten, Johnson, Schnuck, and Owens caused and/or allowed U.S. Bancorp to claim artificially high pension returns as part of the Company's income by allowing the Plan to be invested 100% in equities.  This direct or indirect use of Plan assets benefited the Company and its Board members by decreasing the employer contributions and the funding requirements and by inflating the corporate earnings by the excess risk in the portfolio.

300.    These Defendants, in their positions as fiduciaries of the Plan, maintained an Investment Policy that allowed U.S. Bancorp to report higher operating income than it would have if the Plan had been allocated in a prudent and/or diversified manner. Moreover, these Defendants maintained the 100% Equities Strategy for the benefit of U.S. Bancorp even after dramatic changes in the financial markets, including the sharp increase in the volatility of the equities market and the increased correlation among all stocks in the equities market from late 2007 to mid-2008, which exposed the Plan to an unnecessary risk of large loss.

67

301.   Upon information and belief, by allowing and enabling U.S. Bancorp to report higher operating income based on the excessively risky 100% Equities Strategy, these Defendants expected that the stock price of U.S. Bancorp would also increase.

302.   Upon information and belief, the Investment Policy adopted and implemented for the Plan resulted in a higher stock price for U.S. Bancorp than if the Plan assets had been prudently allocated, diversified, and reported a lower income and/or expected rate of return.

303.   On information and belief, during the Class Period, these Defendants profited from the higher expected rate of return because they were able to exercise and sell stock options at higher prices.

304.   By utilizing the Plan assets to increase corporate income and the corporate stock price and by taking advantage of the increased price of U.S. Bancorp stock by the sale of such stock, these Defendants violated their fiduciary duties under ERISA by dealing with the assets of the Plan for their own personal interests in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

305.   Defendants Coors, Collins, Gluckman, Levin, Stokes, Davis, Reiten, Johnson, Schnuck, and Owens are therefore liable to disgorge any profits they received in connection with the exercise and sale of such stock during the Class Period.

## COUNT VII

### (CO-FIDUCIARY LIABILITY UNDER ERISA § 405 AGAINST THE BOARD OF DIRECTOR DEFENDANTS, U.S. BANK, N.A., THE INVESTMENT COMMITTEE DEFENDANTS, THE COMPENSATION COMMITTEE DEFENDANTS AND FAF ADVISORS)

306.   Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

1862296.2

307.   This Count alleges fiduciary breaches against the Board of Director Defendants, U.S. Bank, N.A., the Investment Committee Defendants, the Compensation Committee Defendants, and FAF Advisors.

308.   As alleged above, during the Class Period, these Defendants were named as fiduciaries in the Plan Document pursuant to ERISA § 402(a), 29 U.S.C. § 1102(a), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

309.   Section 405(a)(1) of ERISA, 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if he knowingly participates in a breach of fiduciary duty by another fiduciary. Section 405(a)(2) of ERISA, 29 U.S.C. § 1105(a)(2), imposes liability if a fiduciary, in the administration of his fiduciary responsibilities, enables another fiduciary to commit a breach.   Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if he knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

310.   The Board of Director Defendants, U.S. Bank, N.A., the Compensation Committee Defendants, the Investment Committee Defendants, and FAF Advisors, each of whom were fiduciaries within the meaning of ERISA, by the nature of their fiduciary responsibilities with respect to the Plan, knew of each breach of fiduciary duty alleged herein arising out the investment allocation strategy pursued by the Compensation Committee and FAF Advisors, which resulted in the Plan's assets being invested 100% in equities and took no steps to remedy those breaches, despite dramatic changes in the financial markets that occurred from late 2007 to mid-2008, including the sharp increase in volatility in the equities market and the increased correlation among stocks.

a.      The Board of Director Defendants knew that the Plan was invested 100% in equities because this fact was repeatedly disclosed in SEC filings and the Company's annual reports.  Directors of the Company were responsible for reviewing the disclosures made to investors.  In addition, the Board of Director Defendants knew that the Plan was invested in a much riskier manner than the typical corporate defined benefit plan because the typical investment allocation, which limited equities to 62% of the Plan's assets and included 32% of fixed income, was also disclosed in the Company's 2007 Annual Report.

b.      The Board of Director Defendants also reviewed the Investment Policy of the Plan, which stated that the Compensation Committee had decided to invest the Plan 100% in equities.

