UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Adetayo Adedipe et al.,

      Plaintiffs,

No. 13-cv-2687 (JNE/JJK)
v.                                ORDER

U.S. Bank, National Association et al.,

      Defendants.

---

This is a private civil enforcement action brought under the Employee Retirement Income Security Act ("ERISA"). The case was filed as a putative class action by participants in U.S. Bancorp's pension plan (hereinafter, "the Plan"). In their Consolidated Amended Complaint, the Plaintiffs allege that the Plan's fiduciaries breached their fiduciary obligations and caused the Plan to engage in prohibited transactions during the proposed class period, which runs from September 30, 2007 – six years to the day before this suit was filed – through the end of December 2010.

Defendant Nuveen Asset Management LLC and the rest of the Defendants – collectively referred to as the "U.S. Bank Defendants" – have separately filed motions targeting the Amended Consolidated Complaint. Currently before the Court are Nuveen's Motion to Dismiss, ECF No. 96, and the U.S. Bank Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment, ECF No. 102. The Plaintiffs responded in opposition to those motions, while also submitting their own motion for relief under Federal Rule of Civil Procedure 56(d), ECF No. 113.[1]

---

[1]     In addition to filing a Motion for Relief under Federal Rule of Civil Procedure 56(d) seeking to defer the ruling on the U.S. Bank Defendants' summary judgment motion, the Plaintiffs have also requested leave to file a reply memorandum in support of their Rule 56(d) motion. ECF No. 127. The Court has considered all of the parties' submissions.

For the reasons and in the manner discussed below, the motions brought by Nuveen and the U.S. Bank Defendants are each granted in part and denied in part, while the Plaintiffs' motion is denied.

## **Background**

According to their Consolidated Amended Complaint (hereinafter, "CAC"), the Plaintiffs – Adetayo Adedipe, James Thole, Marlene Jackson, and Sherry Smith – are former employees of U.S. Bank and vested participants in the U.S. Bancorp pension plan.

They are suing three organizational defendants: U.S. Bancorp; U.S. Bank, National Association (hereinafter, "U.S. Bank"); and Nuveen Asset Management LLC. U.S. Bancorp is the sponsor of the Plan. U.S. Bank, a wholly-owned subsidiary of U.S. Bancorp, is the trustee of the Plan and was, during the proposed class period, the parent of the Plan's investment manager, FAF Advisors, Inc. Nuveen acquired FAF from U.S. Bank in December of 2010.

The Plaintiffs also name a number of individuals as defendants: nine members of the U.S. Bancorp Board of Directors; six individuals and ten John/Jane Does who were members of the U.S. Bancorp Compensation Committee during the proposed class period; and ten additional John/Jane Does who were members of the U.S. Bancorp Investment Committee during the proposed class period. U.S. Bancorp's Compensation and Investment Committees are named fiduciaries of the Plan that have the authority and obligation to manage it, while the Board has the power to appoint and remove the members of the two committees.

In all, the Plaintiffs assert eight counts against these Defendants. The first seven counts are brought, in various combinations, against the Board of Director Defendants, the two sets of Committee Defendants, FAF, and U.S. Bank – all of whom the Plaintiffs contend were either

named or de facto fiduciaries of the Plan – for allegedly breaching their fiduciary obligations with respect to investing the Plan's assets and for causing the Plan to engage in prohibited transactions.  The final count is brought against U.S. Bancorp alone, for "knowingly participat[ing] in the several breaches and prohibited transactions" by the fiduciaries.

Relevant here, then, are the ERISA provisions governing fiduciary responsibility that are codified at 29 U.S.C. §§ 1104, 1005, and 1006.  At § 1104(a), ERISA imposes the following standard of care on a fiduciary of a pension plan:

> **(1)** [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
>> **(A)** for the exclusive purpose of:
>>
>>> **(i)** providing benefits to participants and their beneficiaries; and
>>>
>>> **(ii)** defraying reasonable expenses of administering the plan;
>>
>> **(B)** with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>>
>> **(C)** by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>>
>> **(D)** in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

At § 1106, ERISA prohibits a fiduciary from causing the plan to engage in certain types of transactions:

> **(a)** Transactions between plan and party in interest.  Except as provided in section 1108 of this title:
>
>> **(1)** A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--

3

**(A)** sale or exchange, or leasing, of any property between the plan and a party in interest;

**(B)** lending of money or other extension of credit between the plan and a party in interest;

**(C)** furnishing of goods, services, or facilities between the plan and a party in interest;

**(D)** transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

**(E)** acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

**(2)** No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

**(b)** Transactions between plan and fiduciary. A fiduciary with respect to a plan shall not--

**(1)** deal with the assets of the plan in his own interest or for his own account,

**(2)** in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

**(3)** receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

And at § 1105(a), ERISA imposes liability on a fiduciary for participating in, enabling, concealing, or ignoring a breach of fiduciary responsibility by a co-fiduciary.

In the CAC, the Plaintiffs allege that the Defendants violated these provisions in connection with three subjects. The first is the so-called 100% Equities Strategy. The CAC alleges that the Defendants invested the Plan's assets solely in equity securities, to the exclusion of other asset classes, in order to benefit themselves while exposing the Plan to inordinate risk.

4

According to the CAC, by investing all of the Plan's assets in equities, the Defendants were able to report a higher assumed rate of return on the Plan's investments, which reduced to zero the amount that U.S. Bancorp was required to contribute to the Plan while also inflating U.S. Bancorp's stock price. The Plaintiffs allege that the Defendants persisted in this 100% Equities Strategy throughout the proposed class period despite indications of a deteriorating stock market in late 2007 and 2008. When the market crashed, the Plan, invested exclusively in equities, lost $1.1 billion. Only after FAF was sold to Nuveen in late 2010 did the Defendants revise their investment strategy; one-quarter of the Plan's assets are now invested in other asset classes.

The second subject of the CAC is the investment of Plan assets in Affiliated Funds. The Committee Defendants appointed FAF as the Plan's investment manager in 2007. In fulfilling that role throughout the proposed class period, FAF implemented the 100% Equities Strategy while investing up to 40% of the Plan's assets in its own equities-backed mutual funds. According to the Plaintiffs, the Committee Defendants selected FAF to manage the Plan's investments in order to "prop[] up" FAF, then a subsidiary of U.S. Bank, and FAF invested the Plan heavily in its own mutual funds to benefit itself by making those funds more attractive to other potential investors.

The third subject of the CAC is a Securities Lending Program administered by FAF in which the Plan participated during the proposed class period. The Plaintiffs allege that, pursuant to a contract effective in October of 2005, FAF loaned securities owned by the Plan to borrowers on a short-term basis. In exchange, the Plan received cash collateral – totaling $504 million by the end of 2007 – which FAF then invested in two portfolios that it managed, the Mount Vernon Securities Lending Short-Term Bond Portfolio and the Mount Vernon Securities Lending Prime Portfolio. According to the CAC, FAF invested the Bond Portfolio "in asset-backed commercial

paper issued by three specific structured investment vehicles," which themselves "were backed by toxic subprime mortgages and Alt-A securities."  Those structured investment vehicles became distressed in the second half of 2007.  At that time, instead of divesting the Plan from the Mount Vernon Portfolios, Emil Busse, FAF's head of securities lending, engaged in a fraudulent scheme to "liquidate and restructure the . . . Bond Portfolio."  That scheme ultimately failed, causing the value of the Bond Portfolio to drop significantly in March of 2008 and resulting in over $14 million in losses to the Plan.  The Plaintiffs allege that FAF's parent, U.S. Bank, soon discovered the failed scheme, conducted an investigation, and, when Busse was subsequently found to have committed several violations of the Securities and Exchange Acts by the Securities and Exchange Commission, "paid to settle [his] case."

As relief for the ERISA violations allegedly committed by the Defendants in these three areas, the Plaintiffs seek to have the fiduciary Defendants disgorge any profits they made through the use of the Plan's assets and restore to the Plan the losses it suffered.  The Plaintiffs also seek the creation of a constructive trust for the benefit of the Plan and its participants, the removal of the fiduciary Defendants as Plan fiduciaries, and injunctions that would prohibit the Plan's fiduciaries from utilizing a 100% Equities Strategy and require them to monitor the Plan's investment manager in implementing a revised investment strategy.

## Discussion

With their motions, the Defendants argue that the CAC should be dismissed in its entirety on various grounds, including that the Plaintiffs lack standing to bring this suit, that their ERISA claims are time-barred or have been released, and that their pleading otherwise fails to state a claim on which relief can be granted.

The Plaintiffs' standing – a "threshold question in every federal court case," *U.S. v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003) – must be considered first.

### I.      Standing.

To bring suit in federal court, a plaintiff must have both statutory and constitutional standing. *See generally Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386-88 (2014). In their motions, Nuveen and the U.S. Bank Defendants jointly argue that the Plaintiffs lack constitutional standing, which is a matter of subject matter jurisdiction that "implicates Rule 12(b)(1)." *Faibisch v. University of Minnesota*, 304 F.3d 797, 801 (8th Cir. 2002).

The Defendants do not challenge the Plaintiffs' statutory standing – in other words, that the claims the Plaintiffs assert in the CAC are "encompass[ed]" by a cause of action that Congress "legislatively conferred" with ERISA. *Lexmark*, 134 S.Ct. at 1387. Nevertheless, a consideration of this issue provides a helpful backdrop to the parties' arguments around constitutional standing. The Court therefore begins there.

### A.  Statutory standing.

Congress enacted ERISA in 1974 for the "primary purpose" of "protect[ing] individual pension rights." *Harley v. Minnesota Min. and Mfg. Co.*, 284 F.3d 901, 907 (8th Cir. 2002) (quoting H.R. Rep. NO. 93-533 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4639)). To that end, ERISA "regulat[es] the structure and operation of retirement plans." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994).

