# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1928

_____

James J. Thole; Sherry Smith, individually and on behalf of all others similarly situated

*Plaintiffs - Appellants*

v.

U.S. Bank, National Association, individually and as successor in interest to FAF Advisors, Inc.; U.S. Bancorp

*Defendants - Appellees*

Nuveen Asset Management, LLC, as successor in interest to FAF Advisors, Inc.

*Defendant*

Richard K. Davis; Douglas M. Baker, Jr.; Y. Marc Belton; Peter H. Coors; Joel W. Johnson; Olivia F. Kirtley; O'Dell M. Owens; Craig D. Schnuck; Arthur D. Collins, Jr.; Victoria Buyniski Gluckman; Jerry W. Levin; David B. O'Maley; Patrick T. Stokes; Richard G. Reiten; Warren R. Staley; John and Jane Doe 1-20

*Defendants - Appellees*

------------------------------

AARP; AARP Foundation; R. Alexander Acosta, Secretary of the United States Department of Labor

*Amici on Behalf of Appellant(s)*

Chamber of Commerce of the United States of America

*Amicus on Behalf of Appellee(s)*

——————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

——————

Submitted: May 11, 2017
Filed: October 12, 2017

——————

Before SMITH, Chief Judge, COLLOTON and KELLY, Circuit Judges.

——————

SMITH, Chief Judge.

Named plaintiffs James Thole and Sherry Smith (collectively, "plaintiffs")[1] brought a putative class action against U.S. Bank, N.A. ("U.S. Bank"); U.S. Bancorp; and multiple U.S. Bancorp directors (collectively, "defendants"),[2] challenging the defendants' management of a defined benefit pension plan ("Plan" or "U.S. Bank Pension Plan") from September 30, 2007, to December 31, 2010. The plaintiffs alleged that the defendants violated Sections 404, 405, and 406 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1104–06, by breaching their fiduciary obligations and causing the Plan to engage in prohibited transactions with a U.S. Bank subsidiary, FAF Advisors, Inc. (FAF). The plaintiffs'

——————

[1]The district court dismissed named plaintiffs Adetayo Adedipe and Marlene Jackson per the parties' stipulation.

[2]The district court dismissed defendant Nuveen Asset Management LLC ("Nuveen") on its motion.

-2-

complaint asserts that these alleged ERISA violations caused significant losses to the Plan's assets in 2008 and resulted in the Plan being underfunded in 2008. The plaintiffs sought to recover Plan losses, disgorgement of profits, injunctive relief, and other remedial relief pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA Section 409, 29 U.S.C. § 1109. They also sought equitable relief pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3).

In response, the defendants moved to dismiss the plaintiffs' consolidated amended complaint with prejudice under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Specifically, they argued that the plaintiffs lacked standing to bring the suit, the ERISA claims were time-barred or had been released, and the pleading otherwise failed to state a claim on which relief could be granted. Relevant to the present appeal, the district court[3] concluded that the plaintiffs' claim challenging the Plan's strategy of investing 100 percent of its assets in equities was barred by ERISA's six-year statute of repose. The court, however, permitted the plaintiffs to proceed with their claim that the defendants engaged in a prohibited transaction by investing the Plan's assets in mutual funds that FAF managed.

During the litigation, the factual backdrop of the case changed. In 2014, the Plan became overfunded; in other words, there was more money in the Plan than was needed to meet its obligations. The defendants, alleging that the plaintiffs had not suffered any financial loss upon which to base a damages claim, moved to dismiss the remainder of the action for lack of standing pursuant to Rule 12(b)(1). Although the district court concluded that standing was the wrong doctrine to apply, it granted the motion to dismiss for lack of Article III jurisdiction based on the doctrine of mootness. The court concluded that because the Plan is now overfunded, the plaintiffs

---

[3]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

-3-

lack a concrete interest in any monetary relief that the court might award to the Plan if the plaintiffs prevailed on the merits.[4] The court later denied the plaintiffs' motion for attorneys' fees, determining that the plaintiffs had achieved no success on the merits. The court concluded that the plaintiffs failed to show that the litigation had acted as a catalyst for any contributions that U.S. Bancorp made to the Plan resulting in its overfunded status.

On appeal, the plaintiffs argue that the district court erred by (1) dismissing the case as moot; (2) dismissing the Equities Strategy claim on statute-of-limitations and pleading grounds; and (3) denying their motion for attorneys' fees and costs. We affirm.