c.      The Trustee, U.S. Bank, N.A., knew that the Plan was invested 100% in equities because it was responsible for executing all the trades to effectuate the Investment Policy.

d.      The Investment Committee and Compensation Committee Defendants knew that the Plan was invested 100% in equities because they were responsible for monitoring the individual investments of the Plan and thus knew that the Plan only held equity investments.

e.      FAF Advisors knew that the Plan was invested 100% in equities because it was charged with picking the individual investments for the Plan (which were all invested in equities) and the 100% Equities Strategy was described in the Investment Policy.

f.      The Board of Director Defendants, the Trustee, the Investment Committee and Compensation Committee Defendants, and FAF Advisors all knew that the 100% Equities Strategy was a breach of prudence because, as fiduciaries, they were aware of the prudence requirement to minimize the risk of large losses.

70

g.     The Board of Director Defendants, the Trustee, the Investment Committee and Compensation Committee Defendants, and FAF Advisors all knew that the 100% Equities Strategy was a breach of diversification because the lack of diversification is so extreme in that the Plan was invested entirely in one single asset class.

h.     The Board of Director Defendants, the Compensation Committee and Investment Committee Defendants, and FAF Advisors knew that the 100% Equities Strategy was a breach of loyalty and violated ERISA Section 406 because they were aware of the many ways in which the Company, its Directors, and FAF Advisors benefitted from the breach of loyalty and the Section 406 violations, including but not limited to the mutual fund fees paid to FAF Advisors and the increased corporate income generated by an excessively high assumed rate of return on pension assets.

311.   As such, each is liable for such breaches by the Compensation Committee and FAF Advisors pursuant to Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3).

312.   The Board of Director Defendants, U.S. Bank, N.A., the Compensation Committee Defendants, and the Investment Committee Defendants, each of whom were fiduciaries within the meaning of ERISA, by the nature of their fiduciary responsibilities with respect to the Plan, knew of the breaches of fiduciary duty alleged herein arising out of FAF Advisors' failure to prudently manage the Mount Vernon Portfolios to assure the cash collateral the Plan received under the SLP was being invested in high-quality, low-risk investments, which resulted in the losses to the Plan and took no steps to remedy those breaches.

a.     The Board of Director Defendants, including the Compensation Committee and Investment Committee Defendants, knew of FAF Advisors' actions in connection with the Securities Lending Program because they were aware of the 2010 SEC investigation of Emil Busse that lead to a cease and desist order.  On information

71

and belief, the Company conducted a major internal investigation of FAF Advisors' management of the Securities Lending Portfolio, which led the Company to fire Emil Busse and to sell FAF Advisors to Nuveen.

b.      The Compensation Committee knew of FAF Advisors' actions in connection with the Securities Lending Program because, according to the Plan documents, they were responsible for monitoring FAF Advisors.

c.      The Trustee, U.S. Bank N.A., knew of FAF Advisors' actions in connection with the Securities Lending Program because it was responsible for executing all of the trades related to the reinvestment of collateral for the Plan.

d.      The Investment Committee knew of FAF Advisors' actions in connection with the Securities Lending Program because, on information and belief, they were responsible for monitoring investment managers, such as FAF Advisors.

313.   As such, each is liable for such breaches by FAF Advisors pursuant to Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3).

314.   The Compensation Committee Defendants maintained the unduly risky and inappropriate investment allocation strategy, thereby enabling the breaches of FAF Advisors in adhering to the 100% Equities Strategy, despite dramatic changes in the financial markets that occurred from late 2007 to mid-2008, including the sharp increase in volatility in the equities market and the increased correlation among stocks.   As such, the Compensation Committee Defendants are liable for the breaches of FAF Advisors pursuant to Section 405(a)(2) of ERISA, 29 U.S.C. § 1105(a)(2).

315.   The Board of Director Defendants appointed the Compensation Committee Defendants and then failed to appropriately monitor their performance, despite dramatic changes in the financial markets that occurred from late 2007 to mid-2008, including the sharp increase in volatility in the equities market and the increased correlation among stocks.   This resulted in their failure to implement a prudent, loyal, and diversified

Investment Policy and thereby enabled the breaches of the Compensation Committee Defendants.  As such, the Board of Director Defendants are liable for the breaches of FAF Advisors pursuant to Section 405(a)(2) of ERISA, 29 U.S.C. § 1105(a)(2).