Among the retirement plans that ERISA regulates are "defined benefit plans" like the Plan. *See* 29 U.S.C. §§ 1002(35), 1002(2)(A), 1003.  A defined benefit plan "consists of a general pool of assets" – which "may be funded by employer or employee contributions, or a combination of both"[2] – out of which "a fixed periodic payment" is made to a participant upon her retirement. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (internal quotation and citation omitted).  Owing to the structure of this type of retirement plan, "[n]o [participant] has a claim to any particular asset that composes a part of the plan's general asset pool." *Id.* at 440.  Participants in such plans do, however, have "a right to a certain defined level of benefits, known as 'accrued benefits.'" *Id.*

To protect that right, ERISA contains numerous provisions that are designed to ensure the "equitable character" and "financial soundness" of the plan itself, 29 U.S.C. § 1001(a), some of which were discussed above.  For instance, ERISA requires that the plan be "control[led] and manage[d]" by fiduciaries acting "solely in the interest of the participants and beneficiaries" and "with . . . care, skill, prudence, and diligence," 29 U.S.C. §§ 1102(a)(1), 1104(a)(1); that those fiduciaries "diversify[] the investments of the plan so as to minimize the risk of large losses," 29 U.S.C. § 1104(a)(1)(D); and that the fiduciaries refrain from causing the plan to engage in "certain transactions deemed likely to injure the plan," *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000) (discussing 29 U.S.C. § 1106).

Elsewhere, ERISA requires that the plan be funded in a manner that provides sufficient assets to meet its liabilities, 29 U.S.C. Ch. 18, Subch. I, Subt. B, Pt. 3, and that the plan maintain insurance against underfunding at termination through the Pension Benefit Guaranty Corporation, 29 U.S.C. Ch. 18, Subch. III.  All of these requirements are means to the end of

---

[2]      The CAC alleges that the Plan is a "noncontributory" defined benefit plan, funded solely with contributions from U.S. Bancorp.

"guarantee[ing] that if a worker has been promised a defined pension benefit upon retirement –
and if he has fulfilled whatever conditions are required to obtain a vested benefit – he actually
will receive it." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984)
(quotation and citation omitted). *See also* 29 U.S.C. § 1001(b)-(c) (declaration that policy of
ERISA is to "protect . . . the interests of participants in employee benefit plans and their
beneficiaries" by "establishing standards of conduct, responsibility, and obligation for
fiduciaries," "by requiring [plans] to meet minimum standards of funding," and "by requiring
plan termination insurance"); *Lockheed Corp. v. Spink*, 517 U.S. 882, 887-88 (1996) (discussing
"key measures" of ERISA that are designed "[t]o increase the chances that employers will be
able to honor their benefits commitments—that is, to guard against the possibility of bankrupt
pension funds").

    To enforce ERISA's "comprehensive legislative scheme," Congress authorized both
criminal and civil actions against those who violate its provisions. *Aetna Health Inc. v. Davila*,
542 U.S. 200, 208 (2004) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134,
147 (1985)). *See* 29 U.S.C. §§ 1131 (criminal penalties), 1132 (civil enforcement). The civil
causes of action set forth at 29 U.S.C. § 1132(a) are "a distinctive feature of ERISA, and
essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation
of employee benefit plans." *Aetna*, 542 U.S. at 208.

    In the CAC, the Plaintiffs invoke subsection (2) of this "integrated enforcement
mechanism," *id.* Under that provision, "[a] civil action may be brought . . . by the Secretary [of
Labor], or by a participant, beneficiary or fiduciary for appropriate relief under [29 U.S.C. §]
1109 . . . ." Section 1109, in turn, makes

        [a]ny person who is a fiduciary with respect to a plan who breaches any of the
        responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter

shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. . . .

With its incorporation of the remedies for a fiduciary breach described in § 1109, the cause of action granted to participants at § 1132(a)(2) authorizes relief only for injuries suffered by the plan itself; it "does not provide a remedy for individual injuries distinct from plan injuries." *LaRue v. Dewolff, Boberg & Associates, Inc.*, 552 U.S. 248, 256 (2008). *See also Russell*, 473 U.S. at 140-42, 144 (concluding that "recovery for a violation of § [1109] inures to the benefit of the plan as a whole" and that "Congress did not intend that section to authorize any relief except for the plan itself").

In the CAC, the Plaintiffs, as participants, explicitly seek relief on behalf of the Plan and for injuries to the Plan caused by the Defendants' alleged breaches of their fiduciary responsibilities. *E.g.,* CAC ¶¶ 19 ("Plaintiffs bring this action . . . to recover losses to the Plan for which Defendants are personally liable . . . ."), ¶ 53 ("While the Plan is not a party to this action, the relief requested in this action is for the benefit of the Plan, pursuant to . . . 29 U.S.C.§ 1132(a)(2)."). Twenty-nine U.S.C. § 1132(a)(2) provides them with a cause of action to do so.[3]

---

[3]     The Plaintiffs also invoke the cause of action at 29 U.S.C. § 1132(a)(3), ostensibly in relation to Count VIII. That claim is pled against U.S. Bancorp – the sponsor of the Plan and a non-fiduciary – for "knowingly participat[ing]" in the breaches and prohibited transactions allegedly committed by the Plan's fiduciaries.

With § 1132(a)(3), Congress granted a cause of action to a participant who seeks "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . ." Unlike with § 1132(a)(2), a non-fiduciary may be sued under § 1132(a)(3), though "damages may not be recovered against ERISA non-fiduciaries." *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 914 (8th Cir. 1994) (citing *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993)).

Furthermore, the Supreme Court has determined that § 1132(a)(3) is a "catchall" provision which "act[s] as a safety net, offering appropriate equitable relief for injuries caused by

**B.  Constitutional standing.**

However, even though the Plaintiffs have a cause of action to seek relief for injuries to

the Plan under ERISA, "[i]t is settled that Congress cannot erase Article III's standing

requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have

standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997).  In other words, the Plaintiffs may not

"proceed under § 1132(a)(2) on behalf of the plan" unless they themselves have Article III

standing to bring suit against the Defendants for the misconduct that is alleged in the CAC.

*Braden v. Wal-Mart Stores*, 588 F.3d 585, 593 (8th Cir. 2009).

The standing inquiry mandated by Article III is a matter of subject matter jurisdiction; it

ensures that "the Judiciary's power [is kept] within its proper constitutional sphere." *Raines*, 521

U.S. at 820.  The case-or-controversy requirement imposed by the Constitution limits the federal

courts to deciding only that subset of disputes that are "capable of resolution through the judicial

process" and in which the plaintiff has a "personal stake." *Id.* at 819.  *See also Mass. v. U.S.*

*Envtl. Prot. Agency*, 549 U.S. 497, 517 (2007) ("At bottom, the gist of the question of standing is

whether [plaintiffs] have such a personal stake in the outcome of the controversy as to assure that

concrete adverseness which sharpens the presentation of issues upon which the court so largely

depends for illumination.") (quotation omitted).

Therefore, the Plaintiffs, as the party invoking the power of the Court to adjudicate this

dispute, bear the burden of establishing as the "irreducible constitutional minimum of standing"

(1) that they have personally suffered an "injury in fact" (2) that is "fairly traceable to the

challenged action of the defendant" and (3) that is "likely [to] be redressed by a favorable

---

violations that § [1132] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S.
489, 512 (1996).  Consequently, the relief provided for by 29 U.S.C. § 1132(a)(3) is available
only where Congress did not "elsewhere provide[] adequate relief" for the injury.  *Id.* at 515.

decision." *Braden*, 588 F.3d at 591 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The Plaintiffs need only support these three elements "in the same way as any other matter on which [they] bear[] the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Accordingly, here "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id*. (quotation omitted). *See also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing,  both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."); *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013) ("[A]t the pleading stage a petitioner can move forward with general factual allegations of injury, whereas to survive a summary judgment motion, he must set forth by affidavit or other evidence specific facts.") (quotations omitted).

### 1.  Injury.

As to the first element of constitutional standing, the Plaintiffs must show that they "have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical . . . ." *Lujan*, 504 U.S. at 560 (quotations and citations omitted). Provided that the Plaintiffs can do so, there is no constitutional infirmity in the fact that the legislatively-created cause of action at 29 U.S.C. §

1132(a)(2) provides them with an avenue "to seek relief for the entire Plan" and therefore

"sweep[s] more broadly than the injury [they] personally suffered." *Braden*, 588 F.3d at 592-93.

Relevant to this element, the Plaintiffs allege in the CAC that they are all vested

participants in the Plan who are either currently receiving a pension benefit from it or are entitled

to receive one in the future.[4]  CAC ¶¶ 24-27.  As such, and as noted above, the Plaintiffs have no

"claim to any particular asset that composes a part of the plan's general asset pool." *Hughes*

*Aircraft*, 525 U.S. at 440.  In addition, because the employer "bears the entire investment risk" in

a defined benefit plan and therefore "must cover any underfunding as the result of a shortfall that

may occur from the plan's investments," the Plaintiffs "have no entitlement to share in [the

Plan's] surplus – even if it is partially attributable to the investment growth of their

contributions."[5]  *Id.* at 433, 439.  What the Plaintiffs do have as participants, however, is "a right

to a certain defined level of benefits" paid out from the Plan's pool of assets.  *Id.* at 440.