## I. *Background*[5]

### A. *Overview of the U.S. Bank Pension Plan—A Defined Benefit Plan*

The plaintiffs, both retirees of U.S. Bank, are participants in the U.S. Bank Pension Plan. U.S. Bancorp is the Plan's sponsor, while U.S. Bank (a wholly-owned subsidiary of U.S. Bancorp) is the Plan's trustee. Pursuant to the Plan document, the Compensation Committee and Investment Committee had authority to manage the Plan's assets. The Compensation Committee was composed of U.S. Bancorp directors and officers. The Compensation Committee designated FAF as the Investment Manager with full discretionary investment authority over the Plan's assets. During the relevant time period, U.S. Bank was the parent of FAF.[6]

---

[4]As far as the record discloses, the Plan remains overfunded.

[5]We "accept[] as true all factual allegations in the complaint and draw[] all reasonable inferences in favor of the nonmoving party." *Wieland v. U.S. Dep't of Health & Human Servs.*, 793 F.3d 949, 953 (8th Cir. 2015).

[6]Nuveen acquired FAF from U.S. Bank in November 2010.

The Plan is a defined benefit plan regulated under ERISA. *See* 29 U.S.C. §§ 1002(2)(A), 1002(35), 1003. "A defined benefit plan . . . consists of a general pool of assets rather than individual dedicated accounts. Such a plan, 'as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 154 (1993)). According to the plaintiffs, the Plan's purpose "is to provide a monthly retirement income based on a U.S. Bancorp employee's pay and years of service." In 2009, "Smith elected to receive her Plan benefits in the form of a single life annuity in the amount of $42.26 per month, and received a payment of the portion of her benefit accrued under a predecessor plan . . . in the amount of $7,588.65." In 2011, "Thole elected to receive his Plan benefits in the form of a Estate Protection 50% Joint and Survivor Annuity in the amount of $2,198.38 per month." Under § 2.1.26 of the Plan, Smith and Thole are entitled to receive their respective benefits for the rest of their lives. Thus far, the plaintiffs have received all payments under the Plan to which they are entitled.

U.S. Bancorp and its subsidiaries make all Plan contributions. *See Hughes*, 525 U.S. at 439 ("The asset pool may be funded by employer or employee contributions, or a combination of both." (citing 29 U.S.C. § 1054(c))). Plan "members have a right to a certain defined level of benefits, known as 'accrued benefits.'" *Id*. at 440. "Accrued benefit" for purposes of a defined benefit plan means "the individual's accrued benefit determined under the plan . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A).

A measurement called the Funding Target Attainment Percentage (FTAP) determines whether a plan is on track to meet its benefit obligations to participants. The FTAP is used to determine whether the plan sponsor must make a contribution to the Plan in a particular year. *See* 29 U.S.C. § 1083(a), (d). A plan's assets are less than its liabilities if its FTAP is under 100 percent; if this occurs, then the plan

-5-

sponsor must make a contribution. By contrast, if the FTAP is over 100 percent—i.e., the plan's assets are greater than the liabilities—the plan sponsor is not required to make a contribution. *See* 26 U.S.C. § 430(c).

Under the Plan (like all defined benefit plans), "the employer typically bears the entire investment risk and—short of the consequences of plan termination—must cover any underfunding as the result of a shortfall that may occur from the plan's investments." *Hughes*, 525 U.S. at 439. But "if the defined benefit plan is overfunded, the employer may reduce or suspend his contributions." *Id*. at 440. The defined benefit plan's structure "reflects the risk borne by the employer." *Id*. "Given the employer's obligation to make up any shortfall, no plan member has a claim to any particular asset that composes a part of the plan's general pool." *Id*.

In summary, "[i]n a defined benefit plan, if plan assets are depleted but the remaining pool of assets is more than adequate to pay all accrued or accumulated benefits, then any loss is to plan surplus." *Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002). "Plan beneficiaries have no claim or entitlement to its surplus. If the Plan is overfunded, [the employer] may reduce or suspend its contributions." *Id*. Conversely, "[i]f the Plan's surplus disappears, it is [the employer]'s obligation to make up any underfunding with additional contributions. If the Plan terminates with a surplus, the surplus may be distributed to [the employer]." *Id*. "[T]he reality is that a relatively modest loss to Plan surplus is a loss only to . . . the Plan's sponsor." *Id*.

-6-

## B. *Complaint*

In 2014, the plaintiffs filed the consolidated amended complaint[7] setting forth a putative class action against the defendants, challenging their management of the Plan from September 30, 2007, to December 31, 2010. According to the plaintiffs, the defendants violated ERISA Sections 404, 405, and 406, 29 U.S.C. §§ 1104–06.