316.   The Compensation Committee Defendants maintained the unduly risky and inappropriate investment allocation strategy, thereby knowingly participating in the breaches of FAF Advisors in adhering to the 100% Equities Strategy, despite dramatic changes in the financial markets that occurred from late 2007 to mid-2008, including the sharp increase in volatility in the equities market and the increased correlation among stocks.  As such, the Compensation Committee Defendants are liable for such breaches of FAF Advisors pursuant to Section 405(a)(1) of ERISA, 29 U.S.C. § 1105(a)(1).

317.   The Investment Committee Defendants, whose fiduciary responsibilities included monitoring the performance of the Plan's  investments and reporting on the same to the Compensation Committee, knowingly participated in and/or by their actions enabled the breaches of fiduciary duty alleged herein against the Compensation Committee and FAF Advisors arising out of the 100% Equities Strategy, despite dramatic changes in the financial markets that occurred from late 2007 to mid-2008, including the sharp increase in volatility in the equities market and the increased correlation among stocks.  The Investment Committee Defendants are therefore liable for such breaches of the Compensation Committee Defendants and/or FAF Advisors pursuant to Section 405(a)(1) and (2) of ERISA, 29 U.S.C. § 1105(a)(1) and (2).

## COUNT VIII
### (KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTY AND PROHIBITED TRANSACTIONS AGAINST U.S. BANCORP)

318.   Pursuant to Fed. R. Civ. P. 10(c), Plaintiffs hereby re-allege and incorporate by reference the allegations of the preceding paragraphs.

73

319.   This Count alleges liability for knowing participation in the breaches of fiduciary duty and/or prohibited transactions pleaded in Counts I through V against U.S. Bancorp.

320.   U.S. Bancorp knowingly participated in the several breaches and prohibited transactions set forth in Counts I through V

321.   The Company knew of the 100% Equities Strategy employed by the Compensation Committee Defendants, Investment Committee Defendants, Board of Director Defendants and FAF Advisors, as shown in the Company's 2007 Annual Report, which states, "In establishing its investment policies and asset allocation strategies, the Company considers expected returns and the volatility associated with different strategies."   Moreover, the Company knew that, despite dramatic changes in the financial markets that occurred from late 2007 to mid-2008, including the sharp increase in volatility in the equities market and the increased correlation among stocks,   the Compensation Committee Defendants, Investment Committee Defendants, and FAF Advisors continued to adhere to the 100% Equities Strategy.

322.   The Company knew that the continued adherence to the 100% Equities Strategy was imprudent and non-diversified because it further acknowledged in the 2007 Annual Report that "Generally, based on historical performance of the various investment asset classes, investments in equities have outperformed other investment classes but are subject to higher volatility. While an asset allocation including bonds and other assets generally has lower volatility and may provide protection in a declining interest rate environment, it limits the pension plan's long-term up-side potential."

323.   The Company also disclosed that it was involved in the decision to continue to maintain the 100% Equities Strategy for the Plan.   The 2007 Annual Report states, "Given the pension plans' investment horizon and the financial viability of the Company to meet its funding objectives, the Committee has determined that an asset allocation strategy investing in 100 percent equities diversified among various domestic equity categories and international equities is appropriate."

324.   The Company was also involved in the determination of the long term assumed rate of return as disclosed in the 2007 Annual Report, which states, "The Company has an established process for evaluating all the plans, their performance and significant plan assumptions, including the assumed discount rate and the long-term rate of return," and "the Company considers a range of potential expected rates of return, economic conditions for several scenarios, historical performance relative to assumed rates of return and asset allocation and LTROR information for a peer group in establishing its assumptions."

325.   Moreover, U.S. Bancorp knowingly participated in the decision to maintain the 100% Equities Strategy, despite dramatic changes in the financial markets that occurred from late 2007 to mid-2008, including the sharp increase in volatility in the equities market and the increased correlation among stocks.

326.   U.S. Bancorp profited from their knowing participation in the fiduciary breaches and prohibited transactions committed by the Board of Director Defendants, the Compensation Committee Defendants, and FAF Advisors through fees paid to its subsidiary, FAF Advisors, and through the creation of excess pension income that

75

allowed U.S. Bancorp to project extremely high returns for the pension portfolio, which improved the Company's bottom line.

327.    Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the participants of the Plan are entitled to a constructive trust for their benefit to disgorge all ill-gotten gains obtained by U.S. Bancorp and to obtain any other appropriate equitable relief.