The Plaintiffs do not allege that their benefit levels have actually decreased as a result of

the Defendants' alleged misconduct.  What they allege is that, "[a]s a result of the several

violations of ERISA committed by Defendants, the Plan lost $1.1 billion in 2008 and has

plummeted from being significantly overfunded at the end of 2007 to being significantly

---

[4]      According to the CAC, Plaintiff Marlene Jackson worked for U.S. Bank until August of 2009
and is "a vested participant in the Plan who is now entitled to receive a Normal Retirement Benefit
under the Plan starting in 2018." CAC ¶ 26.  However, the Defendants have offered an exhibit that
appears to show that Jackson elected to receive a lump sum payment of her pension benefits under the
Plan upon her retirement in 1999.
        This dispute of fact as to Jackson's status as a participant and its impact on her standing in this
suit need not be examined further here.  *See Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978,
986 (8th Cir. 2011) (noting that "only one plaintiff need show standing to support our subject matter
jurisdiction").

[5]      The Plaintiffs do not allege that they or any other participants have a reversionary interest
in the Plan's surplus.  Indeed, § 9.2 of a Working Copy of the Plan documents specifies that
"[a]ny funds held by the Trustee after making the allocations [at termination in accordance with
ERISA § 4404] shall revert to and be paid to the Company."

underfunded."  CAC ¶ 4.  As a result of that drop in "the net assets available to pay benefits," the

Plaintiffs allege, "the risk of default of the Plan" has "significantly increas[ed]."  CAC ¶ 167.

In a standing analysis, the import of this alleged increased risk of default can only lie in

the concomitant increase in the risk that the participants will not receive the level of benefits they

have been promised due to the Plan being inadequately funded at termination.  As the Supreme

Court has explained,

> [m]isconduct by the administrators of a defined benefit plan will not affect an
> individual's entitlement to a defined benefit unless it creates or enhances the risk
> of default by the entire plan.  It was that default risk that prompted Congress to
> require defined benefit plans . . . to satisfy complex minimum funding
> requirements, and to make premium payments to the Pension Benefit Guaranty
> Corporation for plan termination insurance.

*LaRue*, 552 U.S. at 255.

In light of the safeguards against default at the heart of ERISA, the Defendants offer

several rejoinders to the Plaintiffs' implicit assertion in the CAC that the fiduciary breaches

alleged there have put their benefits at risk.  For instance, the Defendants assert that U.S.

Bancorp is fully capable of meeting the minimum funding obligations set by the statute – as

evidenced by the $11.44 billion in cash it generated from its ongoing operations in 2013 and the

$61.7 billion in liquidity it had on hand "to cover unanticipated expenses" – and that even "if, for

some reason, U.S. Bancorp could not fund [those] obligations, [the Plaintiffs' vested benefits]

would be fully paid by the Pension Benefit Guaranty Corporation, which in 2012 had a

maximum monthly guarantee of $4,653.41."

In painting this picture of the financial health of the Plan, the Defendants draw on

materials outside the CAC.  As the Defendants have therefore mounted a "factual attack" on the

Plaintiffs' standing, these materials may be considered here under Rule 12(b)(1) without

affording the Plaintiffs "the benefit of 12(b)(6) safeguards."  *Osborn v. U.S.*, 918 F.2d 724, 729

n.6 (8th Cir. 1990) (distinguishing between a "facial attack" and a "factual attack" on the court's subject matter jurisdiction and explaining that only the former entitles the plaintiff to "receive[] the same protections as it would defending against a motion brought under Rule 12(b)(6)").

The Plaintiffs, for their part, have neither alleged in the CAC nor offered any evidence to suggest that U.S. Bancorp is incapable of meeting the minimum funding obligations or paying the PBGC premiums that ERISA imposes for the purpose of bolstering the financial soundness of underfunded defined benefit plans.  The question, then, is whether, against the undisputed evidence of U.S. Bancorp's financial strength, the Plaintiffs' lone assertion that the Defendants' fiduciary breaches caused the Plan to go "from being significantly overfunded . . . to being significantly underfunded" is a sufficient showing of a personal injury in fact at this stage of the litigation.

The Defendants, of course, argue that it is not, relying on the "leading case" of *Harley v. Minnesota Mining and Manufacturing Co.*, 284 F.3d 901 (8th Cir. 2002) for the proposition that a participant in a defined benefit plan is "preclude[ed]" from showing that he has been personally injured by a fiduciary's breaches where "the plan was an 'ongoing plan,' with a 'financially sound settlor responsible for making up any future underfunding,' and there was no evidence that the plan would terminate in the foreseeable future.'"

The Defendants' perspective, buttressed by the non-binding authority they cite, is undoubtedly compelling.  But their gloss of Eighth Circuit precedent on this relatively narrow point is less persuasive.  In *Harley*, participants in 3M's defined benefit plan sued the company and certain of its employees under 29 U.S.C. § 1132(a)(2), alleging that those defendants had breached their fiduciary obligations with respect to a failed $20 million investment and seeking to have them restore that amount to the plan under § 1109(a).  284 F.3d at 903-04.  On a

15

summary judgment record, the Eighth Circuit determined in relevant part that the participants did

not have standing to sue under § 1132(a)(2) because 3M's voluntary contributions had kept the

plan substantially overfunded at all relevant times despite the $20 million loss in plan assets, and

– as participants have no interest in a defined benefit plan's surplus – "a relatively modest loss to

[p]lan surplus is a loss only to . . . the [p]lan's sponsor." *Id.* at 906.  Simply put, the $20 million

loss did not affect the participants' interest in the security of their benefits, as the plan remained

as capable of covering its liabilities after the loss as before.

      In coming to this decision, the *Harley* court indicated that "absence of adequate surplus

[to absorb the loss of plan assets caused by the fiduciary breach] is an element of plaintiffs'

standing under § 1132(a)(2) – proof they are suing to redress a loss to the [p]lan that is an actual

injury *to themselves*." *Id.* at 908.  Subsequent Eighth Circuit decisions have confirmed the

centrality of surplus – or the lack thereof – to *Harley's* injury-in-fact analysis.

      For instance, in a later decision in the same case, the Eighth Circuit noted that in *Harley*,

"[w]e held that [p]articipants suffered no injury in fact because the challenged investment caused

a loss in [p]lan surplus only.  Without injury, they lacked standing to bring an action.  We further

held that, in order to demonstrate standing, the [p]articipants had an affirmative burden to prove

that the [p]lan did not have an adequate surplus."  *Harley v. Zoesch*, 413 F.3d 866, 871 (8th Cir.

2005).  Similarly, in *Braden*, the Eighth Circuit explained that

> [i]n *Harley* the plaintiffs were participants in a defined benefit plan who sued to
> recover losses caused to the plan by the fiduciary's allegedly imprudent
> investments. . . . Because the plan retained a surplus notwithstanding the losses,
> however, the plaintiffs' own benefits remained unchanged and they accordingly
> suffered no harm. . . . We concluded that "participants or beneficiaries who
> have suffered *no* injury in fact" do not have standing to sue on behalf of the plan under
> § 1132(a)(2).

588 F.3d at 593 (citations omitted).  And yet again, in *McCullough v. AEGEON USA Inc.*, the

Eighth Circuit observed that "[i]n *Harley*, this court concluded that § 1132(a)(2) does not permit

a participant in a defined-benefit plan to bring suit claiming liability under § 1109 for alleged

breaches of fiduciary duties when the plan is overfunded."  585 F.3d 1082, 1084 (8th Cir. 2009).

Despite the appeal of the Defendants' position, none of these discussions suggest that the

analysis of participants' injuries in this context is to turn on the financial health of the plan

sponsor or the availability of PBGC insurance to cover a potential shortfall at plan termination.

But that is not to say that those factors are irrelevant; what they do affect is the measure by

which the funding status of the plan should be determined.  A defined benefit plan may be valued

using any number of methods, each with its own complexities and to its own purpose.  But not

all of those methods may be appropriate for use in a particular injury analysis.  As the Eighth

Circuit explained in *Harley*,

> [p]laintiffs have no evidence that the [p]lan will terminate in the foreseeable
> future.  Therefore, they may not satisfy this element [- the absence of adequate
> surplus -] by proposing a termination valuation method because a hypothetical
> termination has no relevance to the issue of whether they have suffered injury in
> fact.  As the district court observed, "ERISA does not require [ongoing] plans to
> maintain funding at termination levels, a fact that the Supreme Court implicitly
> recognized in *Hughes.*"  . . .  Likewise, the district court properly rejected
> plaintiffs' contention that the Plan must be 100% fully-funded under the RPA 94
> valuation method.  The statute does not use that funding level to determine
> whether additional contributions are required, and 3M has never been required to
> make an additional contribution. . . .

284 F.3d at 908.  The Eighth Circuit in *Harley* therefore determined that the plaintiffs lacked

standing because they had failed to meet their burden of showing an absence of surplus "under

any relevant valuation method."  *Id.  See also Zoesch*, 413 F.3d 866 (finding that the plaintiffs

"advance no convincing arguments as to why [the] valuation measures [they offered] are

relevant" to standing to bring suit under § 1132(a)(2)).

Consistent with *Harley*, then, the Plaintiffs bear the burden of alleging the absence of a surplus sufficient to absorb the loss of Plan assets caused by the Defendants' fiduciary breaches under a relevant valuation method.

As the CAC contains no allegation that the Plan will terminate in the foreseeable future, a termination valuation method would be inappropriate – and the Plaintiffs do not offer one. Instead, the Plaintiffs allege that:

- "the Plan reported that it was overfunded by more than $850 million at the end of 2007," CAC ¶ 142;

- in 2008, as a result of a large loss attributable to the Defendants' imprudent and undiversified investment strategy, the actuarial value of the Plan's assets "dropped below" its liabilities, CAC ¶¶ 167, 170;

- on January 1, 2009, the Plan was "underfunded by $248 million (84.44% funded)," CAC ¶ 171;

- on January 1, 2010, the Plan was "underfunded by $366 million (81.91% funded)," *id*.;

- on January 1, 2011, the Plan was "underfunded by $436 million (80% funded)," *id.*;

- on December 31, 2011, the fair market value of the Plan's liabilities exceeded its assets by approximately $754 million, CAC ¶ 172;

- on December 31, 2012, the fair market value of the Plan's liabilities exceeded its assets by approximately $1.03 billion, *id.*;

- from the end of 2010 through the commencement of the lawsuit in September of 2013, the Plan was 80% funded as measured by the Adjusted Funding Target Attainment Percentage ("AFTAP"), CAC ¶ 173.