The plaintiffs alleged that by 2007, FAF had invested the entire Plan portfolio in equities—direct stock holdings or through mutual funds that FAF managed ("Equities Strategy"). According to the plaintiffs, well-accepted principles of diversification provide that a retirement portfolio should be invested in multiple asset classes rather than in a single class. They alleged that diversification among the asset classes reduces the risk of large losses and uncertainty because different asset classes historically do not move up or down at the same time. The plaintiffs maintained that because the Plan was significantly overfunded by 2007, it did not need to pursue such a high-risk/high-reward investment strategy to meet its pension obligations. The plaintiffs alleged that the defendants stood to benefit from the Equities Strategy; specifically, they claimed that U.S. Bancorp and its Board members benefitted from the Equities Strategy because it allowed U.S. Bancorp to increase its operating income and avoid minimum employer contributions to the Plan. And they alleged that the Equities Strategy benefitted the individual defendants holding stock options, which were exercised and sold at a higher price because U.S. Bancorp's reported income (and resulting stock price) was increased by the excess pension income.

Because the defendants put all the Plan's assets in a single higher-risk asset class, the plaintiffs alleged, in 2008, the Plan suffered a loss of $1.1 billion. They alleged that the Plan lost significantly more money in 2008 than it would have if the defendants had properly diversified it. The $1.1 billion loss reduced the funding

---

[7]The plaintiffs filed their original complaint in 2013.

status of the Plan—it went from being significantly overfunded in 2007 to being 84 percent underfunded in 2008.

The plaintiffs claimed that the defendants failed to monitor the investment of Plan assets and terminate the Equities Strategy. This failure, according to the plaintiffs, (1) violated the defendants' fiduciary duty of prudence under ERISA because it exposed the Plan to unnecessary risk; (2) violated their fiduciary duty to diversify plan assets under ERISA because investing an entire retirement portfolio in a single asset class is non-diversified on its face; and (3) violated their fiduciary duty of loyalty under ERISA because the Equities Strategy benefitted the defendants to the detriment of the Plan and its participants.

The plaintiffs also alleged several violations of ERISA based on the purported conflicts of interest associated with the Plan's assets being heavily invested in U.S. Bancorp's own mutual funds ("FAF Funds"). By 2007, FAF had invested over 40 percent of the Plan's assets in the FAF Funds despite their costing more than similar alternative funds. By investing the Plan's assets in U.S. Bancorp's own propriety mutual funds, the plaintiffs alleged, FAF and U.S. Bancorp received management fees from the Plan, increased the total assets under management to $1.25 billion, and were able to attract more investors. The plaintiffs claim that, as a result, the Plan paid too much in management fees for the FAF Funds.

Allegedly, these ERISA violations caused significant losses to the Plan's assets in 2008 and resulted in the Plan's underfunded status in 2008 through the commencement of this suit in 2013. The plaintiffs sought to recover Plan losses, disgorgement of profits, injunctive relief, and other remedial relief pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA Section 409, 29 U.S.C. § 1109. They also sought equitable relief pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3).

-8-

C. *Dismissal Orders*

The defendants moved to dismiss the complaint on various grounds, including that the plaintiffs lacked Article III standing, that their ERISA claims were time-barred, and that their pleading failed to state a claim on which relief could be granted. On November 21, 2014, the district court denied the motion to dismiss in part and granted it in part.[8] First, the district court determined that the plaintiffs had statutory and Article III standing to pursue all their claims. *Adedipe v. U.S. Bank, Nat'l Ass'n (Adedipe I)*, 62 F. Supp. 3d 879, 887–96 (D. Minn. 2014). In determining that the plaintiffs had Article III standing, the district court noted that the plaintiffs did "not allege that their benefit levels have actually decreased as a result of the Defendants' alleged misconduct," *id*. at 891; therefore, they had "no 'claim to any particular asset that composes a part of the [P]lan's general asset pool,'" *id*. at 890 (quoting *Hughes*, 525 U.S. at 440). But the plaintiffs did allege that the defendants' conduct caused the Plan to become underfunded in 2008, and the Plan remained in that status through the lawsuit's commencement. *Id*. at 891.

Based on the Plan's underfunded status, the plaintiffs alleged that they were "injured by the increased risk of default that arose when the Plan's liabilities exceeded its assets as a result of the significant losses caused by the Defendants' ERISA violations." *Id*. at 894. The court agreed. It found relevant "ERISA's minimum funding standards." *Id*. Measured by these standards, the court stated, "the Plan lacked a surplus large enough to absorb the losses at issue." *Id*. at 895. "In other words, Plaintiffs' injury in fact was that Defendants' actions caused an 'alleged increased risk of default' and 'the concomitant increase in the risk that the participants will not receive the level of benefits they have been promised due to the

---

[8]The district court granted summary judgment to the defendants on the plaintiffs' securities-lending claims and dismissed the claim that investing in FAF funds violated the Plan document. The plaintiffs do not challenge these rulings on appeal.