## IX.   ENTITLEMENT TO RELIEF

328.    By virtue of the violations of ERISA described in the preceding paragraphs, Plaintiffs and the Class, as participants and beneficiaries of the Plan, have standing to sue the fiduciaries who committed these breaches of fiduciary duty and/or violations of ERISA pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3).

329.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiffs are entitled to obtain relief under § 409(a), 29 U.S.C. § 1109(a), including: (i) to recover any losses on behalf of the Plan from any breaching fiduciaries; (ii) to recover profits or disgorgement of profits resulting from any such breaches; and (iii) other equitable or remedial relief as the Court deems appropriate, such as permanent injunctive relief and/or the removal of the current fiduciaries and appointment of an independent fiduciary to manage the investments of the Plan.

330.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which permits a plan participant, beneficiary, or fiduciary to bring an action to redress violations and/or enforce provisions of Title I of ERISA, including for any injunctive relief that the Court deems appropriate, Plaintiffs are entitled to sue Defendants for equitable relief.

1862296.2

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants in the following manner:

A.    A declaration that the Defendants have breached their fiduciary duties to the Class in the manner described herein;

B.    An order requiring each fiduciary found to have breached his/her/its fiduciary duty to the Plan to jointly and severally pay such amount to the Plan as is necessary to make the Plan whole for any losses which resulted from said breaches or by virtue of liability pursuant to ERISA § 405;

C.    An order requiring each fiduciary found to have breached his/her/its fiduciary duty to disgorge any profits made through the use of the assets of the Plan.  This includes, but is not limited to, disgorgement of any profits improperly obtained in violation of ERISA §§ 404 and 406;

D.    An injunction preventing the fiduciaries of the Plan from engaging in the 100% equities allocation in the future and preventing disloyal decision-making;

E.    An order removing these fiduciaries from their roles as fiduciaries for the Plan and an order appointing an independent fiduciary to manage the assets of the Plan;

F.    An order creating a constructive trust into which all ill-gotten gains, fees and/or profits paid to any of the Defendants in violation of ERISA shall be placed for the sole benefit of the Plan and its participants and beneficiaries.  This includes, but is not limited to, the ill-gotten gains, fees and/or profits paid to any of the Defendants that have been wrongly obtained as a result of breaches of fiduciary duty or violations of ERISA § 406.

G.    Except insofar as any of the following functions are assigned to a court-appointed fiduciary, an injunction requiring: (i) Defendants to prudently diversify the investments of the Plan among appropriate asset classes; (ii) the Compensation Committee Defendants to review and revise the 100% Equities Strategy of the Plan; (iii)

77

1862296.2

the investment manager to properly implement the revised Investment Policy; and (iv) the Board of Director Defendants and the Compensation Committee Defendants to monitor the performance of all investment advisors to ensure that an appropriate investment allocation strategy which prudently diversifies the Plan's investments is adhered to;

H.     The costs and expenses of this suit, including expenses for expert witnesses and reasonable attorneys' fees pursuant to ERISA § 502(g)(1) and the Court's inherent equitable authority and powers; and

I.     Such other and further relief as the Court deems just and necessary.

Dated:  March 20, 2014                ZIMMERMAN REED, PLLP



                                      By: *s/Patricia A. Bloodgood*
                                      Carolyn G. Anderson, No. 275712
                                      Patricia A. Bloodgood, No. 057673
                                      June P. Hoidal, No. 033330X
                                      1100 IDS Center, 80 South 8th Street
                                      Minneapolis, Minnesota 55402
                                      Telephone: (612) 341-0400
                                      Facsimile: (612) 341-0844
                                      Carolyn.Anderson@zimmreed.com
                                      June.Hoidal@zimmreed.com

                                      COHEN MILSTEIN SELLERS & TOLL, PLLC
                                      Karen L. Handorf
                                      Michelle C. Yau
                                      Bruce F. Rinaldi
                                      1100 New York Avenue, N.W.
                                      Suite 500, West Tower
                                      Washington, D.C.  20005
                                      Telephone: (202) 408-4600
                                      Facsimile: (202) 408-4699
                                      khandorf@cohenmilstein.com
                                      myau@cohenmilstein.com
                                      brinaldi@cohenmilstein.com

                                      *Attorneys for Plaintiffs*

                                      78