18

All of these allegations are corroborated by a series of tax documents and financial disclosures for the Plan that the Defendants have submitted.

With these figures, the Plaintiffs plainly contend that the Plan's assets became insufficient to meet its liabilities according to an actuarial valuation in 2008 and remained so until this action was filed. *See Zoesch*, 413 F.3d at 872 (noting that "because standing is determined as of the lawsuit's commencement, we consider the facts as they existed at that time") (quotation and punctuation omitted). Nevertheless, the Defendants argue that the Plaintiffs actually have not alleged that the Plan has ever been "underfunded" because: (1) AFTAP is the exclusive method for measuring the funding status of a defined benefit plan under ERISA; and (2) the statute "makes no distinction between plans that are between 80% and 100% funded or higher" on an AFTAP basis. This is unpersuasive on both counts.

"The [FTAP] of a plan for a plan year is the ratio (expressed as a percentage)" of "the value of plan assets for the plan year (as reduced [by certain prefunding and carryover balances])" to "the present value of all benefits accrued or earned under the plan as of the beginning of the plan year." 29 U.S.C. § 1083(d)(1)-(2). The AFTAP, in turn, is calculated by increasing both the FTAP's numerator and denominator "by the aggregate amount of purchases of annuities for employees other than highly compensated employees . . . which were made by the plan during the preceding 2 plan years." *Id.* § 1056(g)(9)(B).

With the amendments to ERISA worked by the Pension Protection Act of 2006, Pub. L. 109-280, 120 Stat. 780, certain restrictions on benefits are triggered if a plan's AFTAP falls below 80%. With an AFTAP between 60% and 80%, "[n]o amendment to a defined benefit plan which has the effect of increasing liabilities of the plan by reason of increases in benefits, establishment of new benefits, changing the rate of benefit accrual, or changing the rate at which

19

benefits become nonforfeitable may take effect during the plan year . . . ."  *Id.* § 1056(g)(2)(A).

Where the AFTAP is less than 60%, the plan may not pay an "unpredictable contingent event

benefit" to which a participant becomes entitled during the plan year, *id.* §§ 1056(g)(1)(A), or

make any "prohibited payment," *id.* § 1056(g)(3)(A), and "benefit accruals . . . shall cease as of

the valuation date for the plan year," *id.* § 1056(g)(4)(A).  Thus, at least with regard to these

provisions, the Defendants are correct that ERISA treats defined benefit plans with AFTAPs

between 80% and 100% no differently than those that are more than 100% funded – in short,

they are not subject to any benefits restrictions.

The Plaintiffs, however, do not allege that they have experienced any of these sorts of

freezes or reductions in their benefits.  Instead, they allege that they have been injured by the

increased risk of default that arose when the Plan's liabilities exceeded its assets as a result of the

significant losses caused by the Defendants' ERISA violations.  The funding ratio and threshold

that the statute uses to determine whether benefits restrictions are to be imposed on an

underfunded defined benefit plan – the 80% AFTAP figure – are therefore somewhat beside the

point.  What is certainly relevant, however, is an entirely separate regime embedded in the

statute: ERISA's minimum funding standards.  Under these pension funding provisions, with

respect to any defined benefit plan "in which the value of plan assets" is less than "the present

value of all benefits accrued or earned under the plan as of the beginning of the year," ERISA

obligates the employer to make the "minimum required contributions" necessary to amortize that

shortfall over the ensuing seven years.  29 U.S.C. §§ 1082-83.

Notably, in its standing analysis, the *Harley* court specifically took into account "the

actuarial value of the [p]lan's assets [in relation to] its actuarial liabilities" and considered the

plan's status with respect to the minimum funding requirements then in effect.[6]  284 F.3d at 908.

At least by these relevant measures, then, the Plaintiffs have adequately alleged that the Plan

lacked a surplus large enough to absorb the losses at issue.

Accordingly, the Plaintiffs have satisfied their burden of alleging that they have suffered

a personal injury in fact, and their alternative argument – that they have suffered an injury in fact

by virtue of the Defendants' violation of their "personal statutory right to have their pension

assets managed prudently, loyally, and in a diversified manner" – need not be addressed.


## 2. Causation.

As to the second element of constitutional standing, the Plaintiffs bear the burden of

showing that the injury in fact that they have identified – the increase in the risk that their

benefits will not be paid in full owing to the losses suffered by an underfunded Plan – is "fairly

traceable to the challenged action of the [Defendants]." *Lujan*, 504 U.S. at 560 (quotation and

punctuation omitted).  The aim at this step of the standing inquiry is to ensure that the defendant

is "responsible for" the harm for which the plaintiff seeks relief, *Arizona Christian School

Tuition Organization v. Winn,* 131 S.Ct. 1436, 1447 (2011), and that the injury is not "the result

of the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560-61

(quotation and punctuation omitted).   *See also Miller v. Redwood Toxicology Laboratory, Inc.*,

688 F.3d 928, 935 (8th Cir. 2012).

---

[6]     The Retirement Protection Act of 1994 ("RPA 94") standards in effect at the time *Harley*
was decided "require[d] plan sponsors to make contributions when a plan's 'funded current
liability percentage' [was] less than 90%." *Zoesch*, 413 F.3d at 869.  The Pension Protection Act
of 2006 repealed that regime and replaced it with minimum funding requirements that are now,
as discussed above, tied to the benchmark of 100% funding. *See* Pub.L. 109-280, 120 Stat. 780,
§ 101.

On this element, the Defendants again focus on the Plan's AFTAP, emphasizing that it did not drop below 100% until January 1, 2011.  According to the Defendants, the more than two years that elapsed between the large losses in 2008 allegedly attributable to their ERISA violations and that date effectively negate any plausible inference that the Plan's underfunding was caused by the Defendants' misconduct.

This argument, however, is foreclosed by the discussion above.  The AFTAP is not the sole relevant measure of a plan's funding status.  As noted, the Plaintiffs assert in the CAC that the Defendants' fiduciary breaches caused the Plan to suffer a $1.1 billion loss in 2008.  ¶ 167.  As a result of that loss, "the funding status of the Plan fell sharply, from being significantly overfunded in 2007" to being "underfunded by $248 million . . . as of January 1, 2009."  ¶¶ 169, 171.  Furthermore, the Plaintiffs acknowledge in the CAC that, with the reality of the "growing financial and economic turmoil and the sharp increase in volatility and risk in the equities market" in 2008, the Plan likely would have sustained significant losses even if its assets had been properly managed.  ¶ 168.  Nevertheless, the Plaintiffs contend, "the Plan would have avoided at least $748 million of the [$1.1 billion in] losses the Plan suffered in 2008" if the Defendants had properly diversified the Plan's assets in the manner of other pension plans during the same time period.  *Id.*   In other words, had the Plan not sustained that $748 million loss in 2008, the Plan's surplus could have entirely absorbed the inevitable $352 million loss.

These allegations – that the Defendants' misconduct caused the Plan to lose $748 million in 2008 and that that loss caused the Plan to go from being overfunded in 2007 to being underfunded by January 1, 2009 – are not contradicted by  the evidence or arguments the Defendants have offered.  The Plaintiffs have thus adequately alleged that the increase in the risk

of default brought about by the losses incurred by an underfunded Plan, as measured by a relevant valuation method, was caused by the Defendants' ERISA violations.

### 3. Redressability.

As the third and final element of constitutional standing, the Plaintiffs bear the burden of showing that their injury can "likely" be redressed by a favorable judicial decision. *Braden*, 588 F.3d at 591.

In the CAC's Prayer for Relief, the Plaintiffs request: restoration to the Plan of the losses caused by the Defendants' fiduciary breaches; disgorgement of any profits made by the Defendants through the use of the Plan's assets; the creation of a constructive trust for the benefit of the Plan and participants; the removal of the Plan fiduciaries; and injunctions preventing the Plan's new fiduciaries from investing its assets solely in equities and requiring them to prudently diversify the investments among asset classes. CAC § 10.

The Defendants argue that the injunctions described in the CAC are unavailable because, by the Plaintiffs' own telling, the 100% Equities Strategy has not been in place since the end of 2010, well before the suit was filed. *E.g.*, CAC ¶ 145 ("Not until 2011 . . . did the Plan meaningfully begin to diversify into asset classes other than equities.").

Whatever the merits of that argument, the other forms of relief the Plaintiffs seek – in particular, the restoration to the Plan of the assets that were allegedly lost as a result of the Defendants' misconduct – would remedy the underfunding that is at the root of their injury.

The Plaintiffs have thus made a sufficient showing on all three elements of constitutional standing.

II.     **Claims.**

With the Plaintiffs' standing confirmed, the Court may move to the remainder of the Defendants' motions targeting the claims asserted against them in the CAC.  For the sake of analysis, the parties' arguments will be considered as they pertain to the 100% Equities Strategy, the Affiliated Funds, and the Securities Lending Program.


**A.  100% Equities Strategy.**

First, the Defendants argue on their motions to dismiss that the claims asserted against them relating to the 100% Equities Strategy are barred by ERISA's statute of limitations, and even if not, they are inadequately pled under the standards required by Federal Rule of Civil Procedure 12(b)(6).  The Court agrees.