Plan being inadequately funded at termination.'" *Adedipe v. U.S. Bank, Nat'l Ass'n (Adedipe II)*, No. CV 13-2687 (JNE/JJK), 2015 WL 11217175, at *3 (D. Minn. Dec. 29, 2015) (quoting *Adedipe I*, 62 F. Supp. 3d at 891). The court also determined that the plaintiffs adequately alleged that the defendants' ERISA violations caused the increased risk of default and that the relief that the plaintiffs sought ("the restoration to the Plan of the assets that were allegedly lost as a result of the Defendants' misconduct") would "remedy the underfunding that is at the root of their injury." *Id*. (quoting *Adedipe I*, 62 F. Supp. 3d at 896).

After concluding that the plaintiffs had standing, the court dismissed the Equities Strategy claims on statute-of-limitations grounds, concluding that because the Plan had become invested entirely in equities securities more than six years before the commencement of the suit, the claims were time-barred under 29 U.S.C. § 1113(1)(A). *Adedipe I*, 62 F. Supp. 3d at 898–99. The court further determined that the complaint did not plausibly allege a "significant" change in circumstances that would "trigger an obligation for fiduciaries to investigate whether altering an investment strategy previously decided upon would [be] in the best interests of the plan." *Id*. at 899. Finally, the court denied the defendants' motion to dismiss the plaintiffs' FAF Funds claims based on the alleged conflicts of interest and prohibited transactions. *Id*. at 900–02.

Thereafter, the defendants moved to dismiss the action for lack of standing, renewing an argument raised in the previous motion to dismiss. *Adedipe II*, 2015 WL 11217175, at *1. The defendants based their motion "on the factual development that the Plan is now overfunded." *Id*. at *3. The district court concluded that standing was the wrong doctrine to apply given the procedural posture of the case; instead, the applicable doctrine was mootness. *Id*. The court identified the plaintiffs' injury in fact as "the increased risk of Plan default, or, put another way, the increased risk that Plan beneficiaries will not receive the level of benefits they have been promised." *Id*. at *4.

-10-

The court concluded that because the Plan is now overfunded, the plaintiffs no longer have a concrete interest in the monetary and equitable relief sought to remedy that alleged injury. *Id*. at *5. The court dismissed the entire case as moot.

Shortly thereafter, the plaintiffs moved for attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g)(1). The plaintiffs argued that the defendants' voluntary contribution of millions of dollars to the Plan after the commencement of the lawsuit constituted some success on the merits because the contribution was motivated by the litigation. The defendants responded "that in 2014 they again made excess contributions in order to reduce the Plan's insurance premiums." *Adedipe v. U.S. Bank, Nat'l Ass'n (Adedipe III)*, No. CV 13-2687 (JNE/JJK), 2016 WL 7131574, at *3 (D. Minn. Mar. 18, 2016). The district court denied the plaintiffs' motion, finding "no evidence that Defendants' 2014 contribution is an 'outcome' of the litigation, as opposed to an independent decision that nonetheless affected the viability of Plaintiffs' case." *Id*. at *4.

## II. *Discussion*

On appeal, the plaintiffs argue that the district court erred by (1) dismissing the case as moot based on the Plan's overfunded status; (2) dismissing the Equities Strategy claim on statute-of-limitations and pleading grounds; and (3) denying their motion for attorneys' fees and costs.

### A. *Dismissal of ERISA Claims Based on Plan's Overfunded Status*

The plaintiffs argue that the district court erroneously conflated the doctrine of mootness with the doctrine of standing in holding that the Plan's overfunded status mooted their case. The plaintiffs contend that *Harley* and its progeny provide that whether a Plan is underfunded is a factual issue relevant only to the injury-in-fact element of Article III standing. This issue, the plaintiffs contend, is determined at the commencement of the lawsuit. Because the plaintiffs showed that the Plan was

-11-

underfunded at the commencement of the suit, they maintain, they have satisfied the Article III standing requirement and are not required to establish that standing again. And, according to the plaintiffs, their case is not moot because they are capable of receiving the various forms of relief sought in the complaint and authorized by ERISA; that is, their lawsuit can remedy the Plan's and their own injuries.

"We review de novo a district court's grant of a motion to dismiss for lack of jurisdiction." *Doe v. Nixon*, 716 F.3d 1041, 1051 (8th Cir. 2013). "We may affirm 'for any reason supported by the record, even if different from the reasons given by the district court.'" *Robbins v. Becker*, 794 F.3d 988, 992 (8th Cir. 2015) (quoting *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013)).