**1.   Statute of limitations.**

The Defendants base their statute of limitations argument on the CAC alone.  As bar by a statute of limitations is an affirmative defense which the defendant must plead and prove, it "is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense."  *Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364, 367 (8th Cir. 2011).  And in this posture, "a court must accept the allegations contained in the complaint as true and make all reasonable inferences in favor of the nonmoving party."  *Martin v. Iowa*, 752 F.3d 725, 727 (8th Cir. 2014).  Even reading the CAC through that lens, however, it does definitively reveal that the 100% Equities Strategy claims are time-barred.

ERISA requires that a civil action like this one seeking redress for breaches of fiduciary duty and prohibited transactions be brought within a defined time period.  That section of the statute reads as follows:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
>
> > **(1)** six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > **(2)** three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C.A. § 1113.

The Defendants argue that the claims that they breached their fiduciary duties and engaged in prohibited transactions in relation to the 100% Equities Strategy are time-barred under 29 U.S.C. § 1113(1)(A).  According to the Defendants, the CAC itself reveals that that strategy was adopted before 2007, and as such, the six-year window measured from "the date of the last action which constituted a part of the breach of violation" had closed before this suit was filed in September of 2013.

In response, the Plaintiffs do not disagree that § 1113(1)(A) is the applicable limitations provision, nor do they contend that this is a "case of fraud or concealment."  They do argue, however, that the Defendants' position depends upon an "unsupported" inference that is not due to them in this posture, as there is "[no]thing in the Complaint stating that the 100% Equities Strategy was formally established before 2007."

That is not the case.  The entire thrust of the CAC is that the 100% Equities Strategy was in place well before 2007.  Indeed, the Plaintiffs fault the Defendants throughout the CAC for failing to revise the "existing" 100% Equities Strategy in response to worsening market conditions in late 2007 and 2008.  *E.g.*, CAC ¶ 96 (alleging that "[t]hroughout the Class Period" from September 2007 to December 2010, "and despite the severe increase in volatility in the equities market and the significant increase in correlation among all stocks during the first half of 2008 . . . , the [Defendants] failed to conduct an adequate independent review of the prudence and diversification of the existing 100% Equities Strategy").

Even more to the point, the Plaintiffs allege in the CAC, in a straightforward and unqualified manner, that, "[b]y 2004, effectively 100% of the Plan's assets were invested in equities."  CAC ¶ 91.  The CAC also quotes from U.S. Bancorp's 2004 Annual Report, wherein the company stated that, "[g]iven the pension plan's investment horizon and the financial viability of [U.S. Bancorp] to meet its funding objectives, the [Compensation] Committee has determined that an asset allocation strategy investing in 100 percent equities diversified among various equity categories and international equities is appropriate."  CAC ¶ 103.  In addition, the Plaintiffs allege that the "higher rate of return" that came with the implementation of the 100% equities strategy had allowed U.S. Bancorp to avoid ERISA's minimum contribution requirements as early as 2004.  CAC ¶ 109.

On this point, then, the CAC is susceptible to only one reading: the 100% Equities Strategy was adopted no later than 2004, more than six years before the Plaintiffs filed this action.  Nevertheless, the Plaintiffs attempt to save these claims by offering a "continuing violation theory."  As the Plaintiffs see it, even if the Defendants may have committed themselves to the "practice" of investing the Plan's assets solely in equity securities in 2004, that

decision resulted in "repeated purchases of equity securities," some of which occurred during the six years immediately preceding the filing of this suit.  According to the Plaintiffs, each one of those purchases "constitutes a violation of ERISA's requirements of diversification and prudence," thus vitiating the Defendants' § 1113(1)(A) argument.

This, however, is unpersuasive, for several reasons.  Perhaps most importantly, it is not compatible with the case the Plaintiffs have pled.  Indeed, the CAC affirmatively and repeatedly alleges that the 100% Equities *Strategy* – the *overall approach* to investing the Plan's assets, not any particular purchase of equity securities – is what was imprudent, undiversified, and disloyal. *E.g.*, CAC ¶¶ 3 (alleging that "[t]he 100% Equities Strategy was inappropriately risky, imprudent, disloyal, and undiversified"), 102 (alleging that "[t]he excessively risky 100% Equities Strategy was not solely in the best interests of the participants").

Consistent with that focus, the CAC refers only to the sum total of the Plan's investments, while failing to identify even a single one of the allegedly improper equity purchases that are now the crux of the Plaintiffs' continuing violation theory.  *E.g.*, CAC ¶ 143 (alleging that the Defendants were responsible for the Plan "engag[ing] in multiple transactions between 2007 and 2011 involving the purchase, sale and exchange of hundreds of millions of dollars in equity securities").  Even if the CAC did include more detailed allegations regarding the "repeated purchases of equity securities," the Plaintiffs' theory would still suffer from the analytical problem of how any particular one of those purchases could plausibly constitute an ERISA violation in and of itself, such that the Defendants could be found to have committed a series of statutory violations stretching into the limitations period.  The Plaintiffs offer no support for the supposition that a fiduciary violates the requirements of diversification, prudence, and loyalty solely by virtue of making or directing a purchase of equity securities without

27

including other asset classes in the same transaction, yet that is the premise of the Plaintiffs' theory.

As the Plaintiffs point out, courts have found that a continuing violation theory may be appropriately applied in an ERISA case "where separate violations of the same type, or character, are repeated over time" and the claims are based on "repeated decision-making, of the same character, by the fiduciaries." *Novella v. Westchester County*, 661 F.3d 128, 146 (2nd Cir. 2011) (internal quotations omitted). But that does not hold true here. The CAC does not challenge the Defendants' decision-making with respect to the purchase of any particular equity securities during the limitations period, but rather takes issue with the Defendants' decision to invest the Plan's assets only in equities – in other words, to adopt the 100% Equities Strategy. *See* Plaintiffs' Memorandum in Opposition at 30, 32, ECF No. 121 ("The Complaint alleges that subjecting an entire retirement portfolio to the volatility and risk associated with the stock market is imprudent."). By the Plaintiffs' own allegations, that decision was made in 2004, and the claims arising from it fully accrued at that time.

Thus, when the Plaintiffs filed suit in 2013, the six years that 29 U.S.C. § 1113(1)(A) provided them to challenge the Defendants' 100% Equities Strategy had long since expired. Therefore, the claims that the Defendants violated ERISA in various ways by "maintaining" the 100% Equities Strategy during the proposed class period are untimely and must be dismissed.

### 2. Adequacy of pleading.

To the extent the Plaintiffs attempt to sidestep this conclusion by alleging that the Defendants violated ERISA either by "re-adopting" the 100% Equities Strategy during the proposed class period or by failing to alter it in response to deteriorating market conditions in

late 2007 and 2008, it is also unavailing.  To be sure, significant changes in market conditions can trigger an obligation for fiduciaries to investigate whether altering an investment strategy previously decided upon would in the best interests of the plan.  *Cf. Tibble v. Edison Intern.*, 729 F.3d 1110, 1120 (9th Cir. 2013), *cert. granted in part*, 83 U.S.L.W. 3183 (U.S. Oct. 2, 2014) (No. 13-550).

But even so, it is elemental that ERISA requires the Defendants to have acted prudently and loyally in investing the Plan's assets, not to have predicted and avoided the consequences of the financial crisis.  The facts pled in the CAC undoubtedly show that the Defendants failed to accomplish the latter, but they are insufficient to create a plausible claim with respect to the former.

To survive the Defendants' motion to dismiss under Rule 12(b)(6), the CAC "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This "facial plausibility" standard requires the plaintiff to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Fundamentally, the Court's task is to determine whether the CAC contains "well-pleaded factual allegations" that would "plausibly give rise to an entitlement to relief" if they are proven to be true, or whether the facts that have been pled are "merely consistent with" the Defendants' liability, such that the CAC "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678-79.

It is the latter.  With the 100% Equities Strategy set in 2004, the Plaintiffs assert that the Defendants violated ERISA in various ways by failing to reallocate the Plan's investment portfolio among different asset classes in time to avoid approximately $750 million of the losses that the Plan suffered when the market crashed in 2008.  An examination of the CAC reveals that the only facts the Plaintiffs offer to support that conclusion are that volatility and correlation increased in the equities market in late 2007 and 2008.  *E.g.*, CAC ¶ 164 ("In the face of the significant increase in correlation among stocks in the domestic and international equities market, the fiduciaries of the Plan should have moved a significant portion of the Plan's assets into cash, treasury bills and/or bonds in order to meet their obligations under ERISA . . . .").

This is insufficient.  In the Plaintiffs' own characterization, the information on volatility and correlation available to the Defendants at the time indicated only "weakness and increasing risk in the equities market."  CAC ¶ 163.  While the Court is not aware of any Eighth Circuit decision directly on point, the Second Circuit has held in reviewing similar allegations that, by themselves, these kind of "warning signs" or "suggestion[s] of added risk" in holding a particular type of investment "do not give rise to a reasonable inference that those investments were imprudent to maintain and therefore should have been sold . . . ."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 722 (2nd Cir. 2013).

But this is all the Plaintiffs have offered.  If the 100% Equities Strategy was by its very nature undiversified and disloyal so as to violate ERISA, it was fully so when it was adopted in 2004; but if the violations were not inherent in the strategy, the Plaintiffs have failed to adequately allege how or why it became imprudent after September of 2007.  As with the complaint that the Second Circuit found inadequate, the CAC here "offers no insight into how

risky those unspecified [equity] investments became relative to their price [after September of 2007], nor does it allege any facts suggesting that a prudent investor at the time would have viewed this unspecified risk as high enough to render the investments imprudent." *Id.*

Thus, even if the claims grounded in the assertion that the Defendants should have "reevaluated" the 100% Equities Strategy and "reallocated" the Plan's assets among different asset classes after September of 2007 do evade the sweep of ERISA's statute of limitations, they are far too conclusory to survive the Defendants' motion to dismiss for failure to state a claim.