This case involves ERISA's civil enforcement provision. We first address 29 U.S.C. § 1132(a)(2). Section 1132(a)(2) provides that a plan participant or beneficiary may bring a civil action "for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 1109, in turn, provides:

> (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

> (b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

29 U.S.C. § 1109.

-12-

"In *Harley*, this court concluded that § 1132(a)(2) does not permit a participant in a defined-benefit plan to bring suit claiming liability under § 1109 for alleged breaches of fiduciary duties when the plan is overfunded." *McCullough v. AEGON USA Inc.*, 585 F.3d 1082, 1084 (8th Cir. 2009) (citing *Harley*, 284 F.3d at 905–07). The *Harley* plaintiffs alleged that the plan fiduciaries of the defined benefit plan in which they participated breached their fiduciary duties by (1) inadequately investigating and monitoring a $20 million investment in a hedge fund that resulted in a total loss of the investment, and (2) permitting the plan to enter into a prohibited transaction under 29 U.S.C. § 1106(b)(1) by paying a $1.17 million fee to the hedge fund's investment advisor. *Harley*, 284 F.3d at 903–04, 908.

On appeal, we affirmed the district court's grant of summary judgment dismissing the plaintiffs' failure-to-investigate and monitor claims. *Id*. at 907. Our "focus [was] on whether plaintiffs ha[d] standing to bring an action under § 1132(a)(2) to seek relief under § 1109 for this particular breach of duty, given the unique features of a defined benefit plan." *Id*. at 905–06. We held that § 1132(a)(2) did not authorize the plaintiffs to bring suit because "the Plan's surplus was sufficiently large that the . . . investment loss did not cause actual injury to plaintiffs' interests in the Plan." *Id*. at 907. We explained that "a *contrary construction* [of § 1132(a)(2)] *would raise* serious Article III case or controversy concerns" given that "the limits on judicial power imposed by Article III counsel against permitting participants or beneficiaries who have suffered *no* injury in fact from suing to enforce ERISA fiduciary duties on behalf of the Plan." *Id*. at 906 (first and second emphases added).

But "[t]he statutory holding of *Harley* did not rest solely on constitutional avoidance." *McCullough*, 585 F.3d at 1087. Another critical consideration for the court was ERISA's primary purpose—"the protection of individual pension rights."

-13-

*Harley*, 284 F.3d at 907 (quoting H.R. Rep. No. 93-533, at 1 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4639). We reasoned that the plan participants' and beneficiaries' individual pension rights were fully protected; in fact, their "rights would if anything be adversely affected by subjecting the Plan and its fiduciaries to costly litigation brought by parties who have suffered no injury from a relatively modest but allegedly imprudent investment." *Id*.[9] "[T]he purposes underlying ERISA's imposition of strict fiduciary duties," we reasoned, "are not furthered by granting plaintiffs standing to pursue these claims." *Id*. "In addition to the Article III constitutional limitations," we also noted that "prudential principles bear on the question of standing. One of those principles is to require that 'plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute . . . in question.'" *Id*. (ellipsis in original) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982)).

In *Harley*, we determined "that a breach of a fiduciary duty causes no harm to a participant when the plan is overfunded, and that allowing costly litigation would run counter to ERISA's purpose of protecting individual pension rights. That logic applies whether an action alleges a single breach or a series of breaches." *McCullough*, 585 F.3d at 1087. Additionally, even though *Harley* "addressed only claims for monetary relief," "[g]iven *Harley*'s holding that a participant suffers no injury as long as the plan is substantially overfunded . . . we [have found] no basis to construe § 1132(a)(2) to authorize an action against fiduciaries of an overfunded plan for injunctive relief, but not for the monetary relief sought in *Harley*." *Id*.

---

[9] "Although the court did not identify the precise text of § 1132(a)(2) that it was construing, we presume the court determined that the suit would not be one 'for appropriate relief' under the circumstances." *McCullough*, 585 F.3d at 1084–85.

-14-

"*Harley* was decided on *statutory* grounds," not on Article III standing. *Id*. at 1085 (emphasis added). We acknowledge that some references in *Harley* to standing may have caused some confusion for both the parties and the district court. "The Supreme Court has recently commented that it has observed confusion about the concept of standing and has suggested that the use of that term in conjunction with anything other than the 'irreducible constitutional minimum of standing' provided by Article III should be disfavored." *Tovar v. Essentia Health*, 857 F.3d 771, 774 (8th Cir. 2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014)). We have acknowledged the confusion that the "the term 'statutory standing'" causes; nonetheless, "its purpose is clear: a plaintiff who seeks relief for violation of a statute must 'fall[] within the class of plaintiffs whom Congress has authorized to sue' under that statute." *Id*. (alteration in original) (quoting *Lexmark*, 134 S. Ct. at 1387). "Determining whether this requirement is satisfied is 'a straightforward question of statutory interpretation.'" *Id*. (quoting *Lexmark*, 134 S. Ct. at 1388).