## B. Affiliated Funds.

Second, the Defendants argue on their motions to dismiss that the claims relating to the investment of the Plan's assets in FAF's mutual funds – the Affiliated Funds – fail because they are also barred by ERISA's statute of limitations and inadequately pled under Rule 12(b)(6). As to these claims, the Court disagrees.

### 1. Statute of limitations.

Regarding the timeliness of the Affiliated Funds claims, the Defendants offer essentially the same argument that they press with respect to the 100% Equities Strategy claims: that the CAC itself establishes that the actions the Plaintiffs are challenging occurred before September 30, 2007 and are therefore time-barred. Here, however, the argument is unpersuasive.

As the Defendants point out, the CAC and the materials embraced by it do show that the Plan's investment in FAF's mutual funds began more than six years before this case was filed. *See* CAC ¶¶ 77 (alleging that U.S. Bancorp's Compensation Committee, as fiduciaries of the Plan, "appointed" FAF to be the Plan's investment manager via an Investment Management

Agreement that was "executed in 2007"), 132 (alleging that, "[b]y 2007, FAF Advisors invested over 40% of the Plan's assets in its own mutual funds").[7]   The CAC also alleges that the Plan's assets were used to purchase Affiliated Funds during the limitations period.  CAC ¶¶ 134 (alleging that, "[d]uring 2008, FAF Advisors purchased approximately 630,000 shares of its own FAF Mutual Funds, worth approximately $8.5 million"), 143 (alleging that the Plan "engaged in multiple transactions between 2007 and 2011 involving the purchase, sale and exchange of hundreds of millions of dollars in equity securities and/or FAF Mutual Funds backed by equities").

Unlike with the claims arising from the 100% Equities Strategy, these individual purchases are the sin qua none of the Defendants' liability with respect to the Affiliated Funds. The Plaintiffs' central assertion in this portion of the CAC is that the Defendants engaged FAF as the Plan's investment manager not "solely in the interest of the Plan and for the exclusive purpose of providing benefits to the Plan and its participants and defraying reasonable Plan expenses," but in order to "prop[] up the business" of FAF, which was then a subsidiary of U.S. Bank, N.A.  CAC ¶ 131.  This disloyal goal was pursued by causing or allowing FAF to invest the Plan's assets in FAF's own mutual funds "in multiple transactions between 2007 and 2011." CAC ¶ 143.  The CAC adequately alleges that each of those mutual fund purchases individually "redounded to the benefit" of FAF, insofar as they incrementally "increase[d] the assets under the management of [FAF's] own mutual funds, thus making them more attractive to other investors," and generated management fees for FAF.  CAC ¶¶ 140-41.

---

[7]     While the Plaintiffs do not specify exactly when in 2007 the Defendants engaged FAF as the Plan's investment manager, the Defendants have submitted a copy of the Investment Management Agreement between the Plan and FAF that is incorporated by reference into the CAC.  *See* CAC ¶¶ 77, 136-39.  That contract is undated, but an amendment to it was executed on March 26, 2007.

As the individual mutual fund purchases that occurred during the limitations period thus animate the claims relating to the use of the Affiliated Funds, 29 U.S.C. § 1113(1)(A) poses no bar here.

### 2. Adequacy of pleading.

The statute of limitations aside, the Defendants also challenge the adequacy of the Plaintiffs' pleading of the Affiliated Funds claims under Rule 12(b)(6).

Principally, the Defendants attack the Plaintiffs' allegation that FAF's investment of Plan assets in its own mutual funds violated a prohibition on the use of Affiliated Funds contained in the Plan documents.  *See* CAC ¶¶ 136-39.  The Defendants' position – that the Investment Management Agreement (hereinafter, "IMA") between FAF and the Plan actually authorized FAF to invest Plan assets in Affiliated Funds notwithstanding the Plan documents – is convincing.

The IMA and other Plan documents are embraced by the pleadings, *see supra* n. 7, and are before the Court.  "Where, as here, the claims relate to a written contract that is part of the record in the case, we consider the language of the contract when reviewing the sufficiency of the complaint."  *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 792 (8th Cir. 2014) (internal quotation omitted).

The IMA required FAF "to supervise and direct the investment and reinvestment of [Plan] assets in accordance with the investment objectives, policies, directions and restrictions set forth in the Plan and U.S. Bank Pension Plan Investment Policy Statement ('Investment Policy') . . . ."  IMA § 1(a).  The Investment Policy, in turn, deemed "certain securities, strategies and investments [to be] ineligible for inclusion within this Plan" – unless they were "specifically

approved by the [Compensation] Committee."  Investment Policy § IV.  Included in this list of

prohibited investments were "[s]ecurities of the investment manager, their parent or subsidiary

companies (excluding money market funds) or any other security that would be considered a

self-dealing transaction."  *Id.*

But even if FAF's mutual funds do constitute such "[s]ecurities of the investment

manager," they were, as the Defendants point out, "specifically approved": at § 1(d) of the IMA,

"[t]he Compensation Committee authorize[d FAF] to invest [Plan] assets in investment

companies for which [FAF] acts as investment adviser ('Affiliated Funds') to the extent such

investment is consistent with the Investment Policy."

The Plaintiffs argue – circularly – that the use of Affiliated Funds was not "consistent

with the Investment Policy" by virtue of the exclusionary provision quoted above.  But the

meaning of the contract between the Plan and FAF is clear: the Compensation Committee

authorized FAF to invest the Plan's assets in its own mutual funds to the extent that doing so was

in line with the 100% Equities Strategy and the other guidelines and objectives set forth in the

Investment Policy.  The Plaintiffs do not allege that FAF's use of Affiliated Funds was contrary

to any of those provisions; their contention that it was inconsistent with the Plan documents is

therefore baseless.

Nevertheless, this conclusion is not fatal to the entirety of the Plaintiffs' Affiliated Fund

claims.  The Plaintiffs do not allege that FAF's investment of Plan assets in its own mutual funds

violated ERISA only because it was inconsistent with the Plan documents.  As noted above, the

Plaintiffs allege that the U.S. Bank Defendants engaged FAF as the Plan's investment manager

in order to benefit a subsidiary of U.S. Bank by channeling a significant amount of business to it,

CAC ¶ 131, and they also allege that the use of Affiliated Funds was plagued by the "inherent

conflicts" in FAF acting as "both a fiduciary of the Plan in its capacity as Investment Manager and the investment advisor of the underlying FAF Mutual Funds in which it invested the Plan's assets . . . ."  CAC ¶¶ 135-36.

On these points, the Defendants counter that 29 U.S.C. § 1108(b)(8) and the Department of Labor's Prohibited Transaction Class Exemption 77-3, 42 Fed. Reg. 18734 (April 8, 1977) ("PTE 77-3") "expressly authorize[] ERISA plans to invest in investment products affiliated with the sponsor, and there is no allegation that the Plan has violated these provisions."  However, the CAC need not contain such allegations to be adequately pled; as the Eighth Circuit has explained, "the statutory exemptions established by § 1108 are defenses which must be proven by the defendant."  *Braden*, 588 F.3d at 601.  The Defendants' bare assertions that the Plaintiffs have failed to plead facts to demonstrate that the use of the Affiliated Funds was inconsistent with § 1108(b)(8) and PTE 77-3 are thus unavailing.

Therefore, except insofar as the Affiliated Funds claims depend upon the allegation that FAF's investment of the Plan's assets in its own mutual funds was inconsistent with the Plan documents, those claims survive.[8]

---

[8]     In light of the dismissal of the claims relating to the 100% Equities Strategy, the Court briefly revisits the issue of the Plaintiffs' standing to pursue the Affiliated Funds claims.  *See Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2006) (noting that standing is not "commutative" and "confirm[ing] that a plaintiff must demonstrate standing for each claim he seeks to press").

It is the Plaintiffs' contention in this case that the Defendants' 100% Equities Strategy both violated ERISA and caused the Plan to lose its surplus and become underfunded in 2008.  But *Harley* and its progeny do not require the Defendants' ERISA violations to cause the Plan's underfunding; the alleged violations need only cause losses that the Plan – for any reason – has no surplus to absorb.  Thus, even if it were that the Defendants' alleged misconduct regarding the Affiliated Funds did not by itself cause the Plan to become underfunded, any losses to the Plan caused by those violations after the Plan lost its surplus is an injury in fact to the Plaintiffs.

The Court recognizes, as has the Eighth Circuit, that one implication of the standing analysis outlined in *Harley* is that a private cause of action to remedy a fiduciary breach will be available to a participant when a plan is underfunded, but the same participant will have no

### 3. Nuveen.

However, they do not survive against Defendant Nuveen.  In the CAC, the Plaintiffs

name Nuveen as a defendant only as "successor in interest to FAF," CAC ¶ 30 – while

simultaneously naming U.S. Bank as a defendant both "individually and as successor in interest

to FAF," CAC ¶ 28 – and then proceed to plead their ERISA claims against FAF.

According to the CAC, "Nuveen . . . acquired certain assets and liabilities of FAF . . .

from U.S. Bancorp in or around December 2010," while "as part of the sale, U.S. Bank . . .

retained certain assets and liabilities of FAF."  CAC ¶¶ 28, 30.  Nuveen has submitted the Asset

Purchase Agreement memorializing the sale.  This contract is repeatedly referenced in and

necessarily embraced by the CAC, *see* CAC ¶¶ 28, 30, 145, 146, 196 – indeed, without it,

Nuveen would have no connection whatsoever to this case – and it is therefore properly

considered here on Nuveen's motion to dismiss.  *Miller v. Redwood Toxicology Laboratory, Inc.*,

688 F.3d 928, 931 (8th Cir. 2012).

The parties dispute whether, by this Asset Purchase Agreement (hereinafter, "APA"),

Nuveen assumed FAF's liabilities with respect to the investment management services FAF

provided to the Plan.  The APA specifies that it is to be "governed by and interpreted and

construed in accordance with the substantive laws of the State of Delaware . . . ."  APA § 11.10.