In summary, a careful reading of *Harley* shows that the issue it addressed was whether the plaintiffs in that case fell within the class of plaintiffs whom Congress has authorized under § 1132(a)(2) to bring suit claiming liability under § 1109 for alleged breaches of fiduciary duties given that the plan was overfunded. *McCullough*, 585 F.3d at 1084 (citing *Harley*, 284 F.3d at 905–07). That issue was resolved on statutory grounds, not Article III grounds, such as standing or mootness. *Harley* holds (and *McCullough* affirms) that when a plan is overfunded, a participant in a defined benefit plan no longer falls within the class of plaintiffs authorized under § 1132(a)(2) to bring suit claiming liability under § 1109 for alleged breaches of fiduciary duties. Here, the Plan is overfunded; therefore, *Harley* is applicable, and the plaintiffs no longer fall within the class of plaintiffs authorized to bring suit. Therefore, although the district court dismissed the case on mootness, the dismissal (as far as it concerns relief under § 1132(a)(2)) was nonetheless proper, as we may

-15-

affirm the dismissal for any reason supported by the record. *See Robbins*, 794 F.3d at 992.[10]

We did not address whether "a plan participant may seek injunctive relief under § 1132(a)(3)" in either *Harley* or *McCullough*. *McCullough*, 585 F.3d at 1087. "[C]ases from other circuits [have] conclud[ed] that a plan participant may seek injunctive relief under § 1132(a)(3) [against fiduciaries of an overfunded plan]." *Id.* (citing *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607–10 (6th Cir. 2007); *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 455–56 (3d Cir. 2003)).

Section 1132(a)(3) provides that a plan participant or beneficiary may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). Section "1132(a)(3) is a 'catch-all'

---

[10]The plaintiffs also argue that if we hold that *Harley* and its progeny require that the Plan be underfunded at the commencement of the lawsuit and at every moment throughout the litigation, we must reconsider *Harley* in light of the Supreme Court's recent standing decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles. Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."). As we have explained, however, "*Harley* was decided on statutory grounds," not on Article III standing. *McCullough*, 585 F.3d at 1085. Furthermore, "[t]he statutory holding of *Harley* did not rest solely on constitutional avoidance" but also on "advanc[ing] ERISA's primary purpose of protecting individual pension rights." *Id.* at 1087.

-16-

provision that 'act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy.'" *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 583 (6th Cir. 2016) (alterations in original) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996)). Here, in addition to relief under § 1132(a)(2), the plaintiffs sought "any injunctive relief that the Court deems appropriate" pursuant to § 1132(a)(3). The Sixth Circuit recently rejected plan participants' argument that "they need not show individual injury to obtain injunctive relief for a breach of fiduciary duty" pursuant to § 1132(a)(3). *Soehnlen*, 844 F.3d at 584. In doing so, the Sixth Circuit examined its prior opinion in *Loren* and then observed:

> We recognize that misconduct by the administrators of a benefit plan can create an injury if "it creates or enhances a risk of default by the entire plan." *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 255, 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008). But *Plaintiffs make no showing of actual or imminent injury to the Plan itself*. Plaintiffs concede this point by pleading that the actions of the fiduciaries expose the Plan to *prospective* liability in the amount of $15,000,000. To the extent that Plaintiffs argue that the risk of an enforcement action is itself sufficient to constitute an injury, we find in the absence of any evidence that penalties have been levied, paid, or even contemplated that "these risk-based theories of standing [are] unpersuasive, not least because they rest on a highly speculative foundation lacking any discernible limiting principle." *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013). We therefore affirm the district court's finding that Plaintiffs[] lack standing to bring this claim.

*Id*. at 585 (first emphasis added) (first alteration in original).

While *Soehnlen* is phrased in terms of Article III standing, the Sixth Circuit's recognition that the plaintiffs must "make [a] showing of *actual or imminent injury to the Plan itself*," *id*. (emphasis added), under § 1132(a)(3) is similar to our holding

-17-

in *Harley* that § 1132(a)(2) does not authorize plaintiffs to bring suit when "the Plan's surplus [is] sufficiently large that the . . . investment loss did not cause *actual injury* to plaintiffs' interests in the Plan," *Harley*, 284 F.3d at 907 (emphasis added).