Under Delaware law, the construction and interpretation of an unambiguous contract is a matter

---

recourse for the very same misconduct when the plan is overfunded.  *See Harley*, 284 F.3d at 908
n.5 (noting that the decision does not insulate a breaching fiduciary from suit by "the Secretary
of Labor and any party with a reversionary interest in the plan's surplus").  This approach has
been criticized for "tying a plan participant's standing under § 1132(a) to the stock market's
performance" and conditioning "[a] defined plan's ability to recover losses caused by a
fiduciary's breach [on] the vagaries of the stock market."  *Zoesch*, 413 F.3d at 872 (Bye, J.,
concurring).

  Nevertheless, pursuant to the understanding of Eighth Circuit precedent discussed in
detail above, the Court concludes that the Plaintiffs have made an adequate showing of their
standing to pursue the surviving Affiliated Funds claims.

of law, as is the threshold determination of whether the contract is ambiguous or not.  *Vanderbilt Income and Growth Associates, L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (quotation omitted).  "Ambiguity exists when the provisions in controversy are reasonably or fairly susceptible of different interpretations."  *Id.* (quotation omitted).  But "[c]ourts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty," and "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."  *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).  *See also GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).  Clear contract terms are to be given their plain and ordinary meaning.  *AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108 (Del. 2007).

Applying those principles to the APA, it is evident that the contract unambiguously indicates that Nuveen did not assume any liability that FAF may have had with respect to the Plan.

Under § 2.4(b) of the APA, Nuveen assumed "all liabilities, obligations and commitments of [FAF] under the Assumed Contracts and the Shared Contracts whether arising prior to or after the Closing . . . ."  At Annex D to the APA, FAF's 2007 Investment Management Agreement with the Plan is included as an "Assumed Contract."

However, § 2.5(b) of the APA overrides § 2.4 and excludes from Nuveen's assumption of liabilities "any liability, obligation or commitment under or with respect to any Seller Plans . . . ."  The contract defines "Seller Plans" to mean "all employee benefit, . . . pension, . . . retirement . . . or similar plans, programs, policies, practices, arrangements or agreements . . . that are sponsored or maintained by Seller or its ERISA Affiliates . . . ."  The "Seller" is FAF,

and the APA defines its "ERISA Affiliates" to include "a member of any 'controlled group' (within the meaning of Section 414 of the [Internal Revenue] Code) of which [FAF] is also a member" and "a trade or business, whether or not incorporated, under common control (within the meaning of Section 414(c) of the Code) with [FAF] . . . ."

With respect to a "controlled group," Internal Revenue Code § 414(b) cross-references 26 U.S.C. § 1563(a), which defines the term to include a "parent-subsidiary controlled group," meaning "any group of . . . [o]ne or more chains of corporations connected through stock ownership with a common parent corporation . . . ."  26 U.S.C. § 414(b).  With respect to "common control," Congress at Internal Revenue Code § 414(c) referred the definition to the Secretary of the Treasury.  26 U.S.C. § 414(c).  Treasury Department regulations, in turn, offer the following illustration of a "parent-subsidiary group of trades or businesses under common control": "The ABC partnership owns stock possessing 80 percent of the total combined voting power of all classes of stock entitled to voting of S corporation [and] S owns 80 percent of the profits interest in the DEF partnership."  26 C.F.R. § 1-414(c)-2(e) (example 1(b)).

Here, the Plaintiffs have alleged that U.S. Bancorp is "a diversified financial services company organized under the laws of the State of Delaware," that U.S. Bank is "a wholly owned subsidiary of U.S. Bancorp," and that during the proposed class period, U.S. Bank "was the parent of FAF."  CAC ¶¶ 28-29.  The APA itself states that FAF and U.S. Bank are each "a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware," and that U.S. Bank "owns beneficially and of record all of the issued and outstanding capital stock of [FAF]."  APA §§ 3.1-3.2.

It is thus beyond doubt that U.S. Bancorp and U.S. Bank are "ERISA Affiliates" of FAF within the meaning of the APA.  The U.S. Bancorp Pension Plan is therefore a "Seller Plan."  As

Nuveen did not assume any of FAF's liabilities "under or with respect to any Seller Plans," Nuveen is not a proper defendant for any of the claims that the Plaintiffs assert here. Nuveen's request to be dismissed from this action is therefore granted.

### C. Securities Lending Program.

Third, the Defendants argue that the claims the Plaintiffs bring on behalf of the Plan arising out of the Plan's participation in the Securities Lending Program must be dismissed because they were released by the Plan in September of 2013. The Court agrees.

As an initial matter, it bears noting that the Plaintiffs have pled their claims arising from the Securities Lending Program against FAF, which is not a party to this case. Despite this vagueness, it is evident that the Plaintiffs may have intended to lodge these claims against Defendant U.S. Bank as the successor in interest to FAF or against Defendant Nuveen as the successor in interest to FAF. *See* CAC ¶ 28- 30. But, as discussed above, Nuveen did not assume any of FAF's liabilities with respect to the Plan. Therefore, these claims could only be asserted against U.S. Bank.

Relevant, then, is the Settlement and Release Agreement between the Plan and U.S. Bank that the Defendants have submitted. Like the application of the statute of limitations, release is an affirmative defense on which the Defendants bear the burden of proof. Fed. R. Civ. P. 8(c)(1). Unlike the Defendants' statute of limitations argument discussed above, however, their release argument is not based solely on the allegations in the CAC, but rather depends upon the contents of this contract, which is not referenced in the Plaintiffs' pleading. *Cf. Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063 n.3 (8th Cir. 2005) (documents "incorporated into the pleadings by reference," even if "not expressly part of the pleadings," may

be considered on motion to dismiss under Rule 12(b)(6)). Accordingly, the Defendants have framed their motion with respect to the release of the Securities Lending Program claims as one for summary judgment under Rule 56, and the Plaintiffs have responded to it as such.

It is appropriate to consider the effect of the Settlement and Release Agreement on the Plaintiffs' Securities Lending Program claims here under Rule 56, even at this early stage of the litigation. *E.g., U.S. v. Light*, 766 F.2d 394, 397 (8th Cir. 1985) (per curiam) ("Rule 56 . . . does not require trial courts to allow parties to conduct discovery before entering summary judgment.").

### 1.  Release.

The Settlement and Release Agreement was entered into on September 30, 2013 – the same day the Plaintiffs filed this suit – by Defendant U.S. Bank and the Plan.  Section 4 of the Agreement, entitled "Release," reads as follows:

> [The Plan], for itself and its predecessors, successors, assigns, and all persons and entities who could claim through or under it, waives and hereby voluntarily releases, and forever discharges, [U.S. Bank] and any and all of its past, present, and future parent corporations, and any and all of its affiliates and subsidiaries (including, without limitation, [U.S. Bancorp Asset Management], the Mount Vernon Securities Lending Trust, the four Liquidating Trusts, etc.), and all their respective past, present and future employees, officers, directors, advisors, attorneys, agents, trustees, representatives and successors and assigns, whether acting in their individual capacities or on behalf of [U.S. Bank] or its affiliates from any and all claims, causes of action, suits, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature, whatsoever, known or unknown, fixed or contingent, that it may have, or claim to have as of the date of this Agreement, arising out of or otherwise relating to [the Plan's] participation in [U.S. Bank's] securities lending program prior to the date of this Agreement, including, without limitation, the investment of [the Plan's] cash collateral in the [Mount Vernon Securities Lending Trust Short-Term Bond Portfolio, or MVSTBP], the liquidation of the [MVSTBP] and the subsequent investment in the liquidating trusts created in connection with such liquidation.

The Defendants contend that, with this language, the Plan executed a valid release that encompasses the claims relating to the Securities Lending Program that the Plaintiffs assert here, and that it is binding on the Plaintiffs as "persons . . . who could claim through or under [the Plan]." The Plaintiffs disagree. To them, whether Section 4 covers the claims they assert relating to the Securities Lending Program that was administered by FAF is "at best ambiguous" because the Agreement "neither mentions FAF nor any fiduciary breach claims of participants that arise out of the SLP" and, "on its face, [section 4] only releases U.S. Bank from any further liability for the Plan's investment in [the Mount Vernon Securities Lending Trust] – not for FAF's fiduciary liability for the Plan's investment in [that Trust]."

The Settlement and Release Agreement specifies that it is to be "governed by, and construed in accordance with, the laws of the State of Minnesota . . . ." § 8.3. Under Minnesota law, as in Delaware, the construction and interpretation of an unambiguous contract is a matter of law:

> A settlement agreement is a contract, . . . and [the court] review[s] the language of the contract to determine the intent of the parties . . . . When the language is clear and unambiguous, we enforce the agreement of the parties as expressed in the language of the contract. . . . But if the language is ambiguous, parol evidence may be considered to determine intent. . . . Whether a contract is ambiguous is a question of law . . . . The language of a contract is ambiguous if it is susceptible to two or more reasonable interpretations.

*Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010) (citations omitted).