Under both § 1132(a)(2) and (a)(3), the plaintiffs must show actual injury—to the plaintiffs' interest in the Plan under (a)(2) and to the Plan itself under (a)(3)—to fall within the class of plaintiffs whom Congress has authorized to sue under the statute. Given that the Plan is overfunded, there is no "actual or imminent injury to the Plan itself" that caused injury to the plaintiffs' interests in the Plan. *Soehnlen*, 844 F.3d at 585. For that reason, as in *Harley* and *McCullough*, the plaintiffs' suit is not one for appropriate relief, and we hold that dismissal of the plaintiffs' claims for relief under § 1132(a)(3) was also proper.[11]

## B. *Attorneys' Fees and Costs*

The plaintiffs next argue that if we affirm the district court's dismissal of their claims based on the Plan's overfunded status, then they are entitled to fees pursuant to ERISA Section 502(g)(1), which permits "the court in its discretion [to] allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). We review for an abuse of discretion a district court's denial of an award for attorneys' fees and costs. *McDowell v. Price*, 731 F.3d 775, 783–84 (8th Cir. 2013). But, as a threshold matter, "a fees claimant must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1)." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)). This standard is not satisfied "by achieving 'trivial success on the merits' or a 'purely procedural victor[y].'" *Id*. (alteration in

---

[11]Because we conclude that all of the plaintiffs' claims were properly dismissed based on the Plan's overfunded status, we need not address whether the district court erred in dismissing the Equities Strategy claim on statute-of-limitations and pleading grounds.

original) (quoting *Ruckelshaus*, 463 U.S. at 688 n.9). But the standard is satisfied "if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Id*. (alteration in original) (quoting *Ruckelshaus*, 463 U.S. at 688 n.9).

Before the district court, the plaintiffs argued that they had achieved some success on the merits because after they filed suit, the defendants, in 2014, made $311 million in voluntary excess contributions to the Plan. *Adedipe III*, 2016 WL 7131574, at *4. According to the plaintiffs, "their litigation served as a catalyst for Defendants' $311 million contribution." *Id*. The district court found this a flawed argument because no evidence existed that the defendants' 2014 contribution was "an 'outcome' of the litigation, as opposed to an independent decision that nonetheless affected the viability of Plaintiffs' case." *Id*. According to the defendants, they made the 2014 contribution "to reduce the Plan's insurance premiums." *Id*. at *3. The district court found the defendants' explanation for this excess contribution "to be supported by the record" and recounted the record evidence as follows:

> In 2012, Defendants voluntarily made a $35 million contribution. Hansen Decl. ¶ 6, Dkt. No. 264; *see also* Dkt. No. 108–1, Ex. E at 2–1 (showing September 11, 2012 contribution of $35 million). As explained in a sworn declaration by U.S. Bancorp's Senior Vice President of Benefits Design, David Hansen, the contribution was made in order to reduce the expensive variable insurance premiums the Plan would otherwise have been required to pay for Plan Year 2011. Hansen Decl. ¶ 6. In 2013, before Plaintiffs filed suit, Defendants made $163 million of the total of $290 million in voluntary excess contributions that year, again to reduce premiums, as well as for other reasons unrelated to the litigation. *Id*. ¶¶ 7–8. Defendants explain that in 2014 they again made excess contributions in order to reduce the Plan's insurance premiums. *Id*. ¶ 9. They note that the excess contributions in 2013 and 2014 brought the Plan's "PBGC ratio," which is used to

-19-

> calculate the required insurance premiums, almost exactly to the ratio
> that would minimize premium costs, thus corroborating this explanation
> for Defendants' decisions to make the contributions. *Id*. ¶¶ 8–9.

*Id*. (footnote omitted). According to the court, the plaintiffs offered no evidence beyond mere speculation that the "litigation caused the contributions to the Plan." *Id*.

Additionally, the district court noted that "no court order spurred Defendants' actions, nor did [the district] [c]ourt ever state that it was likely to grant summary judgment to Plaintiffs." *Id*. at *4; *cf. Hardt*, 560 U.S. at 256 (holding that plaintiff, whose claim for benefits was denied by insurer, achieved some success on the merits of her ERISA claim when, although the plaintiff "failed to win summary judgment on her benefits claim, the [d]istrict [c]ourt nevertheless found 'compelling evidence'" that supported her case and stated that it was inclined to grant her summary judgment but first ordered the insurer to reconsider her claim and the insurer, during its "court-ordered review," awarded the plaintiff the claimed benefits). In fact, the "case was still in the pleadings stage when the [c]ourt dismissed it." *Adedipe III*, 2016 WL 7131574, at *4.