To constitute a valid release, the Settlement and Release Agreement need only "manifest an intent to release, discharge, or relinquish a right, claim, or privilege by a person in whom it exists to a person against whom it might have been enforced . . . ." *Id.* It does. With Section 4, the Plan specifically and clearly discharged U.S. Bank and its "past, present, and future parent corporations" – i.e., U.S. Bancorp – from liability connected to the losses the Plan suffered "due

41

to a decline in value of MVSTBP shares" in March of 2008.  This is precisely the subject matter of the claims the Plaintiffs have asserted relating to the Securities Lending Program.  *See, e.g.,* CAC ¶ 189 ("Despite Mr. Busse's fraudulent efforts to prop up the NAV of the Mount Vernon Bond Portfolio, the value of the portfolio – and therefore the value of the Plan's assets – dropped significantly on March 5, 2008.  The Plan, which was also invested in the Mount Vernon Bond Portfolio, suffered losses as a result of the defaulted [structured investment vehicles].").

Accordingly, Section 4 unmistakably "manifest[s] an intent to release, discharge, or relinquish," *id.*, "any and all claims" that the Plan – as well as "all persons . . . who could claim through or under it" – may have against U.S. Bank and U.S. Bancorp related to the Plan's participation in the Securities Lending Program.[9]  In the face of this broad and straightforward language, the Plaintiffs offer no plausible explanation of how this release of "any and all claims . . . of any kind, character, or nature, whatsoever . . . arising out of or otherwise relating to [the Plan's] participation in [U.S. Bank's] securities lending program" could reasonably be construed to exclude the fiduciary breach and prohibited transaction claims arising out of or otherwise relating to the Plan's participation in the Securities Lending Program that they assert here on the Plan's behalf.

The Minnesota Supreme Court has "consistently stated that when a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction." *Savela v. City of Duluth*, 806 N.W.2d 793, 797 (Minn. 2011) (quoting *Valspar*

---

[9]        Section 4 also releases all such claims against "all [the] past, present and future employees, officers, directors, advisors, attorneys, agents, trustees, representatives and successors and assigns" of U.S. Bank, its parent U.S. Bancorp, and its affiliates and subsidiaries, "whether [they were] acting in their individual capacities or on behalf of [U.S. Bank] or its affiliates . . . ."
        This language unambiguously brings the Board and Committee Defendants within the scope of the release.  *See* CAC ¶¶ 42-52 (describing the Committee Defendants as "directors" of U.S. Bancorp).

*Refinish, Inc. v. Gaylord's, Inc.,* 764 N.W.2d 359, 364–65 (Minn.2009)).  The Court will not do

so here; the release the Plan granted unambiguously encompasses the Plaintiffs' Securities

Lending Program claims.


### 2.  Rule 56(d).

Against that conclusion, the Plaintiffs argue that summary judgment for the Defendants

on these claims should be denied or deferred under Rule 56(d).  That provision provides that a

party opposing summary judgment may obtain a continuance or other appropriate relief if it can

show that the summary judgment motion is premature by "filing an affidavit affirmatively

demonstrating . . . how postponement of a ruling . . . will enable him, by discovery or other

means, to rebut the movant's showing of the absence of a genuine issue of fact."  *Toben v.*

*Bridgestone Retail Operations, LLC,* 751 F.3d 888, 894 (8th Cir. 2014) (quotation omitted).

In support of their request under Rule 56(d), the Plaintiffs fault the Defendants for

> not provid[ing] any evidence in their motion concerning the facts and
> circumstances surrounding the settlement agreement on which they rely or the
> scope of the agreement . . . .  Plaintiffs have not had an opportunity to discover
> facts that may shed light on whether the settlement agreement is anything other
> than what it appears to on its face: a wholly-unrelated release of disputes related
> to a service contract between the Plan as a securities lending customer and the
> Bank as securities lending agent.

As an initial matter, any extrinsic evidence that the Plaintiffs could hope to discover

relating to the  meaning of the Settlement and Release Agreement – including its "scope" –

would have no bearing on the Defendants' summary judgment motion.  Parol evidence is only

admissible to aid the factfinder in determining the parties' intent if the contract is ambiguous.

*Dykes*, 781 N.W.2d at 582.  The Settlement and Release Agreement is not ambiguous, and its

meaning and scope have accordingly been determined as a matter of law by the plain and ordinary meaning of its terms.

Nevertheless, what may still be relevant is evidence that would undermine the validity of the Settlement and Release Agreement and, therefore, the release it contains. In this respect, the Plaintiffs have offered a declaration in which they posit that discovery in two additional areas would allow them "to rebut the . . . Defendants' assertion that the Settlement Agreement released their claims."

First, the Plaintiffs represent that they "intend to seek discovery regarding the role of Evercore Trust Company," the independent fiduciary that advised the Plan regarding the merits of the Agreement.[10] Specifically, the Plaintiffs request a continuance to investigate whether Evercore adequately considered FAF's alleged fiduciary liability, "whether there was adequate consideration for releasing all the claims," and whether the Agreement was reached in "compliance with the governing regulations, including PTE 2003-39." Second, the Plaintiffs "intend to seek discovery as to the timing, nature, and circumstances surrounding the Settlement Agreement, including the negotiations leading up to it," whereby they "expect to uncover any

_____

[10] According to § 3.2.7 of the Agreement,

[a]s contemplated by Prohibited Transaction Exemption 2003-39, [the Plan] has duly appointed Evercore Trust Company to serve as the fiduciary to [the Plan] to advise [it] regarding the merits of this Agreement, including whether transactions contemplated by this Agreement are reasonable and in the best interest of [the Plan] consistent with Section II of Prohibited Transaction Exemption 2003-39; Evercore Trust Company has accepted the appointment as fiduciary for such purposes; Evercore Trust Company has confirmed to [the Plan] that it has no relationship to, or interest in, [U.S. Bank] or its affiliates that might affect its best judgment as a fiduciary; and [the Plan], in approving this Agreement, is acting upon the advice of Evercore Trust Company which has approved the terms of this Agreement . . . .

evidence of inequitable conduct, fraud or misrepresentation, or economic coercion by U.S. Bank in obtaining the release."

What is conspicuously absent from the Plaintiffs' submission, however, is any reason whatsoever to believe that these areas of inquiry might yield evidence to undermine the validity of the Agreement.  The Plaintiffs fail to identify any basis on which to even suspect that any misconduct may have occurred in the negotiations, and they offer no explanation of how Evercore's fulfillment of its role as an independent fiduciary for the Plan could possibly be found to violate PTE 2003-39 or any other "governing regulation."  Against this silence, it is particularly notable that the Plan itself, on whose behalf the Plaintiffs have brought their claims, expressly represented in the Agreement that it was fully counseled and properly advised in the negotiations and that it entered into the Agreement "knowingly and voluntarily and without any coercion, undue influence, threat or intimidation of any kind whatsoever."  Settlement and Release Agreement § 8.1.

Furthermore, with respect to the information available to the Plan at the time it granted the release, the Plan specifically acknowledged in the Agreement that "facts different from or in addition to those which they now know or believe to be true with respect to the claims released hereby" may be discovered "hereafter," and yet it agreed that, "in any such event, this Agreement shall be and remain effective in all respects, notwithstanding such different facts or additional facts, or discovery thereof."  Settlement and Release Agreement § 8.2.

Moreover, "[d]etermining whether sufficient consideration exists for an agreement is a question of law," and "Minnesota follows the long-standing contract principle that a court will not examine the adequacy of consideration as long as something of value has passed between the parties."  *Brooksbank v. Anderson*, 586 N.W.2d 789, 794 (Minn. Ct. App. 1998) (internal

quotations and citations omitted). That is clearly the case here. *See* Settlement and Release

Agreement §§ 1-2 (reflecting that U.S. Bank, N.A. purchased the Plan's interest in the "illiquid

Securities Liquidating Trust" and additionally paid the Plan approximately $1.4 million as

"partial reimbursement" for its "Collateral Investment Loss Amount").

The Plaintiffs' request under Rule 56(d) is, of course, in the service of keeping alive a set

of claims that they bring here on behalf of the Plan. But the Plan itself has already been

compensated for releasing those claims. The Plaintiffs thus paradoxically seek to pursue claims

on behalf of the Plan by undermining the bargain and the representations the Plan made with

respect to those very claims in the Settlement and Release Agreement. Even setting aside that

paradox, the Plaintiffs' request is founded entirely on speculation. The relief the Plaintiffs

request is not warranted in these circumstances. *E.g., Duffy v. Wolle,* 123 F.3d 1026, 1041 (8th

Cir. 1997) ("[I]t is well settled that Rule 56([d]) does not condone a fishing expedition where a

plaintiff merely hopes to uncover some possible evidence of [misconduct].") (quotation omitted).

As the Plaintiffs have failed to satisfy their burden under Rule 56(d), the Court's ruling

on the Defendants' summary judgment motion with respect to the Securities Lending Program

claims should not be delayed. *Light,* 766 F.2d at 398 ("Where a party fails to carry his burden

under Rule 56([d]), postponement of a ruling on a motion for summary judgment is

unjustified."). It is granted.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendant Nuveen's Motion to Dismiss the Consolidated Amended Complaint [ECF No. 96] is GRANTED IN PART AND DENIED IN PART consistent with the memorandum above.

2. U.S. Bank Defendants' Motion to Dismiss the Consolidated Amended Complaint or for Partial Summary Judgment [ECF No. 102] is GRANTED IN PART AND DENIED IN PART consistent with the memorandum above.

3. Plaintiffs' Motion for Relief under Federal Rule of Civil Procedure 56(d) [ECF No. 113] is DENIED.

4. Plaintiffs' Motion for Leave to File Reply in Support of Motion for Relief Under Fed. R. Civ. P. 56(d) [ECF No. 127] is GRANTED.


Dated: November 21, 2014                    s/Joan N. Ericksen
                                            JOAN N. ERICKSEN
                                            United States District Judge