"Courts within the Eighth Circuit and elsewhere have found that an award of attorney's fees in an ERISA case may be proper when a plaintiff's suit operated as a catalyst to bring about a voluntary change in the defendant's conduct." *Greater St. Louis Constr. Laborers Welfare Fund v. X–L Contracting, Inc*., No. 4:14-CV-946-SPM, 2016 WL 6432768, at *11 (E.D. Mo. Oct. 31, 2016) (citing *Boyle v. Int'l Bhd. of Teamsters Local 863 Welfare Fund*, 579 F. App'x 72, 77–78 (3d Cir. 2014) (determining that the plaintiffs had achieved some success on the merits and could receive an award of attorneys' fees under the catalyst theory where the defendants voluntarily reinstated the plaintiffs' benefits but did so only after the plaintiffs filed suit); *Broadbent v. Citigroup Long Term Disability Plan*, No. CIV 13–4081–LLP, 2015 WL 1189565, at *4–5 (D.S.D. Mar. 16, 2015) (determining that

-20-

the plaintiff had achieved some degree of success on the merits where the lawsuit "served as a catalyst to cause [the defendant] to provide her with substantially all of the relief she sought in her complaint"); *Greenwald v. Liberty Life Assurance Co.*, No. 4:12–CV–3034, 2013 WL 3716416, at *3 (D. Neb. July 12, 2013) (determining that a plaintiff can obtain fees under ERISA pursuant to the catalyst theory even though the litigation did not result in a favorable judgment, if "the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief," and explaining that "an award of attorney fees under § 1132(g) does not require the fee claimant to achieve prevailing party status" and that "ERISA is remedial legislation, and should be interpreted to advance Congress' goals of protecting employee rights and securing effective access to federal courts" (internal quotation marks omitted)).

Here, the record supports the district court's conclusion that the plaintiffs failed to produce evidence that their lawsuit was a material contributing factor in the defendants' making the 2014 contribution resulting in the Plan's overfunded status and any relief that the plaintiffs sought in their complaint. Accordingly, we hold that the district court did not abuse its discretion in denying the plaintiffs' motion for attorneys' fees and costs.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I agree with the court's conclusion that—under <u>Harley</u> and <u>McCullough</u>—the plaintiffs lack authorization to sue under 29 U.S.C. § 1132(a)(2). However, I respectfully dissent from the court's holding that the plaintiffs lack authority to bring their claims for injunctive relief under 29 U.S.C. § 1132(a)(3). As relevant, § 1132(a)(3) authorizes civil actions "by a participant, beneficiary, or fiduciary (A)

-21-

to enjoin any act or practice which violates any provision of [29 U.S.C. §§ 1104–1106], or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce [§§ 1104–1106]." In light of this unambiguous statutory text and in the absence of any dispute that the plaintiffs are participants in and beneficiaries of the Plan, I believe that the plaintiffs' complaint—which seeks to enjoin the defendants from breaching their fiduciary duties under §§ 1104–1106 in relation to their management of the Plan—falls within "the zone of interests to be protected or regulated" by ERISA. See Harley, 284 F.3d at 907 (quoting Valley Forge, 454 U.S. at 475).

I also believe that—accepting as true all factual allegations in the plaintiffs' complaint and drawing all reasonable inferences in their favor, as we must—the plaintiffs have shown an actual or imminent injury. Cf. Soehnlen, 844 F.3d at 585 (concluding plaintiffs who made "no showing of actual or imminent injury to the Plan itself" lacked standing). More specifically, the plaintiffs allege that the defendants invested the entirety of the Plan's assets in high-risk/high-reward equities, in violation of their fiduciary duties under §§ 1104–1106, and that as a result, the Plan suffered a loss of $1.1 billion, causing the Plan to fall from being significantly overfunded in 2007 to being 84 percent underfunded in 2008. See Harley, 284 F.3d at 905 (recognizing that investment losses were cognizable losses to the ERISA plan because they reduced the pool of plan assets). The relief sought is not monetary, but injunctive, and the injury alleged is not speculative. Moreover, the complaint alleges that at least some of the defendants continue to serve as Plan fiduciaries and remain positioned to resume their alleged ERISA violations. Cf. Soehnlen, 844 F.3d at 585 (finding risk of a potential enforcement action too speculative to satisfy requirement of actual or imminent injury "in the absence of any evidence that penalties had been levied, paid, or even contemplated"). Finally, I do not believe that Harley or McCullough controls our decision in this case as to whether plaintiffs have authority under § 1132(a)(3) to sue for injunctive relief. See McCullough, 585 F.3d at 1087

-22-

(applying <u>Harley</u> as controlling circuit precedent on the plaintiff's claim for injunctive relief under § 1132(a)(2), and specifically noting that the plaintiff had not relied on § 1132(a)(3)).

For these reasons, I believe that the plaintiffs are authorized to sue for injunctive relief under § 1132(a)(3).  I would therefore affirm the district court's dismissal of the plaintiffs' claims under § 1132(a)(2), reverse the dismissal of their claims for injunctive relief under § 1132(a)(3), and remand this matter to the district court for further proceedings, including reconsideration of the issue of attorney's fees and costs upon final resolution of the case.

_____